1

Mr. Piero A Bugoni Pro - Se
c/o American Justice Corporation
1875 I St. NW 5th Floor
Washington DC 20006

# IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE MIDDLE DISTRICT OF FLORIDA

Piero A. Bugoni
   PLAINTIFF

vs

TPD Former Chief jane castor et ux,
TPD Chief eric ward et ux,
TPD carithers et ux or vir,
TPD gudes et ux or vir,
TPD norris et ux or vir,
TPD danny rhodes et ux or vir,
TPD dusty rhodes et ux or vir,
TPD gary filippone et ux or vir,
TPD neal et ux or vir,
Florida ASA Karina Rios
  Officially and Individually,
    Defendants

Tampa Mayor Bob Buckhorn,
Board Of Trustees Of City Pension Fund
For Firefighters and Police Officers In
City Of Tampa
  Officially, Defendants

Municipal Corporation of Tampa,
Google Incorporated,
Amazon.com Incorporated,
Cloudflare Incorporated,
Yahoo! Incorporated,
Microsoft Corporation,
Hurricane Electric Incorporated,
APH Incorporated, d.b.a "Codero"
  As Corporations, Defendants

Srikanth Rao
  Individually, Defendant

Case No.:
  **8:15-CV-01716-VMC-TGW**

**FIRST AMENDED COMPLAINT AND
STATEMENT OF CLAIM FOR RELIEF**

**JURY DEMANDED**

GoDaddy.com LLC,
Key-Systems GmbH,
Fabulous.com PTY Ltd.,
Network Solutions LLC,

Domains By Proxy LLC,
WhoisProxy.com Ltd,
International Whois Privacy Services Limited,
Soylent Communications,

ICANN,
Verisign Incorporated,
Public Interest Registry,

"TampaBayProfiles.com",
"Hidden-Past.com",
"Mugshots.org",
"Arrests.org",
"Openpasts.com",
"Mugshotsearch.org",
"Mugshots.com" a.k.a Julkisuudessa LLC
  In Their Corporate
  Or Individual Capacity, Defendants

A. Lee Bentley III,
Pam Bondi
  In Their Official Capacity
  Respondents

28

Table Of Contents:

I. Jurisdiction And Venue — ¶¶ 1-7, pp. 3 - 4

II. Entitlement To Relief — ¶ 8, p. 4

III. Parties — ¶¶ 9-18, pp. 5 – 11

IV. Synopsis — ¶ 19, p. 11

V. Factual Allegations — ¶¶ 20 - 179, pp. 12 - 70

   A) 106 West Osborne, 24 April 2014: — ¶¶ 20 - 111, pp. 12 - 41

   B) Unconstitutionality of Tampa Fire and police Pension Statutes: — ¶¶ 112 - 120, pp. 42 - 45

   C) KopCam: — ¶¶ 121 - 134, pp. 46 - 51

   D) Unconstitutionality of Florida Law 2015-41 (Amendments To FRS § 119.071): — ¶¶ 135 - 141, pp. 52 - 54

   E) Unconstitutionality of FRS § 322.34 (DWLS): — ¶¶ 142 - 171, pp. 54 - 64

   F) Unconstitutionality of FRS §§ 893.02(3), 893.03(1), 893.13 (Possession of Cannabis): — ¶¶ 172 - 179, pp. 65 - 70

VI. Claims Of Liability — ¶¶ 180 - 234, pp. 70 - 99

   A) Tampa police Defendants, Municipal Corporation of Tampa, Bob Buckhorn: — ¶¶ 180 - 217, pp. 70 - 89

   B) Google, Yahoo!, Microsoft, "mugshot websites": — ¶¶ 218 - 223, pp. 89 - 91

   C) Fire and police Pension Trustees: — ¶ 224, p. 95

   D) ICANN, Verisign, Public Interest Registry,"Domain Name" Registrars: — ¶¶ 225 - 228, pp. 96 - 97

   E) "Domain Name" Registrants: — ¶ 229, p. 97

   F) Amazon.com, Cloudflare Inc. Hurricane Electric Inc., APH Inc. d.b.a. Codero, Srikanth Rao: — ¶ 230 - 234, pp. 98 - 99

VII. Claims Of Malice — ¶¶ 235 - 247, pp. 100 - 111

VIII. Claims Of Retaliation — ¶¶ 248 - 250, pp. 112 - 114

IX. Damages Suffered — ¶¶ 251, p. 114

X. Cause Of Action — ¶¶ 252 - 410, pp. 121 - 167

XI. Relief Requested — ¶¶ 411 - 418, pp. 167 - 179

1

## I. Jurisdiction And Venue:

1)    Per FRCP Rule 8 (a) (1), Plaintiff claims jurisdiction herein because 42 USC Chapter 21, and 18 USC Chapter 13, statutorily protect explicit civil and criminal actions against public officers of trust, or for profit, acting under color of law or official right, or under bogus authority, in excess of or without jurisdiction, acting ultra-vires, or acting by policy, custom, or usage, for violating the Civil Rights of any Person, and because 28 USC 1343 statutorily authorizes this Court to try and grant relief for Civil Rights Violations.

2)    This Court has Jurisdiction per 28 USC 1331 because claims charged herein arise under and are brought pursuant to the Laws and The Constitution of The United States.

3)    This Court has Jurisdiction per 28 USC 1361 to compel Respondent Bentley to prosecute Tampa police defendants pursuant to 18 USC Chapter 13.

4)    Plaintiff seeks supplemental Jurisdiction herein over claims brought pursuant to Florida State Law, pursuant to 28 USC 1367, and because the Uniform Declaratory Judgments Act, Codified in Florida under FRS Chapter 86, grants authority to Florida State Courts to declare Judgments on Questions of Constitutional and Statutory Law, and because the violations charged against defendants are additionally violations of the Florida State Constitution, and Laws of the State of Florida, as claimed herein, and those violations of State Law are in inseparable nexus with the violations of Federal Law charged in this Complaint.

5)    This Court has Jurisdiction over private parties Google Incorporated, Yahoo! Incorporated, Amazon.com Incorporated, Cloudflare Incorporated, Microsoft Corporation, Hurricane Electric Incorporated, APH Incorporated d.b.a. Codero, GoDaddy.com LLC, Network Solutions Incorporated, Domains By Proxy LLC, Soylent Communications, ICANN, Verisign Incorporated, Public Interest Registry, "TampaBayProfiles.com",

28

1

"Hidden-Past.com", "Mugshots.org", "Arrests.org", "Openpasts.com",
"Mugshotsearch.org", "Mugshots.com" a.k.a Julkisuudessa LLC, Key-Systems GmBH,
Fabulous.com PTY Ltd., WhoisProxy.com Ltd., International Whois Privacy Services
Limited, and Srikanth Rao, per 28 USC 1332, because they are individuals or corporations
residing in or incorporated in several of the United States, or are Citizens, or Subjects of, or
Corporations Incorporated in Foreign States, and because Plaintiff seeks more than $75,000
in damages.

6)     All statutory claims of Jurisdiction supra are pursuant to The Constitution of The
United States of America, and per Article III thereof.

7)     28 USC 1391 grants Venue herein because the acts of defendants that are charged by
claim herein were committed, or the damages caused by that conduct, were incurred by
Plaintiff in the State of Florida, in Hillsborough County.

## II. Entitlement To Relief:

8)     Per FRCP Rule 8 (a) (2), and 28 USC 2201 and 2202, Plaintiff is entitled to relief
because the United States Constitution, and all statutes made in pursuance thereof guarantee
such relief as requested infra, and because at all times defendants' conduct charged is and
was in violation of the Laws and Constitutions of The State of Florida and The United States
of America, and because defendants carithers, gudes, neal, norris, castor, filippone, dusty
rhodes, danny rhodes, and Karina Rios are sworn law enforcement officers of The State of
Florida, and did swear oaths to uphold the Constitution and Laws of The State of Florida,
and The United States, and did act under color of official right, and because all defendants
acting individually and in conspiracy did act in violation of all Standards of Care, and did
cause Plaintiff to suffer physical injury, loss of Business and Income, unlawful
imprisonment, loss of Life, Liberty, Property, and Privacy; and to be subject to Community

28     Suspicion, and loss of Standing In The Community, as claimed infra.

1

### III. <u>Parties</u>:

9)   Plaintiff:

Piero Bugoni in his Personal and Individual Capacity.


10)   Tampa Municipal, and police officer defendants:

TPD roni sharmara carithers in her personal and official capacity,

TPD orlando lamar gudes in his personal and official capacity,

TPD norris in his personal and official capacity,

TPD neal in her personal and official capacity,

TPD danny rhodes (brother of dusty) in his personal capacity, and official capacity, as lead detective in the criminal case charged by defendant carithers,

TPD dusty rhodes (brother of danny) in his personal and official capacity,

TPD filippone in his personal and official capacity,

TPD former Chief jane castor in her individual and former official capacity,

TPD Chief eric ward in his individual and official capacity,

Vir or Ux Carithers (if extant) in his or her community property capacity to roni carithers, as common law spouse or lesbian or other domestic partner thereof,

Vir or Ux rhodes (if extant) in his or her community property capacity to danny rhodes, as common law spouse, or homosexual domestic partner thereof,

Vir or Ux rhodes (if extant) in his or her community property capacity to dusty rhodes as common law spouse or homosexual domestic partner thereof,

Vir or Ux filippone (if extant) in his or her community property capacity to filippone as common law spouse or homosexual domestic partner thereof,

Vir or Ux gudes (if extant) in his or her community property capacity to gudes as common law spouse or homosexual domestic partner thereof,

Vir or Ux neal (if extant) in his or her community property capacity to neal as common law spouse or lesbian domestic partner thereof,

28   Vir or Ux norris (if extant) in his or her community property capacity to norris as

common law spouse or homosexual domestic partner thereof,

Ux castor in her capacity as lesbian domestic partner, spouse or otherwise to former Tampa police chief jane castor,

Ux ward in her community property capacity as spouse to eric ward.

Board of Trustees of City Pension Fund For Firefighters and Police Officers In City of Tampa as the respondeat party responsible for administering that fund pursuant to FRS §§ 185.01, 185.03, 185.05, and 185.25, and liable to show cause as to both the compelling objective for, and lack of less restrictive alternatives to, or otherwise defend the constitutionality of those statutes.

Bob Buckhorn in his official capacity as the respondeat party liable to be enjoined for the policies and customs of the police department of the City of Tampa.

Municipal Corporation of Tampa as the corporate party liable to pay damages for the tortious conduct of its officers charged herein.

11)    Karina Rios, in her individual and official capacity, liable for maliciously prosecuting Plaintiff in Case Number 2014-CF-005912, 13th Judicial Circuit, State of Florida.

12)    Mugshot Website Defendants:

"TampaBayProfiles.com", "arrests.org", "mugshots.com", "mugshots.org" "openpasts.com", "mugshotsearch.org", "hidden-past.com", are internet "domain names" that are used to publish information about Plaintiff that may be outright libelous, but that that in all cases is misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing to Plaintiff, that is the subject of his complaint against them, and these "domain names" themselves are property that can be seized, and are used as pseudonyms for the actual but unknown individual or corporate parties responsible for paying for the registry of these "domain names" with an internet name "registrar", and or who pay for whatever "servers" are used to host "websites" published under those "domain names", and who may profit in any way from the dissemination of information published

28

1   under those domain names. The actual party or parties they reflect may be one in the same who publishes under several names, on multiple "servers" or may be multiple individuals or corporations involved in the same such activity, but are hereafter collectively referred to as "mugshot websites". These parties may additionally publish the same information using other "domain names" and "servers" and other internet "registrars" than those named likewise as defendants.

13)   Internet Search Publisher Defendants:

Google Incorporated, as a Corporation, Incorporated in The State of Delaware, liable for the business practice of aggregating and republishing the misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information published by "mugshot websites".

Yahoo! Incorporated, as a Corporation, Incorporated in The State of California, liable for the business practice of aggregating and republishing the misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information published by "mugshot websites".

Microsoft Corporation, as a Corporation, Incorporated in The State of Washington, liable for the business practice of aggregating and republishing the misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information published by "mugshot websites".

14)   Internet Domain Name "Registrant" Defendants:

Domains By Proxy LLC, a "registrant", as a corporation incorporated in the State of Arizona, the party actually responsible for registering of and securing ownership to the various parties of the Internet "domains" named "TampaBayProfiles.com", "OpenPasts.com", "MugshotSearch.org", and "Hidden-Past.com" and who may be the actual publishing party, or is the party responsible for obscuring the identity of the publishing party and who acts on their behalf.

28

1

WhoisProxy.com Ltd. a "registrant", the party actually responsible for registering of and securing ownership to the internet "domain" named "Arrests.org" and who may be the actual publishing party, or a party responsible for obscuring the identity of the publishing party and who acts on their behalf.

International WHOIS Privacy Services Limited, a "registrant", the party actually responsible for registering of and securing ownership to the internet "domain" named "Mugshots.com" and who may be the actual publishing party, or is the party responsible for obscuring the identity of the publishing party and who acts on their behalf.

Soylent Communications Incorporated, a "registrant", the party actually responsible for registering of and securing ownership to the internet "domain" named "Mugshots.org" and who may be the actual publishing party, or is the party responsible for obscuring the identity of the publishing party and who acts on their behalf.

"Domains By Proxy LLC", "WhoisProxy.com Ltd.", "International WHOIS Privacy Services Limited", and "Soylent Communications Incorporated", are hereafter collectively referred to as the "registrants" of the Internet Domain Names used to publish the misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information charged by Plaintiff herein.

15)   Internet Domain Name "Registrar" Defendants:

GoDaddy.com LLC, a "registrar", as a Corporation incorporated in the State of Arizona, the party actually responsible for maintaining registry of and facilitating publishing functionality to the various parties responsible for publishing the internet domains named "TampaBayProfiles.com", "OpenPasts.com", "MugshotSearch.org", and "Hidden-Past.com".

Key-Systems GmbH a "registrar", as a corporation, i.e. "Gemeinschaft mit begrenze Handlung" "Corporation with limited Holdings", believed to be incorporated under the Laws, "Gesetze", of Germany, "auf Deutschland", responsible for securing ownership and publishing functionality to the various parties responsible for publishing the internet domain

28

1    named "Arrests.org".

Fabulous.com PTY Ltd, a "registrar" as a "Proprietary Limited Corporation", believed to be incorporated under the Laws of Australia, the party actually responsible for maintaining registry of and facilitating publishing functionality to the various parties responsible for publishing the internet domain named "Mugshots.com"

Network Solutions LLC a "registrar" the party actually responsible for maintaining registry of and facilitating publishing functionality to the various parties responsible for publishing the internet domain named "Mugshots.org"

GoDaddy.com LLC, Key-Systems GmbH, Fabulous.com PTY Ltd., and Network Solutions LLC, are hereafter collectively referred to as the "registrars" of the Internet Domain Names used to publish the misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information charged by Plaintiff herein.

16)   Domain Name Service (DNS) / Server Provider Defendants:

Amazon.com Incorporated as a corporation incorporated in the State of Delaware, as the party responsible for providing technical and practical goods and services, namely "Domain Name Service", and "Server" "hosting" for the "websites" "TampaBayProfiles.com", "Arrests.org", "Mugshots.com", necessary for them to publish their misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information.

Cloudflare Incorporated, as a corporation incorporated in the state of Delaware, as the party responsible for providing technical and practical goods and services, namely "Domain Name Service", and "Server" "hosting" for the "websites" "OpenPasts.com", and "MugshotSearch.org", necessary for them to publish their misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information.

28    Hurricane Electric Incorporated, as a corporation, believed to be incorporated in the

1

State of California, as the party responsible for providing technical and practical goods and services, namely "Domain Name Service", and "Server" "hosting" for the "website" "Mugshots.org", necessary for them to publish their misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information.

APH Incorporated, d.b.a "Codero" Incorporated in the state of Delaware as the party responsible for providing technical and practical goods and services, namely "Server" "hosting" for the "website" "hidden-past.com" necessary for them to publish their misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information.

Srikanth Rao, a natural person, who is responsible for performing the technical tasks necessary for the publishers of "openpasts.com" and "mugshotsearch.org" to publish the misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information.

17)   Internet Authority Defendants:

Verisign Incorporated as a Corporation incorporated in the State of Delaware, whose business practice is to grant, certify, and facilitate the ability and business practice of other parties to act as "Registrars" of "Domain Names" for parties seeking to register "Domain Names" using the ".com" ("Dot-Com") "Top Level Domain".

"Public Interest Registry" as a Not For Profit Corporation incorporated under the District of Columbia Non-Profit Corporation Act, whose business practice is to grant, certify, and facilitate the ability and business practice of other parties to act as "Registrars" of "Domain Names" for parties seeking to register "Domain Names" using the ".org" ("Dot-Org") "Top Level Domain".

ICANN, The "Internet Corporation for Assigned Names And Numbers", as a Non-Profit Corporation, incorporated in the State of California, responsible directly, and through its subsidiary, IANA, for all "Domain Name Service" to the entire "Internet" and by whose

28

business practice of accrediting and facilitating parties to act as Registrars and Registrants of

1

"Domain Names", and providing "Root Zone" "Domain Name Service", they facilitate publishers of misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information under "Domain Names". (See "What Does ICANN Do?" https://www.youtube.com/watch?v=lJY5xJKPhjA, and "What you need to know about IANA." https://www.youtube.com/watch?v=Lk5j25nmZKY)

18)  Respondents:

A. Lee Bentley III, in his official capacity as the United States Attorney, for the Middle District of Florida.

Pam Bondi in her official capacity as the party responsible for administering Florida Law Chapter 2015-41 (FRS § 119.071) as law, and responsible for prosecuting carithers, gudes, neal and norris for false imprisonment and for their aiding and abetting mccall and rose with their crimes against Plaintiff.

## IV. Synopsis:

19)  This is a Civil Rights Complaint Pursuant to 42 USC 1983, 1985, and 1986, 18 USC 241, and 242, The United States Constitution, and Amendments I, II, IV, V, VIII, IX, X, and XIV thereof, against Tampa police defendants for wrongfully acting under color of official right, for malicious prosecution arising therefrom, and for Common Law invasion of privacy by private parties, arising from the conduct of the state actors charged. It challenges the Constitutionality of FRS 185.01, 185.03, 185.05 and 185.25, Florida Law Chapter 2015-41. (Amendments to FRS § 119.071), FRS § 322.34, (DWLS), and FRS §§ 893.02(3), 893.03(1), and 893.13 (Possession of Cannabis). Relief is sought in Compensatory Damages, Injunction, Punitive Damages, and Declaratory Judgment, for a series of related events and harm caused by defendants.

28

1

# V. Factual Allegations:

**A) Allegations Against Tampa Police Defendants Arising From Events Occurring At 106 West Osborne, Tampa Florida, On 24 April 2014:**

20)    On 15 February 2014 Plaintiff witnessed an individual named donna mccall vacating a real property and domicile located at 106 West Osborne, in Tampa Florida.

21)    Plaintiff negotiated a purchase / usage agreement (Ex. 1) with mccall for that property, and donna mccall was paid in full to release her claim to that property on 19 February 2014. (Ex. 2.1, 2.2, 2.3).

22)    The intent of the contract between Plaintiff and mccall was:

i) mccall would contact her creditors claiming lien on the property, giving her assent to the purchase of the property by a corporation of which Plaintiff presided.

ii) That corporation would purchase the property from the lien holders by paying mccall's debt on the property to them. (A "Short-Sale").

iii) mccall was given Five Thousand Dollars, as rent paid six months in advance, pro-rata from 19 February 2014, to pay for usage of the property by Plaintiff's corporation, during the time it would take to arrange for, and make payment of the debt claimed by the lien holders.

iv) Upon failure by Plaintiff's Corporation to that contract, that all legal claim and title that mccall may have held in that property would be released by her to the lien holders. (Ex. 3).

23)    Whatever rental agreement that was arranged between Plaintiff and mccall was completed on 19 February 2014, with a granting by Quitclaim Deed (Ex. 3), of the Real Property located at 106 West Osborne to Plaintiff in exchange for the valuable consideration

28    that Plaintiff would settle mccall's remaining debt on that property with her mortgagor, and

1

that all money that Plaintiff's had payed to mccall was pursuant to that Deed. By that Deed, mccall relinquished to Plaintiff's Corporation, "all ownership and title" to the real property and domicile located at 106 West Osborne. (Ex. 3).

24)   The Quitclaim Deed that mccall executed and delivered to Plaintiff on 19 February 2014, (Ex. 3), operated as a Deed of Transfer, and as an addendum to the Sale And Purchase Contract executed by mccall, pursuant to § 18.R of that Contract. (Ex. 1).

25)   The reason for the terms of the contract between Plaintiff and mccall was as follows:

i) mccall had been a defendant in a foreclosure action in Hillsborough County since January 2013, (Case # 13-CA-000743), and when Plaintiff met her, she had not made payments to her mortgage since at least the time the action was filed, and was in the process of vacating the property, as a result of that action.

ii) Failure by mccall to agree such a terms would be indicative of fraud on her part.

iii) It was not clear at the time of contract exactly what if any legal claim or title that mccall may have actually possessed to sell the property, much less to reclaim it later, and it may be that mccall's entire contract with Plaintiff is fraudulent from the outset due to her default on her mortgage, for which she was being foreclosed upon.

26)   On 22 April 2014, mccall posted a notarized, but false, sworn notice on the door of the property claiming Plaintiff, (not the Corporation that contracted with mccall), owed her money, and demanding payment. (Ex. 4).

27)   That notice claimed that defendant owed her $1,2069.00 [sic] for the use of the premises located at "106 Osborne Ave Tpa" and her reply address was listed as "106 West Osborne Ave, Tpa FL" (Ex. 4).

28

1

28)   On 23 April 2014, Plaintiff called mccall on the telephone, and she claimed that she was doing what she was told to do by her lawyer, because Plaintiff did not make payments, pursuant to the Contract in Exhibit 1, to Greentree Financial Inc.

29)   mccall stated to Plaintiff that in accordance with her notice in Exhibit 4, she would be returning to the property on 24 April to "retrieve the keys."

30)   She was told not to return to the property, but stated "it's my house". She was told then not to return to the property without the police. She claimed the police would be with her when she arrived. They were not.

31)   When Plaintiff called mccall, on 23 April 2014, it was actually mccall's mother, sandra rose who answered at first, and claimed that mccall was not there, and stated "She's in the hospital... Didn't I tell you that yesterday?" After Plaintiff explained that he had just seen mccall recently, and that she had left a note on the door, rose said "hold on a minute... let me talk to her." A moment later the phone was passed to mccall by rose.

32)   During that call, mccall refused to provide the name of her supposed "lawyer", and refused to provide Plaintiff with the contact information of the person at Greentree Financial Inc. to whom she was supposed to give authorization for Plaintiff to negotiate, pursuant to the Contract in Exhibit 1, and its Addenda, Exhibits 2, 3. Instead, she accused Plaintiff of default for failure to "make payments", (presumably to Greentree Inc.), supposedly pursuant to the Contract in Exhibit 1, and its addenda.

33)   Nothing in that Contract constituted any specific agreement to "make payments" per mccall's claim at that time. The agreement was to settle mccall's debt with Greentree Inc. mccall agreed to contact Greentree Inc, to give her assent to that, so that Plaintiff could proceed.

28

1

34) During the interim from 19 February 2014, to 22 April 2014, Lourdes Gomez, the agent for the Title Company assisting with the purchase of the property, called mccall as many as three times, to obtain the information necessary for Plaintiff to settle mccall's debt with Greentree Inc., but each time, mccall rebuffed her and refused to provide that information.

35) A few days before mccall posted her first "Notice" on the property on 22 April 2014, she appeared there in person, purportedly to check as to the progress of the purchase arrangement. While there, she asked if Plaintiff had made payments to Greentree. When he indicated that he had not, she acted indignant and stated "Huh... Unbelievable." Ultimately she threatened Plaintiff with violence if he did not vacate the property. She stated that she had two big brothers in law who would come over and "put a boot in your ass..." It was not clear to Plaintiff that she was being disingenuous by feigning indignance, or whether at the time her threat of violence was credible. Both are clear now.

36) At all times mccall did act disingenuously in her dealings with Plaintiff. To wit:

i) She claimed in front of the Realtor witness who assisted with the preparation of the purchase contract that she had the only key to the house.

ii) She swore on a notarized document that she was transferring that key to Plaintiff.

iii) When asked in front of the Realtor witness if she was interested in a rental-only agreement, or an opportunity to reclaim the house later, she stated "I don't want the house".

iv) She feigned indignance at Plaintiff's supposed default, but all the while refused to provide the information necessary for Plaintiff to make any kind of financial arrangement with Greentree Inc., nor in the alternative to contact them and give her assent to them for Plaintiff to negotiate, and pay.

v) She falsely swore on a notarized instrument that Plaintiff owed her money in the amount of $1,2069.00 [sic].

28

vi) She falsely swore on an official document on 11 June 2014, in a subsequent

1   fraudulent state-court Landlord-Tenant action that she is indigent. (Ex. 5). She was given

Five Thousand Dollars (S5,000) by Plaintiff on 19 February 2014.

vii) She falsely claimed to own the property at 106 West Osborne. That property is

owned by its lien holder and their assigns, known or believed by Plaintiff to be Bank of New

York Mellon, and Greentree Financial Inc, and she swore a notarized release of title to that

effect.

viii) She falsely claimed that her lawyer had instructed her to cure the claimed

default in the manner she was.

ix) She refused to give Plaintiff any reasonable opportunity to cure this supposed

default, and rejected his effort to do so, instead choosing to appear on the property on 24

April 2014, and commit crimes against him.

x) She falsely claimed to the Tampa Police that she was appearing on the property as

a landlord performing an eviction. (Ex. 6, TPD GO #2014-264588, pp. 8, 19, 21).

xi) She falsely claimed to the Tampa Police that Plaintiff was "behind on the rent for

six months" (Ex. 6, TPD GO #2014-264588, p. 21).

xii) She falsely (and bizarrely) claimed that 106 West Osborne was the reply address

to her to direct legal matters regarding the resident at that address.

xiii) She falsely claimed in her Statement Of Claim in a State-Court landlord-tenant

complaint that 106 West Osborne, was her address, and the reply address in that matter, yet

filed a claim to remove Plaintiff from that same address.


37)   On 24 April 2014 mccall returned to the property at 106 West Osborne, Tampa, that

she claimed to own, and sandra rose did accompany her.


38)   Plaintiff has NO BUSINESS NOR PERSONAL ASSOCIATION WHATSOEVER

with sandra rose in any capacity, neither in his personal capacity, nor through the

Corporation that agreed to the contract with mccall. At all times, on 24 April 2014 sandra

28   rose was a complete stranger to Plaintiff, and he had never had any prior business nor

1     personal contact of any kind with her.

39)     When mccall did appear accompanied by rose on the real property at 106 West

Osborne, Tampa, on 24 April 2014, she did do the following:

i) Willfully enter upon the "structure", and its "curtilage" (as defined in FRS 810.011

(1) ), without having been invited, authorized nor licensed in any way, and after having been

told prior explicitly not to appear at nor enter upon that property, did remain upon that

structure and its curtilage, and did refuse to depart after being told explicitly to do so, in

violation of FRS 810.08 (1).

ii) Enter that property for the purposes of, by her own admission, to "retrieve the

keys" (from Plaintiff), to seize control over or unilateral exclusive possession of that

property for her own use, and to remove Plaintiff from that property and deny him all further

access to, and the use and possession of that property, in violation of FRS 812.014 (2)(b)1.

iii) Use a metal "key", fashioned prior exclusively for entry into the structure upon

the real property, to enter that structure and remain there in violation of FRS 810.08 (1), as

stated in i) supra, and in violation of FRS 810.06.

iv) Forcibly and by threat, confine Plaintiff, without lawful authority, in violation of

FRS 787.01, for the purposes of holding him for collection of the false debt she claimed, in

violation of FRS 836.05, for the purposes of imprisoning him therefor, terrorizing Plaintiff

by calling the police and making false claims to them in violation of FRS 837.05, 837.055.

v) Use force, violence, assault, and putting Plaintiff in fear for the purposes of

accomplishing the above.

40)     At all times that sandra rose did appear at or upon on the real property at 106 West

Osborne, which Plaintiff and his Corporation were the lawful possessor, and make contact

with Plaintiff thereupon, she was a complete stranger to Plaintiff, and she was neither

authorized, licensed, nor invited upon that property, and was there at all times to, and did aid

28    and abet mccall in robbing Plaintiff, terrorizing Plaintiff, threatening Plaintiff, and

committing burglary of and trespassing upon the real property that Plaintiff did lawfully lease from mccall, contract to purchase from mccall and her lienor, and of which mccall had released all possessory claim by sworn agreement pursuant thereto.

41)   At her entry upon the curtilage of 106 West Osborne on 24 April 2014, mccall did disturb Plaintiff's peace by banging on the door and demanding entry, then attempted to enter the structure by the use of a key that she had retained in contradiction to her sworn statements otherwise, and while doing this was calling the police on her cell-phone, and making false claims to them about Plaintiff, as well as false claims regarding her conduct, and presence at that location.

42)   At the point in mccall's course of criminal conduct against Plaintiff whereupon she attempted to enter the structure upon the property at 106 West Osborne on 24 April 2014, Plaintiff did tell mccall to leave the property. She refused and continued to make false claims on her call to the police. Plaintiff did begin a video recording of the incident as evidence of her conduct at that time, and exited the building.

43)   Plaintiff then told mccall that he was leaving, and walked to his motor vehicle. mccall and rose then followed Plaintiff to his vehicle in the driveway, (they were on the porch, at the front door prior), and they deliberately blocked his exit from the property. mccall stated into her telephone: "the police need to come now because he's gettin' ready to leave".

44)   Plaintiff told mccall and rose repeatedly to "Get Out of The Way!", and gave them ample opportunity to do so, but they both refused, and instead continued to block Plaintiff's motor vehicle, strike it and kick it. The video that was recorded by Plaintiff at the time of incident clearly show these facts. As Plaintiff freed himself from the unlawful imprisonment by mccall and rose, mccall falsely accused Plaintiff of running over her foot. The recording of the 911 call that was presented to Plaintiff during as discovery in the criminal case against

1   him clearly indicates mccall stating that Plaintiff did not run over her foot, nor use any force of any kind against her, and on those grounds the charges in that case were dismissed.

45)   Plaintiff then left the property and looked for a pay phone to call the police. Without finding one  Plaintiff returned shortly. mccall had entered the house and was standing in the doorway. mccall stated that she had gone in the house. Plaintiff recorded this on a video camera. About that time TPD neal rolled up in her cop car, and Plaintiff turned and walked away. neal said over the speaker in her car "come here". Plaintiff turned and waited for neal to approach and video recorded.

46)   At the time neal arrived at the location, mccall was standing inside open doorway of the house, and had entered the property. When asked by Plaintiff if she had entered the house, she stated: "yes I did...". This was recorded by Plaintiff on video by the camera that was taken by carithers.

47)   Shortly thereafter TPD carithers rolled up in her car and spoke to Plaintiff. carithers took Plaintiff's video camera without his permission in violation of FRS 812.014. That property was taken by carithers without warrant and without any consent or permission from Plaintiff.

48)   carithers and neal then lied and said Plaintiff was "being detained", (when he was actually being arrested and imprisoned by them), and carithers said "I'm going to put you in handcuffs" and threatened Plaintiff with violence and death if he refused. They lied and claimed that Plaintiff was not under arrest when he was. carithers admitted these facts in her report, (Ex. 6, TPD GO #2014-264588, p. 19). Plaintiff was not free to go thereafter until he paid a bond of $9,200, including premium, thirty-two hours later, after being charged with two counts of violating FRS 784.045(1)(a)2. (Aggravated Battery With A Deadly Weapon,

28   13th Judicial Circuit Case Number 14-CF-005912).

1

49)   In addition to the other property taken, the vehicle Plaintiff was renting was taken from him by carithers as well as certain items within it, including Plaintiff's "debit card", an electronic tablet computer, and machine parts, all of which Plaintiff needed to pursue his business, and corporate purposes.

50)   From the moment carithers, neal, gudes, and norris arrived at 106 West Osborne Avenue on 24 April 2014, Plaintiff was not free to go. From the beginning of the encounter with them, Plaintiff was physically restrained in the back of a police car, in handcuffs, unable to leave by any means, and prohibited from doing so because the doors to the police car only opened from the outside. Plaintiff was told explicitly that he was not free to go, and by carithers', gudes', neal's and norris' conduct was completely unable to terminate the encounter with them by his own will, at any time.

51)   During the nearly hour and a half he spent unlawfully imprisoned in the back of the police car, Plaintiff sustained injuries to his wrists at the surface with contusions, and damage to the connective tissues and nerves below resulting in lasting pain, loss of sensitivity and dexterity and the loss of use of his fingers and hands for one week. The contusions on the outer skin were visible for at least a week and were photographed when Plaintiff was taken into Preliminary Proceedings Court, and in the days after his release.

52)   While Plaintiff was unlawfully imprisoned in the back of the police car, officer gudes asked Plaintiff if he owned the house. Plaintiff affirmed that he did. gudes then asked if Plaintiff had purchased the house from mccall. Plaintiff affirmed that he did. gudes then stated "then its a civil matter".

53)   Additionally, while Plaintiff was unlawfully imprisoned in the back of the police car, and carithers brought up Plaintiff's record on the police car computer, he noticed a statement

28   to the effect of "WARNING: WORE HIDDEN CAMERA IN COURT". It is for this reason

1

that Plaintiff claims that the actions of all TPD defendants are a matter of retaliation against Plaintiff, as described in Paragraphs 248 – 250, infra.

54)    Shortly after taking seat in the back of the police car, Plaintiff noticed a video camera mounted near the roof of the police car on the partition between front and back seats, and pointing down at where a person sits in the back seat. Plaintiff has seen video recordings by these cameras recorded by Tampa police and has cause to believe they are standard issue. Plaintiff asked carithers if he was being recorded, and she said "no". Plaintiff knows that the Supreme Court of the United States, and other Courts have ruled that it is legal for police to use "strategic deception" (i.e. lie), as part of investigation, (*Frazier v. Cupp*, 394 U.S. 731; *United States v. Russell*, 411 U.S. 423; *State v. Cayward* 522 So. 2d 971, and subsequent cases). Because of this Plaintiff knew not to believe carithers, but instead chose to use that recording as an opportunity to record himself, for the purposes of evidence, repeatedly notifying carithers and the other officers of the Totality Of Circumstances, particularly of the existence of a Notarized Deed, and that they had no authority to search, nor enter the premises, nor did mccall, that mccall had no legal claim to the house, and repeatedly later to retrieve exculpatory evidence that carithers attempted to dispose of by giving it to rose. The recording made by that video camera (including audio), is and should be available, per TPD SOP 609.7, but because carithers lied about it being made, (Per FDLE Police Officer Ethical Standards Rule 2.2), she or other Tampa police may dispose of it. Plaintiff deliberately notified carithers, gudes, neal and norris of the Totality of Circumstances at hand, explicitly to prevent his arrest, and deliberately to subvert any qualified immunity defense that the officers may try to make later in a case such as this. But because they have exclusive control of such recording, and can lie about its existence, they are then able to destroy it later to prevent it being used in a person's defense, or as evidence against them in a Civil Rights case such as this. Ultimately these two separate elements combine to deprive a person of Due Process and Equal Protection of Law, and for these reasons Plaintiff seeks the relief requested in Paragraph 414, §§ xi – xv, infra.

28

55)   Further, while Plaintiff was unlawfully imprisoned in the police car, defendant norris opened the door and said something to the effect that Plaintiff's supposed "agitated state" would cause norris to commit some act of violence against Plaintiff. Plaintiff was fully acting within his First Amendment Rights at that time, and when Plaintiff began to firmly restate the facts of the matter at hand, (as described herein), norris became agitated and said "what, what... what!" His tone was hostile and threatening and clearly indicated an intent to commit an act of violence against Plaintiff for exercising his Freedom of Speech, and for notifying norris of the exculpatory evidence, and of his and the other officers' wrongful conduct. Regardless, Plaintiff restated exactly the same way, the facts at hand, and the unlawfulness of mccall's, roses's and the other officers' conduct, and norris said "that's better". norris' behavior was clearly an attempt to intimidate or threaten Plaintiff's exercise of his Rights to Free Speech and Due Process, and to attempt to manipulate Plaintiff into believing, or to purport by his conduct that he was determining how Plaintiff spoke or would speak or act by threatening Plaintiff in violation of 42 U.S.C § 1983, and 18 U.S.C. § 242, for exercising his Right to Free Speech.

56)   At all times that gudes, carithers, neal, and norris were present at 106 West Osborne, they were notified that:

     i) mccall had no legal claim to the property.

     ii) Neither mccall nor rose had any permission to trespass on the property, its curtilage, nor in any structure thereupon.

     iii) None of them had any permission to trespass upon the property likewise.

     iv) None of them had any permission to enter the structure thereupon.

57)   Yet in complete indifference to these claims, carithers, gudes, neal, and norris remained on the property, its curtilage, and did enter the structure thereupon, and did both permit and aid and abet mccall and rose in doing so.

28

58)   At the time of the incident, Plaintiff handed a manilla envelope to carithers that contained all proof of purchase of the real estate property by Plaintiff's corporation. (Exhibits 1-3). (See GO #2014-264588, Ex. 6, p.19). As a result, at all times during the incident on 24 April 2014 at 106 West Osborne, carithers was in possession of such records, receipts and exculpatory evidence to show the following:

   i) Legitimate possession and lawful lease of that property by the Corporation that purchased legal title and claim from mccall to that property. (Ex. 1-3).

   ii) Payments in the total of $5,000 pursuant to the contract agreed between mccall and Plaintiff's corporation, made between February 15, and February 19, 2014. (Ex. 2.1, 2.2, 2.3).

   iii) Forfeiture by mccall of all claim and title to that property to Plaintiff's Corporation first, and then ultimately to the property's lienholders, in the event of failure by Plaintiff's Corporation to deliver on its agreement. (Ex.3).

59)   The articles that were in that envelope that indicated the legitimate possession and payment by Plaintiff, and forfeiture by mccall of legal title, are attached as exhibits, and are as follows:

   i) AS - IS REAL ESTATE PURCHASE AND SALE CONTRACT, Approved by the Florida Bar, and Florida Realtors. (Ex. 1), submitted in full, eleven pages.

   ii) Photocopies of Amscot Money Orders, #0005988416, #0005988417, #0005988418, #0009318724, #0009318725, #0009318725 (Ex. 2.1, 2.2), in the total of $5,000 paid to mccall pursuant to the contract.

   iii) A notarized quitclaim agreement by mccall giving leave to Plaintiff to settle her debt in exchange for the property, or in the alternative, relinquishing that property to her creditors therefor. (Ex. 3).

   iv) A Notarized addendum to the contract for the purpose of securing particulars thereof. (Ex. 2.3).

28

1

60)    Because the contents of the Manilla envelope handed to carithers was the actual claim of legal possession of the property at 106 West Osborne by Plaintiff's corporation, and Plaintiff paid $5,000 Dollars for it, that was its minimal financial value. Since those documents gave Plaintiff possession of the property in toto, and mccall claims that property to be valued at $70,000, that amount can be assessed as its presumptive value.

61)    Further, since it contained the preponderance of exculpatory evidence to the criminal charges that resulted from mccall's, roses, carithers', neals', gudes', norris', and dusty rhodes' conduct that day, the value of the contents of that envelope can be estimated at no less than Plaintiff's loss of his occupation and earnings, and punitive damages for any wrongful conviction that might result. An amount that can be assessed between 1 Million and 3 Million Dollars, at least, (based on the number of years of potential incarceration, plus the years of lost employment afterwards, due to "background checks"). But of course, the actual value of the contents of that envelope was that of Plaintiff's Liberty itself, which is priceless.

62)    At the conclusion of the incident that took place at 106 West Osborne, on 24 April 2014, sandra rose attempted to steal that Envelope with all its contents. Plaintiff saw her get into a vehicle with mccall and begin to drive away. carrithers, neal, norris, and gudes attempted to aid and abet rose and mccall with stealing this valuable property, and disposing of this exculpatory evidence by refusing to retrieve it when told repeatedly to do so and why. carithers, gudes, neal, and norris, all refused to consider anything Plaintiff had to say during the entire matter regarding this evidence, and it was not until Plaintiff screamed repeatedly at them so loudly that any neighbor could hear Plaintiff notifying them of their wrongful conduct, (and thereby be called as witnesses), that carithers decided to ever-so-begrudgingly saunter over to mccall's car, retrieve that envelope, and return it to Plaintiff.

63)    At all times during the incident at 106 West Osborne, on 24 April 2014, carithers, gudes, neal, and norris had the documents in that envelope in their possession, and did know

28

their contents. Plaintiff witnessed them review those documents on the trunk of the police car he was in. Likewise, the rear-facing video-camera that is part of the police car's "dash-cam" system should have captured those officers reviewing those documents, and that recording can be used as evidence.

64)    Because of that, rose, carithers, gudes, norris and neal did aid and abet mccall in attempting to deny Plaintiff the use of the property that was lawfully leased by Plaintiff's corporation, and ultimately deny Plaintiff's corporation the opportunity to purchase that property as a corporate asset, and their conduct was deliberately and with malice for the purpose of mccall unlawfully regaining possession of that property. This constitutes a theft, or attempted theft, of between $5,000 and $70,000, committed mccall, and aided and abetted by rose, carithers, gudes, neal, and norris.

65)    During the incident that took place at 106 West Osborne in Tampa on 24 April 2014, mccall did enter the building located at that address without Plaintiff's permission, and did refuse to heed his repeated notice to the contrary, and did attempt to enter that building while Plaintiff was inside it. carithers, neal, gudes, and norris did aid and abet mccall with this trespass, and carithers did further violate Plaintiff's privacy by entering that same building, and photographing Plaintiff's personal property inside the structure where Plaintiff did reside and do business.

66)    carithers had no warrant to enter the structure on the property located at 106 W. Osborne, had no permission to do so, was not invited in any way to do so, was told explicitly not to do so, and no crime was committed inside that structure, nor was any crime reported as having been committed therein.

67)    Upon removal to custody at the Orient Road jail, Plaintiff insisted on filing a sexual assault complaint against carithers.

68)   carithers is a female and females are sexual beings. (They will always be the first to tell you so, or, in the alternative, let them deny it). Plaintiff is Male and females are his exclusive sexual partners, and other than family, established acquaintances, and occasional business relationships, Plaintiff has not much interest in any contact from females for any other reasons than sex, or domestic activities. Since carithers is not any of these persons to Plaintiff, nor does Plaintiff have any interest in carithers in any way, much less these ways, all contact from her is assault. Because she is female, therefore it constitutes sexual assault. (Unwanted touching of a sexual nature).

69)   Because of carither's violent sexual assault, Plaintiff feels dirty, violated, suffered physical injury, and wants no more contact from this woman ever.

70)   Plaintiff notified dusty rhodes of all this but rhodes refused to file sexual assault charges against carithers, and is therefor in breach of duty, and thereby did deny Plaintiff Equal Protection of Law.

71)   Plaintiff further insisted that rhodes indicate to him what was the resolution of the supposed "civil matter" to which Tampa PD supposedly do not respond. That is, Plaintiff needed to know what was told to mccall by carithers regarding possession and entry onto the structure and into the building located at 106 West Osborne, in order to protect himself from potential burglary by mccall. dusty rhodes deliberately and indifferently refused to notify Plaintiff of that disposition, and deliberately and indifferently refused to inquire of carithers that information as well, and relay it to Plaintiff. dusty rhodes was given notice on a recorded statement that the Corporation that purchased the usage and title to the property stood to lose property of a technical nature contained therein, that included intellectual property, and a potential loss of Tens of Millions of Dollars if stolen. He shrugged indifferently and deliberately insulted Plaintiff by indicating that he did not care.

28

1

72)     Plaintiff further notified dusty rhodes that the criminal charges against him would cause him to lose employment for up to seven years due to those records appearing in "background checks" performed by potential employers as a requisite to granting employment or corporate contracts. Again rhodes indicated that he did not care about these consequences, and took no action to mitigate them.

73)     When Plaintiff asked dusty rhodes about the video camera that carithers had stolen, and if the police had reviewed the video, dusty rhodes called norris and appeared to ask, but then stated something to the effect that it had only recorded something from the beginning, and that it did not really help Plaintiff. This statement was entirely false, and was recorded by dusty rhodes himself, along with Plaintiff's entire conversation with him. The video from that camera was presented on 24 June 2015 at an evidentiary hearing pursuant to *Dennis v. State*, in the criminal case against Plaintiff resulting from mccall and rose's false accusations, and as a result of the events and statements recorded on that video, and the information contained in the recordings of the 911 calls made by mccall, the Aggravated Battery charges against Plaintiff in that case were dismissed.

74)     At the time rhodes made the statement about the video recorded by Plaintiff not being exculpatory, Plaintiff had every reason to believe that dusty rhodes was being disingenuous, or deliberately sadistic. When he told Plaintiff that the video recording did not help him, his tone of voice and mannerism seemed to be that of one who is lying. He also studied Plaintiff's reaction and facial expression for a long moment, which is usually a sign that someone is lying. (The are checking to see if you are believing what they say, and in the case of a sadist, they are taking delight or seeking erotic gratification in seeing the expression of your suffering, loss, or fear). Likewise it appeared by his visage that a "micro-expression" of excitement came across it that is associated with a person who is compelled by "duping delight", and enjoys knowing that they are lying to people or scamming them. It

28      appeared that rhodes was deliberately lying to Plaintiff in order to see Plaintiff's expression

1

at the absence or loss of critical exculpatory evidence, and the threat of incarceration that comes with that, and that his actions were not any kind of legitimate police conduct, but were purely sadistic.

75)   Further, when that video evidence was presented at the evidentiary hearing on 24 June 2015, to dismiss the Aggravated Battery charges that carithers filed against Plaintiff, carithers stated under oath that the video camera and its recording had been in her possession since she had taken it from Plaintiff, and that sergeant norris had never reviewed that evidence.

76)   carithers, neal, dusty rhodes, norris and gudes all claimed to Plaintiff that he had "no right" to defend himself, and that in the circumstances at hand he was required by law to remain unlawfully imprisoned or kidnapped by mccall and rose until the police arrived twenty minutes or more later, because (according to them), that is what a "Reasonable Man" would do, and that because Plaintiff did not conduct himself with their and Chief castor's concept of reasonableness, that he was guilty of two counts of a serious (Florida Class 2) Felony.

77)   Further, carithers, neal, dusty rhodes, norris and gudes all claimed that because the state had not, or because a court had not officially decided that Plaintiff had actually purchased the real estate property, that then Plaintiff could not claim ownership of it, or legal title to it, and likewise, that mccall was free to post personal collection notices on the building, without needing them to be certified by a Court, or served by a third party, and that she was free to enter the building, and that as Tampa police officers, they were free to enter onto the property, and into the structure thereupon, to assist mccall with collecting the debt she claimed, and that because no one can own anything until the state certifies it, that mccall was free to remain on that property because the driveway, porch and other curtilage was a "common area" that is open to the public.

28

1

78)   TPD dusty rhodes further claimed that because no formal "no-trespass" order was given by a Tampa police officer to mccall, that mccall did not trespass upon the property that Plaintiff's Corporation had lawfully leased, and that Plaintiff was residing in, and doing business from, but likewise refused to assist Plaintiff by issuing such an order to mccall and rose pursuant to TPD SOPs  402.5, 403.5, and 541.1.

79)   When Plaintiff gave a statement to dusty rhodes regarding the sexual assault by carithers, Plaintiff had in his possession the manila envelope with all the evidence described in Paragraphs 58 – 62, supra. rhodes took a photograph of the notarized agreement in Exhibit 3, and its purpose was clearly explained to him.

80)   At all times carithers, dusty rhodes, gudes, neal and norris did claim that their conduct was both individually decided, and per the policy of Chief castor, and that their conduct was the custom of the Tampa police department, and at all times did act with such consistency and uniformity of conduct between them to substantiate such a claim.

81)   At all times, carithers, dusty rhodes, gudes, neal and norris did claim that they were deliberately and with indifference imposing a "single-victim / single-perpetrator" false narrative upon the totality of circumstances, because mccall was the "first to call" 911, and that they deliberately reward the first person in a civil dispute who calls 911, by charging the other with a crime, while allowing the caller to commit crimes, without prosecuting them, for the purposes of deliberately and falsely inducing people to believe that the party who calls the police are legally immune from prosecution and free to commit crime, because since they supposedly do not respond "civil matters", that by rewarding persons who impulsively, vindictively, or pre-emptively call the police, that they will perpetuate a "snitch society" where people will be forced to call the police, or have the police called on them, and that this will keep them employed, and with plenty of fodder to satiate their sadistic addiction to violating persons houses, property, boundaries, lives, families and freedom, and

28

1      that this conduct is per department policy set by castor, and that it is the custom of the

Tampa PD and the kind of people each of them are.

82)    After Plaintiff was released from Orient Road jail, on or about 25 April 2014, he

returned to the property at 106 West Osborne, and forthwith inspected the premises. Plaintiff

discovered the following items missing from the house:

     i) A video camera of the same make and model as that stolen earlier by carithers,

worth approximately $149.00.

     ii) An "HTC Evo" "cell phone", worth approximately $100.00.

     iii) Several pages postage stamps worth at least $30.00.

83)    There were no signs of forced entry, and as stated prior mccall had a key, and the only

other known key. Further, another hand-written notice was posted on the building, (Ex. 7.1,

7.2), and mccall's driver's license was found on the floor in the back bedroom. (That Driver's

License was submitted as evidence in Case Number 8:14-CV-01037, this Court). Plaintiff

did call the Tampa PD latent crime reporting section but was told that these facts combined

with mccall's prior acts at the property, her prior criminal history, and history of drug abuse

were not sufficient probable cause to investigate her for the purpose of seeking return of this

property.

84)    On or about 27 May 2014, mccall would appear on the property again, and was heard

by Plaintiff at the back door which was open, saying "hellooo...". Plaintiff immediately ran

out the front door of the house and down the block. mccall shouted after him: "I don' know

why you runnin'... The police have been called." Plaintiff called the police to report her

trespass, but was told by the police that the person has to be on the property to be told by

them not to return. Further Plaintiff was told that there were no prior calls made in the area

to 911. It appears mccall was lying about calling the police, and that she had arrived on the

28    property to further menace, harass and threaten Plaintiff.

1

85)   On 11 June 2014, mccall did file a landlord-tenant action in state court to regain possession of the property. (Case Number 14-CC-015789, Thirteenth Judicial Circuit Court, Hillsborough County Florida).

86)   By 29 June 2014, mccall did in fact unlawfully regain possession of that property in violation of the clearly posted "No Trespassing" signage, and by breaking and entering thereinto, (as Plaintiff had changed the door locks by that time), and in violation of the lease-purchase agreement that was still in effect at that time.

87)   On or about that same date, 29 June 2014, Plaintiff Called the Tampa police District 3 office to notify them of mccall's trespassing into, and taking of Plaintiff's real property located at 106 West Osborne, and filippone was notified by that call as to mccall's trespass and unlawful taking of that property. First he asked if Plaintiff was looking for a defense in the criminal case against him, and sounded as though he were attempting to incriminate or gain evidence for further criminal charges against Plaintiff for his doing so, or for the purposes of deliberately denying Plaintiff such a defense. filippone falsely claimed that Plaintiff had "abandoned" the property, and that because of that mccall was free to take that property. Plaintiff notified filippone that he was notifying him in his official capacity as a police officer, of a trespass by mccall on the property in violation of FRS Chapter 810, and the unlawful taking of that property in violation of FRS § 812.012 and FRS § 812.014, but filippone refused to act. filippone was notified that "No Trespassing" signs were clearly placed in all the windows on the property. He claimed that "if she legitimately believed" that she owned the property mccall was free to remove them, enter the property and take that property from Plaintiff. filippone asked Plaintiff whose name was recorded as the last purchaser with the county property appraiser. He was notified that it was mccall's name, and said "there's not a cop in the world that would charge her for trespassing..." filippone's response was a deliberate failure to act, because:

28

        i) What someone supposedly "legitimate believes" does not decide ownership of

1

anything, and in fact counts for nothing, nor was it his place to presume nor decide for himself what someone else supposedly believed, and;

ii) there are many "cops" in the world, and what they would or would not do is not for filippone to say, nor for him to conjecture, and any such conjecture is complete and deliberate falsehood, nor any excuse for him to not act, and;

iii) There is no basis in Law for any of the claims by filippone, nor for him to refuse to act, nor was it his place to presume what mccall supposedly believed, and;

iv) Under Florida Law, a Deed of Transfer takes effect at the time of delivery, and there is no requirement that it be recorded for it to be valid. (*Sweat v. Yates* App. Dist. 1, 463 So. 2nd 306; *Howarth v. Moreau* App. 5 Dist., 430 So. 2nd 576), and;

v) Under Florida Law, recording of conveyances and liens per FRS § 695.01, "does not operate to convey title or create lien upon property" (*Van Eepoel Real Estate Co. v. Sarasota Milk Co.*, 100 Fla. 438 at p. 456, (1930) ), and FRS § 695.01 "is primarily intended to protect rights of bona fide purchasers of property and creditors of property owner, rather than rights of immediate parties to conveyance", and "was not intended to have result of requiring a grantee to record his own deed within a specified time or lose an otherwise valid title." (*Fong v. Batton*, 214 S. 2d 649 (1968) ), and FRS § 695.01 "is intended to protect purchasers against secret deeds", (*Rabinowitz v Keefer*, 100 Fla. 1723, (1931) ), and, "By execution and delivery of quitclaim deed, the grantee acquires such title as grantor held at the time of conveyance", (*June Sand Co. v. Devon Corp.*, 156 Fla. 519 (1945) ), and, "Recording has no particular efficacy as between seller and purchaser or grantee and grantor since purpose of recording statutes is to give notice to third persons of status of title and related factors", (*Hensel v. Aurillio*, 417 S. 2d 1035 (1982) ), and, "Actual notice of unrecorded instruments may be implied," (*Rafkind v. Beer* 426 So. 2d 1097 (1983) ), and, "Ordinarily a recording statute has no effect as to transactions between the parties involved and mere failure to record a deed does not affect the title of grantee except as to creditors and subsequent purchasers for valuable consideration without notice", (*Moyer v. Clerk* 72 S. 2d 905 (1954) ), and, "A deed between the parties is valid though not recorded." (*Stewart v.*

28

1   *Mathews* 19 Fla. 752, (1883); *Black v. Skinner* Mfg. Co. 53 Fla. 1090 (1907); *Licata v. De Corte*, 50 Fla. 563 (1905); *Ballard v. Lippman* 32 Fla. 481 (1894); *State ex rel. Dixon v. Trustees of Internal Improvement Fund*, 20 Fla. 402 (1884) ), and;

vi) Because Plaintiff was the lawful owner, lessee, and possessor of the real property located at 106 West Osborne, and did post "No Trespassing" signs on that property clearly visible to all persons, Plaintiff gave "constructive notice to all world", (*Florida Land Holding Corporation v. McMillen* 133 Fla. 431 (1939); *Carolina Portland Cement Co. v. Roper*, 68 Fla. 299, (1915); *Tate v. Pensacola Gulf land & Development Co.* 37 Fla. 439, (1896); *Blackburn v. Venice Inlet Co.*, 38 So. 2d 43, (1949)), including mccall, of his ownership of that property, and her taking of that property was therefore trespass and theft in violation of FRS Chapters 810, and 812.

88)   After mccall had filed her fraudulent landlord-tenant action in state-court, Plaintiff attempted to record the contract and quitclaim agreement with the Hillsborough County Clerk of Court, Recording Department, as proof of transfer by mccall of her ownership, legal title, and claim in the real property located at 106 West Osborne to Plaintiff's Corporation, and ultimately to her creditors, but the clerk therein refused to do so because the quitclaim agreement did not say "Quitclaim Deed" upon it, nor did it contain the "legal description" of the property.

89)   Matters of Real Property purchase, sale, contracts, and transfers are statutory in Florida per Florida Revised Statutes Title XL, and as apply to this matter, and the state-court cases at hand, are codified in Chapters 689, 692, 694 – 697, 701, 702, and 715, therein.

90)   There is no explicit provision in FRS Title XL that a Quitclaim Deed must state so on its face, nor that it must contain the "legal description" of the property being transferred, nor that it must be recorded with the County to be valid. The quitclaim agreement sworn and

28   witnessed between mccall and Plaintiff's Corporation did incorporate by reference the

1

additional Purchase and Sale Contract signed by both parties, that Contract did contain the "legal description" of the property, and Plaintiff did attempt to record both of these together as the Deed of Transfer.

91)   By attempting to enforce these agreements, mccall claimed their prior validity, because but for that validity she would have no legal basis whatsoever to enter upon the Real Property described in them, nor to demand, nor attempt to collect Money from Plaintiff for anything, and as such her conduct would constitute outright trespass, robbery and extortion.

92)   Because of these facts, what filippone was actually doing was deliberately refusing to lend aid, for the purposes of deliberately being a indifferent, deliberately causing Plaintiff harm, and perpetuating the harm caused to Plaintiff by mccall, rose, carithers, gudes, neal, norris, danny rhodes, and dusty rhodes, by choosing not to take action. And like all disingenuous people, filippone simply made up some pseudo-legitimate sounding excuse for doing nothing, for the purpose of deliberate causation of harm.

93)   Per mccall's own statements in the Tampa police Report GO# 2014-264588, (Ex. 6, pp. 8, 21, 22), and as recounted by defendant carithers therein, mccall stated that she: i) came to the property to "kick [Plaintiff] out", and; ii) that she and rose both told Plaintiff to "stop" while Plaintiff was attempting to retreat from the situation, and free himself from their unlawful imprisonment. Both these statements are clear evidence that mccall intended to forcibly remove Plaintiff from the property, and to unlawfully imprison him for the purpose of unlawfully taking $12,069.00 from him by written and verbal threat, and by the use of force, in violation of FRS 836.05, and FRS 787.01. Further, sandra rose did aid and abet mccall and act as accomplice to mccall in the commission of these crimes against Plaintiff, and is therefore a principal in those same crimes.

28

1

94)    As of 20 May 2015 donna mccall is deceased, apparently by suicide from a gunshot wound to the abdomen.

95)    As a result of mccall's death, Count 1 of Florida 13th Judicial Circuit Case Number 2014-CF-005912, (Aggravated Battery With A Deadly Weapon), was Dismissed With Prejudice at an evidentiary hearing that took place on 24 June 2015, in that case.

96)    At that same evidentiary hearing on 24 June 2015, Count 2, (Aggravated Battery With A Deadly Weapon, against alleged victim sandra rose), was dismissed on grounds of Immunity per FRS 776.032. Plaintiff, as Defendant in that case, filed a Motion Pro Se for Declaration of Immunity and Dismissal of Count 1 and 2, pursuant to FRS 776.032, and on that date the Motion was heard and granted. The Court found, and Defendant Rios conceded that neither mccall nor rose had any lawful grounds to be on the property or curtilage at 106 West Osborne, nor to attempt to take it from Plaintiff.

97)    At that hearing Judge Christopher Sabella notified defendant Rios that the evidence upon which Counts 1 and 2 were dismissed was unquestionable, and clearly convincing, and he seemed to indicate by his tone at least, that her continued prosecution while having been in possession of that evidence since the outset of the case, was malicious.

98)    Rios' prosecution of Plaintiff was without probable cause because neither mccall nor rose had any lawful grounds to appear on the property at 106 West Osborne, and had no right to complain to the police against Plaintiff, when they were trespassing and committing crimes against him, and because in the 911 call that mccall placed to the police, she admitted that Plaintiff had not used any force against her, and that she was attempting to unlawfully imprison Plaintiff until the police arrived, and attempting to use them to assist her in extorting Plaintiff, and committing theft of the Real Property located at 106 West Osborne.

28

1

99)   For whatever reasons, unknown to Plaintiff, and apparently unknown to Rios, the Tampa police refused to release the recording of the 911 call made by mccall to Rios as State's Evidence for more than a year after the incident for which Plaintiff was criminally charged, and that recording was only released to Rios on or about 29 May 2015. A copy was not made available to Plaintiff until two days before the evidentiary hearing on 24 June 2015. Rios did indicate at that hearing that she had listened to the 911 call recording prior to that hearing.

100)   During the course of Rios' prosecution of Plaintiff such delays were the norm. Rios repeatedly would not respond to Plaintiff's communications by email for weeks at a time. This ultimately led to prejudice in Plaintiff's defense of the prosecution by Rios, caused him loss of valuable time, anger and aggravation, and violated his Right to Due Process.

101)   Rios' prosecution of Plaintiff was for a wrongful purpose because it was in retaliation for Plaintiff's development and use of the KopCam to record police misconduct, and because it was in retaliation for Plaintiff's repeated Civil Rights complaints against Hillsborough County and Tampa Municipal officials, and in retaliation for Plaintiff's repeated calls to the Tampa police internal affairs department to complain of officer misconduct. Further, Rios' prosecution of Plaintiff is part of a common plan or conspiracy by her and other law enforcement officers to injure, oppress, threaten and intimidate persons in The State of Florida from freely exercising and enjoying their Right to self-defense, and to impose a "chilling effect" thereby upon the Public against the Free Exercise of that Right.

102)   The reasons for this behavior are well understood by all, and are self-evident. "Tyrants", (as they would be called by the Founders of this Nation), people who would in modern parlance be described as "psychopaths", "sociopaths", "sadists" or "predators", always have the individual pathology that they need to feel that only *they* can have or do

28   something. It is almost irrelevant what that thing is, as to them it is not enough simply to

have that thing for themselves, but they instead they need to deny that thing to others, so that they can feel as only they can have it. The more personally valuable, or essential that thing is, the more it triggers their compulsion to steal it. Others having things that make others feel secure make them feel insecure, and that feeling of insecurity is so strong and so unnerving that it compels them to behave in the ways that they do. They see other people having things as somehow themselves being denied those things. They see other peoples privacy and security as somehow threats to them, or a rejection of them, and because of these kind of paranoid or phobic delusions, or the insult they take at being so rejected, they will continually connive and scheme to interfere with other peoples Rights to Privacy and security, and to steal or otherwise expropriate their property and their Rights, in order to make themselves feel secure against those perceived threats, or in retaliation to that perceived rejection. Thomas Jefferson put it thus:

*"Men by their constitutions are naturally divided into two parties: 1. Those who fear and distrust the people, and wish to draw all powers from them into the hands of the higher classes. 2. Those who identify themselves with the people, have confidence in them, cherish and consider them as the most honest and safe, although not the most wise depositary of the public interests. In every country these two parties exist, and in every one where they are free to think, speak, and write, they will declare themselves. Call them, therefore, Liberals and Serviles, Jacobins and Ultras, Whigs and Tories, Republicans and Federalists, Aristocrats and Democrats, or by whatever name you please, they are the same parties still and pursue the same object. The last one of Aristocrats and Democrats is the true one expressing the essence of all."* --Thomas Jefferson to Henry Lee, 1824. The Writings of Thomas Jefferson Memorial Edition, Lipscomb and Bergh, editors, 16:73.

103)  Therefore, the wrongful purpose for which Karina Rios prosecuted Plaintiff and persisted in prosecuting Plaintiff when she was in possession of wholly exculpatory evidence from the outset of the case, was for the purpose of imposing her own socio-political agenda upon the Citizens of Florida, and as part of a common plan or conspiracy

1

perpetrated by law enforcement officers to that same end. The reasons for that behavior is only because of their own individual sociopathology, not for any legitimate governmental nor political purpose.

104) Defendant Rios prosecuted Plaintiff for violating FRS § 322.34 for allegedly operating a motor vehicle on 24 April 2014 while his Driver's License was supposedly suspended for not paying Traffic Citations 4391SXP, (Martin County), and A0QQGHP (Hillsborough County). The state's evidence showed that Defendant's "privilege" to drive was allegedly "suspended" on 30 November 2011 for Citation 4931SXP, and 5 August 2013 for Citation A0QQGH. Defendant payed citation 4931SXP on 4 November 2013, more than five months before being charged. The "D6" delinquency notice for Citation A0QQGH was entered in case number 13-TR-119499 on 1 July 2013, less than thirty days after the Citation was filed, prior to the first scheduled court appearance for Defendant in that case, and likewise prior to any judgment in that case. The scheduling of Defendant's first court appearance in that case was entered into the record on 8 July 2013, and Defendant was scheduled by that entry to appear on 28 August 2013. The court entered a delinquency in that case prior to even scheduling a court date for Defendant to appear in that case. The "suspension" caused by the delinquency notice filed became "effective" on 5 August 2013, twenty three days prior to the first hearing date that was actually scheduled for Defendant to appear in that case. That case was adjudicated on 6 March 2014, and, and per the judgment in that case, Defendant was given until 11 July 2014 to pay that judgment. (More than two months beyond the date Plaintiff was charged by carithers. The state's evidence also indicates that for both citations 4931SXP and A0QQGH that the "COURT REQ[IUREMENTS] [were] MET". Rios was notified of these facts but continued to prosecute the charge for violating FRS 322.34 charged by carithers.

105) The Florida State Legislature Office of Program Policy And Accountability Report Number 14-07, (http://www.oppaga.state.fl.us/MonitorDocs/Reports/pdf/1407rpt.pdf),

28

1

clearly states on page 9: *"clerks of court believe that the ability to suspend a driver license is an effective tool in increasing collections."* In the case being prosecuted by Rios, Plaintiff's Drivers License was suspended for the purpose of collecting revenue, yet the funds were already collected, or not due.

106) Rios also prosecuted Plaintiff for violating FRS § 893.13(6)(b) for allegedly being in possession of Cannabis in an amount less than 20 Grams. FRS § 893.13(6)(b) is unconstitutional because FRS § 893.03 schedules Cannabis as a Schedule 1 Controlled substance, while twenty three of the United States, and the District of Columbia have legislated the medical use of Cannabis, and it is completely legal to possess Cannabis in four of the United States, and the District of Columbia. FRS § 893.13(6)(b) makes it a crime to possess a substance that is wrongfully scheduled as illegal in Florida, and as such combined with FRS § 893.03, fails to meet the State's obligation to Substantive Due Process. FRS § 893.13(6)(b) is further in violation of Article IV § 1 of the United States Constitution because Cannabis is completely legal in other of the Several States, and the District of Columbia. Rios was notified of these facts and has a duty as an officer of the State of Florida to know these facts, and to know the law. Further Rios swore an Oath as both an attorney and an Officer of The State of Florida to uphold the Constitution of The United States of America, but continued to prosecute Plaintiff for violating a law she knows is unconstitutional, and continued to prosecute Plaintiff in violation if her Oath.

107)   Ultimately at a status hearing on 4 August 2015, Plaintiff plead Nolo Contendere to Counts 3 and 4 in the state court case resulting from his arrest on 24 April 2014, thus terminating that case. Adjudication for those counts was withheld, and Plaintiff was told explicitly by Judge Sabella that a withholding of adjudication was "not a conviction". Because of this, all counts in Florida 13th Judicial Circuit Case Number 2014-CR-005912 were terminated in Plaintiff's favor. Because Plaintiff was not convicted on any Count in that

28 case, and because the state trial court withheld adjudication, there was no conviction nor

1

judgment in that case that could be potentially invalidated by judgment in this case, and therefore, this Court is not barred by the decision in *Heck v. Humphrey* from granting Plaintiff relief by Judgment in his favor in this matter.

108)  As a result of the wrongful charges brought against Plaintiff due to the false accusations of mccall and rose, Plaintiff has been denied employment and contract no less than seven times since 24 April 2014, and the time of filing this Complaint. The first was shortly after the charges were brought, and was because Plaintiffs arrest and booking image appeared on Google's website, the next two were during the month of June 2015, due to "background checks" performed by potential clients and employers of Plaintiff, the fourth was in July 2015 when Plaintiff disclosed the circumstances of this complaint to a client after being offered a contract, and that offer was rescinded.

109)  In Plaintiff's line of work, a "background check" is the last step prior to securing employment or contract. "Background checks" are only performed by clients and employers for those persons they actually intend to employ, or contract with. In one of the instances as of the filing of this Complaint, Plaintiff has a confirmed offer letter, and likewise a confirmed ineligibility letter as a result of the "Background check". In the case previous to that the communication was done by email and telephone, however Plaintiff is able to obtain a statement from the client indicating a choice not to employ.

110)  After dismissal of the charges against Plaintiff in the State Court criminal case, Plaintiff twice requested of Karina Rios that she provide Plaintiff with a statement of wrongful prosecution, for the purposes of forwarding that information to potential employers and clients. Rios was notified that such a statement was necessary to demonstrate to employers and clients that there was no reason for Plaintiff to have been arrested nor charged, and that this was necessary for Plaintiff to obtain gainful employment until such

28    time as the records of the dismissed charges were removed and would no longer appear in

1 "background checks", and likewise to re-establish Plaintiff's credibility with those potential clients and employers. However, Rios twice denied that request. While Florida may have an expungement procedure, that procedure requires Plaintiff to petition for expungement at his time and expense, and the process can take several months. Plaintiff is entitled as a matter of Right to IMMEDIATE restoration to his prior condition and IMMEDIATE remediation from the harm caused by wrongful criminal charges against him, and he is protected by Constitutional Law from having to pay any kind of fee for that restoration, much less have to take any action to obtain it.

111) When Plaintiff was taken to jail on 24 April 2014 the rental car he was renting was returned to the rental company after being unlawfully searched by carithers, gudes, neal, or norris. After being released from jail Plaintiff inquired of the rental company as to his property that was in the vehicle. They did not have it in their lost and found which meant that there was no property in the vehicle when it was returned to them. They suggested that Plaintiff call the towing company, and Plaintiff did. The towing company claimed that the property in the vehicle was in possession of the Tampa police. Plaintiff did call the Tampa police and was told that his property was in possession of the Tampa police. On 25 June 2015, Plaintiff re-inquired of defendant Rios of that property, and on 17 July 2015 defendant Rios notified Plaintiff that the property that was in the vehicle when it was taken from Plaintiff was not in the possession of the Tampa police. That property included:

      i) a tablet computer that cost Plaintiff $150.00;

      ii) machine parts that were part of a machine that cost Plaintiff $850.00 and that cannot be replaced individually;

      iii) a debit card in the name of Plaintiff's corporation which he used to do corporate business;

      iv) various other machine parts that Plaintiff had taken considerable time to source. Either that property was taken by the Tampa police, or by the towing company, or possibly

28 mistakenly not recorded, or mis-recorded by the vehicle rental company. Because the rental

1

company only holds property in their lost-and-found for thirty days, therefore at the time of filing this complaint, that property was irretrievably taken from Plaintiff by the actions of carithers, gudes, neal and norris.

**B) Allegations Against Tampa Municipal Defendants Arising From The Unconstitutionality of FRS §§ 185.01, 185.03, 185.05, and 185.25:**

112) Because castor has "retired" as of 8 May 2014, she has received, or will be receiving a retirement disbursement in an amount of around $750,000. (Ex. 8). Because no person has any Right to profit nor benefit financially from violating the Law, nor the Constitution of any State or The United States, castor is not entitled to receive even a single Cent from whatever violations of Law she has committed in her career as a police officer, nor allowed, authorized or ordered in her capacity as Chief of the Tampa police department. For this reason, Plaintiff is entitled to relief as requested in Paragraph 414, § xi, infra.

113) Municipal police pension funds are mandated by Florida Revised Statutes Chapter 185, and particularly sections 185.01, 185.03, and 185.05 therein. These statutes are unconstitutional because they violate the 14th Amendment requirement of equal protection of law. They levy an excise tax on property casualty insurance premiums, by state law, to pay for the retirement benefits of police officers. No non-government employees have any such statutory guarantee of retirement benefits, nor any equivalent such laws in their benefit, and nothing in police employment nor municipal incorporation prevents the establishment of such funds on an employee-initiated, or per-municipality basis. Since all other persons have to make it their own individual responsibility to see to their retirement finances, there is no compelling objective to provide municipal police officers with such by state law. Additionally, FRS 185.25 prohibits these funds from being attached "by any legal proceeding whatsoever." This is a violation of the Constitutional Separation of Powers, because it constitutes a denial of Judicial Authority by Act of Legislature, and is therefore pure tyranny.

28

1

114)  Further, the statutes passed under FRS Chapter 185 were passed due to lobbying by police unions and other labor bargaining units, and by police officers themselves appearing before legislative committees while on duty. Because The public does not pay its tax dollars for individuals and groups to lobby the legislature to get more money for themselves, and because non-police Citizens must take time out of their business and labor, and pay out of their own funds to appear as such, the Public has a compelling interest in the equal protection and benefit of the relief requested in Paragraph 415, § i, infra.

115)  Because the method of acquiring funds for these pensions is by tax on property casualty insurance premiums, these statutes emburden or impugn Peoples Fundamental Rights To Property. As such there must be a Compelling Objective for the statutes, and no Less Restrictive Alternatives, not merely a "proper and legitimate state purpose", (as claimed in FRS 185.01). Subsidizing the retirement of municipal employees is not a compelling government objective because nothing prohibits these individuals from subsidizing their retirement from employment with private businesses, and nothing prevents them from starting their own business, to contribute to the forty-six percent of this Nations GDP that small businesses do, nor is it a compelling Public objective because the Public does not benefit in any way from these individuals retirement subsidy, only the individuals themselves do. The money disbursed from the pension fund is not used for public infrastructure, nor public works, nor any facilities that are shared equally by all, nor to provide services to the Public that are equally available to and used by all. There are less restrictive alternatives to a statutorily mandated retirement subsidy for a sub-class, namely individual self-contributed retirement subsidy, or by agreement between labor and management of the municipal corporation on an as-negotiated basis.

116)  Further, the State Constitutions, of Washington, Arizona, and Oregon (at least), explicitly prohibit special privileges being granted by state law to individual Citizens, nor classes of Citizens:

28

1

Arizona Constitution Article 2, Section 13:

*"No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."*

Washington State Constitution Article 1, Section 12:

*"No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."*

Oregon State Constitution Article 1 Section 20:

*"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."*

117)   These provisions of other states' Constitutions are applicable to Florida law, per Article IV, Section I of the United States Constitution, which states:

*"Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state. And the Congress may by general laws prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof."*

118)   Because the Citizens as a whole are not granted by law these same benefits as castor and other police officers, castor and other police officers are therefore not entitled to them. Per the Bureau of Labor Statistics Of The United States Department of Labor, the average US salary is approximately $44,000 annually, and nine of the ten most common occupations pay less than $40,000 annually, (Exhibit 9). Further per the BLS statistics, the cost of living in Tampa is approximately ten percent below national average, (Exhibits 10, 11), while castor's salary was, and eric ward's salary is four times the national average, and likewise per BLS statistics, less than a quorum of Citizens, (67%) have any retirement benefits at all. (Ex.

28

12). Public officials are only entitled to retirement benefits when the entire public has them,

1    and not entitled to salaries above those they serve. And, since like all working Citizens, municipal police officers will receive Social Security benefits, they are not entitled to additional benefits created by state law. For these reasons then, castor and ward's salaries are a misappropriation of Public Funds, and FRS §§ 185.01, 185.03, 185.05 and 185.25 are unconstitutional, because they deny Citizens equal protection, application, and benefit of such law, because there is no compelling objective for such law, and because there are less restrictive alternatives.

119)  Further, per the City of Tampa 2015 Recommended Operating and Capital Budget, pp. 212-213, payment to the "Fire and Police Pension" has nearly tripled since 2012 from $92,997,870 to $278,296,220 while payments to the "General Employee Pension Fund" have more than doubled since 2012, from $42,284,269 to $110,317,393. The current market value of the "Fire and Police Pension" is $2.088 Billion, which is almost triple the market value of the "General Employee Pension" at $742.5 Million. Ultimately these funds have been bilked from the Public by unconstitutional state law, and the "Fire and Police Pension" is discriminatory to General Employees, and denies them equal protection. Police and Fire Employees are the only ones benefiting from that fund, while all other Tampa employees have reduced benefits, pursuant to Chapter 23559, Laws of Florida 1945, and therefor any persons who obtain non-police or non-firefighter employment from the Municipal Corporation of Tampa are discriminated against by these laws.

120)  Likewise those who are not employed by the Municipal Corporation of Tampa are discriminated against by the statutes creating pensions for those employed by the Municipal Corporation of Tampa.

28

1

## C) **Factual Allegations Regarding The "KopCam"**:

121)  A recent news article published in the Free Press, (8 January 2015, Ex. 13), indicates

that a pilot-program for Tampa police to be wearing individual audio-video recoding

cameras is being implemented, at a cost of $83,000 for sixty officers, and that the major cost

involved is for "storage software" sold to the department by the vendor, taser international,

whose products are used by police officers in Florida to threaten the Public with violence

and death,  for failure to "obey" police orders, instead of charging persons with violating

whatever law supposedly makes such a crime, so that a Jury may decide.


122)  However, these video camera devices allow the officer to begin and end recording,

thereby allowing the officers to bias the acquisition of evidence in their favor, and as a result

will do nothing to prevent the type of harm and violations of Civil Rights by Tampa police

officers charged herein.


123)  Further, all the "software" components needed to fully implement a publicly available

video storage and retrieval system are available free-of-charge as "open-source" software,

and these components can be combined inexpensively to provide a customized system to

meet the Public's needs in any municipality, while at the same time making the recorded

videos fully available to the Public via the "Internet". And, to a large extent, as a

professional technology developer, Plaintiff has already combined such software

components to create such video acquisition, storage, and distribution systems. It is likely

that taser international is already using such free software components, yet charging a high

price for them, but regardless, they are ultimately ripping the Public off by charging The

Municipal Corporation of Tampa a prohibitively high price for something that is available

for free, and can be customized to a particular deployment, at a relatively low cost.


124)  castor stated in the article mentioned supra, that her prediction is that deploying such a

28   system will "improve officer behavior to a small degree" but that it will "improve the

1

behavior of the Citizens to a very large degree" and that deploying such a system in Tampa will be a "whole new reality show for the rest of the community because Citizens have no idea what officers do out on the street every day."

125)   That statement is offensive in se, and is just another example of the congenital narcissism of a tyrant like castor. It is not clear what supposed behavior "improvements" she was presuming to suggest, however, if she did not like how Citizens behaved, she was always free to get another job where she did not have to put herself in their midst. The Citizens are free to behave as they wish. Whether or not that behavior is offensive to a police officer is irrelevant. The Public owes no obligation of politeness nor consideration to police officers whatsoever. Further, her statement constitutes the continued habitual denials that the police violate the Law and the Constitution even in the face of countless Civil Rights cases, and recorded videos of police harassing, abusing assaulting and murdering Citizens. Her implication that the Citizens are somehow a problem, or *the* problem, is offensive and disturbing. It is also delusional, and clearly indicates a mentality that is based in a presumption of guilt, and as such her mentality is a danger to society, in violation of FRS § 394.451 et seq.

126)   castor's claim that the "Citizens have no idea what officers do out on the street every day" is likewise delusional. First, because it is psychotic on her part to claim to know comprehensively, or presume herself to claim to know, the ideas, thought content, (or absence thereof), nor the conscience, or mentality of more than 300,000 separate other individuals, whom she has never met, much less ever interacted with in any way, and second, because per the Hillsborough County Court Records published at ftp://hillsclerk.com, the Tampa police issue around 20,000 Civil Traffic Citations every year, and about the same amount of Criminal Traffic Citations every year. When those records are aggregated, at least 584,000 *separate people* were given either a Civil Traffic Citation, or a

28   Criminal Traffic Citation, by Tampa PD between 2003, and the time of filing this complaint.

I

Likewise, the Hillsborough County Court processes around 20,000 misdemeanor, and 20,000 felony cases each year. The notion that the Citizens have "no idea what officers do out on the street every day" is, mathematically speaking at least, completely disbelievable . It is inconceivable how castor could ever claim she knows what ideas the Citizens either do have or don't have.

127) Her comments amount to a continued denial of her and people like her's conduct, and a projection of blame on to everybody else. It is disgusting, disturbing, and a shock to the conscience, and it is indicative of narcissistic delusions of self-importance, or delusions of some kind of omni-prescience. (The typical "everybody else doesn't get it" mentality). The Public *must* have an idea what officers do out on the street every day, because it is being done to *them*. En Masse. If not, then what is it these officers *are* doing every day that the Citizens are unaware of? Conspiring secretly against the Public? That is police officers' job, to interact every with the Public in their professional capacity every day. If the Public is unaware of "what officers do out on the street every day", then castor admits that they are engaging in a policy or custom of secrecy against the Public, which constitutes treason, or at minimum, failure to perform their duty.

128) What castor and all other delusional narcissistic police officers need to be made to understand, is that everything they have comes from the rest of the Public. None of the food that is brought to people's tables every day is produced by police officers. None of the buildings that people live and work in every day are built by police officers. None of the businesses that generate all the revenue and provide all the jobs and all the economy of this Nation are run by nor staffed by police officers. None of the roads and bridges that people travel every day are built by police officers. None of the consumer goods that people use and rely on every day are produced by police officers. Nothing of the genuine sustenance of this Country comes from police officers. Because the Public has the Right to "treat" the mental

28   illness of its public servants, Plaintiff seeks relief as requested in Paragraph 414, §§ xi – xv,

1

infra.

129)  castor further claimed in the news article mentioned that Citizens would only be notified that they are being recorded when the officers enter a private space. This is a violation of all Citizen's Rights to Due Process and Equal Protection of Law. The "no reasonable expectation of Privacy" rule applies to Citizens video recording other Citizens in public. It does not apply to Citizens video recording police officers, as police officers are public servants doing their public duty and all Citizens have a Right to make a Public and Journalistic Record thereof, and to audit the conduct of public servants to maintain Constitutional Compliance. (*Ex Parte Young*, 209 U.S. 123, (1908)), Further the "no reasonable expectation of Privacy" rule does not apply to police video or audio recording Citizens in public as those recordings are public records, and the Public has a Right to Free and unencumbered access to those records, and when those recordings are made during contact with the Public by police officers, the Public has a Right to be informed of their Rights any time they are accosted by police officers, arrested, or otherwise not free to go, or led to believe so for any reason, or by any conduct of police officers, and these Rights not only include notice of the Rights of the accused, per *Miranda v. Arizona,* (384 U.S. 436), but also include notice of their Rights to Equal Protection of Law, Due Process, and Free Access to Public Records. Because the policy announced by castor in the Free Press regarding video recording by police officers is a blatant violation of the Public's Rights, and each Citizen's individually, Plaintiff has the Right to seek relief *Jus Tertii,* therefor, and likewise to impose Constitutional Compliance upon Tampa police officers, per *Ex Parte Young*, as requested in Paragraph 415, §§ ii – iv, infra.

130)  Because Plaintiff has prior as a matter of business prototyped, and is and was developing such a system at the business location mentioned herein that was described in the article mentioned supra, (see http://KopCam.com, and Exhibit 16), and because that

28

endeavor has value to Plaintiff, and is therefore Property, and because Plaintiff is now

deprived of that endeavor by the acts of Tampa police defendants, Plaintiff is entitled to capitalize on this opportunity via punitive damages upon castor, and the Municipal Corporation of Tampa for respondeat superior liability for the conduct of all other Tampa police defendants, for the damages caused to Plaintiff, as is requested in Paragraph 414, § xi – xv, infra.

131) Likewise because Plaintiff's "KopCam" system is less expensive, denies police officers the ability to control the acquisition of evidence in their favor, and uses "open-source" software that is available in the Public Domain, free of cost, and because ultimately any such system must be developed via real-world testing and refinement, and because Plaintiff has a desire to do so, that such is a matter of Value to him, and is therefor Property obtainable by him as relief for the damages caused by Tampa police defendants. Plaintiff therefore has the Right to develop and capitalize on such a system as punitive damages upon carithers, gudes, neal, and norris, for their conduct charged herein, and upon castor and the Municipal Corporation of Tampa for their liability as respondeat superior for the conduct of all Tampa police defendants charged herein, and for castor's bullshit described supra, as is requested in Paragraph 414, §§ xi – xv, infra.

132) Additionally, Plaintiff's KopCam system reduces the video-storage cost associated with deploying a police-officer-worn camera system across an entire department. The cost of storing all the video captured is cited as the major hurdle at this time, to such a system, because such systems produce many hours of recorded video and audio data, and the cost of preserving that much electronically recorded information is prohibitive given the cost of technology currently available to do so. However, there are currently multiple technical methods available to reduce the overall amount of electronically recorded information produced by such systems, and thereby reducing the cost of storing it. Plaintiff's KopCam system makes use of these methods, and the system is engineered from the outset to do so. (Current systems simply use off-the-shelf miniature personal video cameras, typically from

28

1

China, adapted to police use. These cameras were designed for occasional use by a person to record video and audio. They were not designed as an integrated system for recording an entire daily shift worth of video per officer, up to 10 hours, integrating those recordings with data from dispatch and record-keeping systems currently in use, and automatically editing, transcoding, or otherwise modifying the video to minimize the amount of "data" produced, to reduce storage costs). Plaintiff's KopCam system takes all these parameters into consideration, and is conceived from the outset to meet the technical demands of police department use, Public cost considerations, Individual Constitutional Protections of the Public, and was designed, and is to be manufactured here in America.

133) Further, because Constitutional Protections are ONLY maintained by adversariality and opposition to police who violate them, and not by police sycophants like a university "criminology" (a.k.a. cop-school) program, nor private corporations taser international who glad-hand violators of Constitutional Law, and profit therefrom, thereby enabling and perpetuating police violent behavioral pathology, tyranny, and treason, Plaintiff, by a Corporation he creates for the purpose of developing and deploying a police video-camera system, is entitled to be given an exclusive contractual role in developing and deploying such a system upon Tampa police officers, as punitive damages requested in Paragraph 414 §§ xi – xv, infra, upon defendant castor, and eric ward as her replacement, and The Municipal Corporation of Tampa as respondeat superior for the custom of Tampa police defendants' conduct charged herein.

134) Because carithers, gudes, neal, and norris were not at arrest time using such a system as The KopCam, they apparently believed they were free to violate Plaintiff's Rights as claimed herein, and knew they could escape culpability therefor, due to lack of evidence thereof, and as such it is *but for* the absence of such a system, that they engaged in the custom of conduct that that they did, per policy set by castor, and as such Plaintiff has the

28

Right to enforce Constitutional Compliance upon these officers as Punitive Damages, and

1

Injunctive Relief, by compelling those individuals at least, to use such a system for the purpose of protecting Citizens' Civil Rights, and for the purpose of enforcing Constitutional Compliance, (per *Ex Parte Young*, 209 U.S. 123 (1908)), upon these individuals.

**D) Allegations Regarding The Unconstitutionality of Florida Law Chapter 2015-41, (Amendments to FRS § 119.071):**

135) At the time of filing of this complaint, the Florida State Legislature passed a Bill regarding the use of "body cameras" worn by law enforcement officers in the state of Florida. That Bill was approved by The Governor on 21 May 2015, was enacted into Florida Law as Chapter 2015-41 of the Florida Laws, and took effect on 1 July 2015. That act amends Florida Revised Statute Chapter 119, Section 017, rendering that statute unconstitutional.

136) Florida Law 2015-41 and its amendments to FRS § 119.071 are unconstitutional because it prevents the recordings made by those devices from being released to the public under almost all circumstances where they will be used, including and especially public or governmental facilities that offer "mental health care" or "social services" where the Public has a compelling interest to maintain Constitutional Compliance, and to expose fraud, and fraudulent persons like psychiatrists, psychologists, and social workers as the fraudulent persons that they are, and prosecuting their unlawful conduct. Such restrictions defeat the purpose of making these recordings, namely police and government accountability, Civil Rights protection, and maintaining Constitutional Compliance by Public officers.

137) Florida Law 2015-41 and its amendments to FRS § 119.071 are unconstitutional because because it denies the Public equal access to the information recorded, because it fails to require police to notify individuals that they are being recorded, and because its supposed "compelling objective" or "rational basis" is supposedly to prevent a supposed "chilling effect" that supposedly will cause a person to refuse to "cooperate" with law

28

1

enforcement officers, or call a law enforcement agency because supposedly: *"People who know they are being recorded by a body camera may be unwilling to cooperate fully with law enforcement officers if they know that a body camera recording can be made publicly available to anyone else. People may also be less likely to call a law enforcement agency for services if their sensitive personal information or the circumstances that necessitate a law enforcement agency's involvement are subject to public dissemination as a body camera recording".* (id., § 2, ¶ 3).

138)  Because no person is required to cooperate with law enforcement officers, nor call a law enforcement agency for any reason, and all persons have the Right To Remain Silent, the Bill's "Compelling Objective" or "Rational Basis" is in violation of established Constitutional Protections. Further, there is no rational basis for a legislature to take any action, nor restrict the Public's Rights based on what it supposedly believes people supposedly *may* do. Further, if for any reason a person is not free to terminate the encounter with law enforcement officers, then they are under arrest, and have a Right to Remain Silent, and be informed of that Right, and the other Rights of accused and arrested persons, per *Miranda v. Arizona.*

139)  Further, Florida Law 2015-41 and its amendments to FRS § 119.071 are unconstitutional because because it restricts the release of recordings made by "body cameras" worn by police officers subject to Court Order, and restricts release of recorded material to a person to only that material that law enforcement supposedly considers *"relevant to the person's presence in the recording".* A person for whom police have entered their residence without warrant has an Absolute Right to be informed of the Totality of Circumstances that justified any such entry in order to challenge the lawfulness of that entry.

28

1

140)  For whatever privacy protections may ultimately be the compelling objective of the amendments to FRS § 119.071, less restrictive alternatives exist. Since a person's privacy inside their own residence is already protected by Constitutional Law, a law enforcement officer is already prohibited from entering a person's residence without a warrant. In any case where they may enter a person's residence lawfully without a warrant, sufficient notice to that person that they are being recorded must be given, and if a person declines that recording, on privacy grounds, then it can be prohibited from release to the public by lack of consent thereto by the recorded party. The appropriate way for the state to guarantee privacy protection is to enforce and maintain Constitutional Compliance by law enforcement officers. NOT by reducing the Rights of the Public.

141)  Plaintiff challenges the Constitutionality of Florida Law 2015-41 (Amendments to FRS § 119.071) on the grounds stated in Paragraphs 135 – 140 supra, and for the conduct of Tampa police defendants charged herein as cause of action against them, as cause of action to challenge the Constitutionality of that Law, and grounds for relief requested in Paragraph 415, § iv, to be granted.

**E) Unconstitutionality of FRS § 322.34 (DWLS):**

142)  FRS § 322.34 is facially unconstitutional for the reasons stated in Paragraphs 143 – 161 infra.

143)  FRS § 322.34 Violates Persons Right To Travel. Travel is a Fundamental Right. There is no compelling objective for FRS § 322.34, nor for suspending Drivers' Licenses or Privileges, and regardless of whatever compelling objective may be stated by the law, there are less restrictive alternatives to obtain it rather than threaten a person with arrest, criminal prosecution, incarceration, and seizure of property for engaging in an otherwise completely lawful, and Rightful conduct, but because they did not pay a judgment in a civil case. The law fails to state any compelling objective for its existence and violates a person's Right To

28

1

Travel solely for revenue collection.

144) FRS § 322.34 Violates Persons Rights to Procedural and Substantive Due Process because:

     i) A person can be arrested and charged charged twenty-four hours per day, seven days a week, three-hundred-sixty-five days a year for DWLS. The Court and The DHSMV are only open business hours, and not on holidays. The state will enforce the law at all times and arrest and charge a person with non-compliance at all times but places no lawful provisions on its agencies to concomitantly avail compliance to the public at all times.

     ii) FRS § 322.34 is vague and conflicting with regard to what constitutes the Knowledge element necessary to constitute a criminal violation of that statute. FRS § 322.34 states that "*The element of knowledge is satisfied if the person has been previously cited as provided in subsection (1)...*". If a person is cited for violating FRS § 322.34(1), it is a moving violation. (A civil infraction). At some point after such a citation a person's license can be reinstated. However the law is not clear as to whether "previously cited" means *ever* having been previously cited, or that if a person has been previously cited and then continues drive a vehicle without first reinstating their license. If a person is cited for violating FRS § 322.34(1), that could constitute notice that their driver's license is suspended, but at such time as it is reinstated, it is no longer suspended. However the law reads such that because a person had *ever* been cited for violating FRS § 322.34(1), that it constitutes notice that their license is suspended at the current time even if it had been reinstated in the interim, but then was suspended again for some other reason.

145) FRS 322.4 denies persons Equal protection of law and imposes a "Euclidian Discrimination" upon persons because in all states, cities, counties, and municipalities the distance between everything and everything else is set by state law. This is because zoning ordinances set the size of roadways, parking lots, residential and commercial parcels sizes, and the dimensions of all land use. These dimensions combine to create the distance

28

1   between everywhere and everywhere else.

146)  Since the advent of the automobile more than a century ago, (e.g., Ford Motor

Company, incorporated 1903), all municipalities have been "zoned" to accommodate the use

of the automobile. All roads, highways, and interstates, are dimensioned for the use of

automobiles. Commercial and residential properties are required by law to have a certain

number of parking spaces based on occupancy, and so forth. As stated, these dimensions

combine to create distances between things that are disfavorable to those who do not travel

by automobile.

147)  Evidence in support of this can be seen in Cities that were "zoned" before the advent

of the automobile. (New York City, Philadelphia, Washington DC., San Francisco, Paris,

London, Rome, Athens, Istanbul to name a few). In these older cities, generally speaking,

everything is in walking distance, and the cities were dimensioned to suit people walking,

because there was little other alternative. In these cities necessities of life like food, labor,

housing, medical care and the like are all within walking distance of each other, and likewise

more comprehensive public transportation is often in place.

148)  The Constitutionality of local "Zoning" laws was determined by the United States

Supreme Court, in *Village of Euclid Ohio v. Ambler Realty Co.* (272 U.S. 365, (1926)).

(Coincidentally, if not ironically, Euclid was also a Greek mathematician who devised the

mathematics of Geometry, which is used heavily in land-surveying).

149)  There are over 15.6 Million Licensed drivers in Florida.

(http://www.flhsmv.gov/html/factsfigures/factsfiguresinfographic.pdf). This literally

represents 100% percent of the adult population.

(http://quickfacts.census.gov/qfd/states/12000.html). Not surprisingly, all geometrical

28   "Zoning" of land and parcel sizes is done to accommodate them. This creates a "Euclidian

Discrimination" against those who do not drive motor vehicles, because ultimately by state laws, everything becomes farther away than it would be if the entire population did not drive.

150)  Because of the state chooses to make by law everything as far away from everything else as it is, and does so to accommodate those who drive motor vehicles, those laws discriminate against those who do not drive. Because Amendment XIV of the United States Constitution guarantees all persons "equal protection of the laws", this kind of privilege-based discrimination is unconstitutional.

151)  Because of this, when a state, or some agency, or some commissioner suspends a persons driver's license for reasons not related to their competency nor skill in driving, (namely to compel them by threat of arrest, criminal charges, and theft of their motor vehicle and drivers license card to pay police officers', and other government officials' salaries), they are subjecting that person to this kind of discrimination. Because the state cannot retroactively shrink the geometric allotments of land parcels, buildings, roadways, parking lots, easements, and the like, much less do so individually for those whose driver's licenses it has suspended, and because the state does not provide any kind of equivalent transportation to those who do not drive that those who do drive provide to themselves, then to suspend a person's driver's license for reasons that are not due to them posing a clear and present danger to others, is unconstitutional because it denies persons Equal Protection of Law, because coexistent zoning laws create municipal and topographical dimensions that discriminate against the minority who does not drive in favor of those who do. Plaintiff refers to this kind of privilege-based discrimination as "Euclidian Discrimination".

152)  FRS § 322.34 Violates Persons Right To Drive. The Privilege to Drive is a Right. It is an expression of the Right To Travel. It is irrelevant what mode of travel is used. The legal definition of "privilege" is: "a special type of Right." The privilege to drive is a Right. A

person's Right to drive is threatened and they are threatened with arrest and incarceration, criminal prosecution, and seizure of property for continuing to engage in a conduct that is completely lawful, simply because they did not pay a judgment in a civil case brought by the state.

153) FRS § 322.34 Violates persons Right To Life. The Right To Life means not just being alive but living as one chooses, and the quality thereof. All persons have a Right to pursue Travel, Labor, Commerce, Liberty and any other lawful pursuits, and suspending a person's driver's license overwhelmingly and irreparably causes a person to lose their opportunity to travel, pursue Labor, Commerce, Economic Prosperity, and causes them to overwhelmingly suffer loss of their economic mobility.

154) FRS § 322.34 Violates persons Right To Be Free From excessive fines fees or penalties, cruel and unusual punishment. Suspension of Driver's Licenses is an indefinite punishment for failure to pay a judgment in a civil case brought by the state. Amendment VIII of the United States Constitution protects all individuals from excessive fines fees and penalties.

155) Suspending a person's Driver's License amounts to Bill of Attainder or Writ of Attainder. A person's Right to drive is "suspended", that is they are placed under threat of arrest, incarceration, and prosecution for exercising it, by act of administrators. Ultimately an act is made illegal sua-sponte, for a particular person, by a Court Clerk, or appointed administrator of the DHSMV, because they did not pay a judgment in a civil case, while that same act remains legal for all others. This is invidious discrimination and amounts to a writ of attainder. Bills or writs of attainder are prohibited by the United States Constitution, Article I, Sections 9 and 10, and The Florida Constitution, Article 1, Section 10.

28

1

156)  The State of Florida requiring persons who are licensed in another state to pay a "reinstatement fee" to reinstate their "Driving Privilege" after it has been suspended in Florida violates the Federal Protections of Interstate Comity. Plaintiff's License is issued by the state of Arizona, and he uses it to travel about the Country performing contracts for clients, and did come to Florida for such, and did operate as such in Florida through a Corporation founded by him. While it may be that Florida may charge a reinstatement fee to re-issue a license issued by the state of Florida, for use of a vehicle solely within the state of Florida, it may not charge a fee for a license, much less the privilege, to engage in Interstate Commerce. Out of State Drivers are granted their Privilege to Drive among the several states, by Interstate Comity. The State of Florida has no Right to charge a fee to issue a "Privilege" that is a matter of Federal Interstate Comity. (*Murdock v. Pennsylvania*, 319 U.S. 105, (1943), at p. 113 ).

157)  In Florida persons' Driver's Licenses and Privilege To Drive is suspended, (that is the person is threatened with arrest, criminal charges, prosecution, and theft of their vehicle and Driver's License card for continuing to drive a vehicle upon the highways of the state), for the purpose of enforcing collection of revenue by the state. (See Florida OPPAGA Report, p. 9, http://www.oppaga.state.fl.us/MonitorDocs/Reports/pdf/1407rpt.pdf). Collection of civil judgments from persons for cases brought against them by the state, is not a "compelling state objective", nor a reason to violate persons' Liberty. If the state cannot make due on the taxes consented to by the Public then the state is compelled to reduce services. Since government operates at a 75% - 95% labor cost, and per the Hillsborough County, and Tampa municipal budgets, it can be shown that all the revenue from civil traffic fines goes to pay police officers' or other officers' salaries, these individuals are violating other persons' Rights in order to subsidize their own existence. This constitutes theft and treason. Because those revenues that are ultimately collected by compelling people to by them by threat of arrest, seizure of person, and property, do not go to infrastructure or facilities to be used and

28   shared equally by all, but only to the benefit of specific individuals, collection of those

revenues is not a compelling objective. Ultimately, suspending a person's Driver's License or Privilege amounts to an indefinite punishment for a person's failure to pay civil judgment, and makes a particular conduct that is legal for all others, (driving), a crime for that person exclusively, because they did not pay a civil judgment, and that conduct is not made illegal by an act of the legislature, but by an administrative officer, and in all reality, by computer programs that operate without any human interaction.

158)  FRS § 322.34 causes a person to be imprisoned for debt, in violation of Florida Constitution Article I, Section 11. A civil fine, or a fine for a civil infraction is a non-consensual debt imposed by the state. Deprivation of Liberty of any kind amounts to imprisonment. Whether that person is incarcerated, or imprisoned by limitation of their economic mobility, or limitation of their Freedom to Travel or to move about, they are ultimately imprisoned for the debt created by the state.

159)  FRS § 322.34 imposes slavery, involuntary servitude, and forced labor upon a person in violation of 18 USC §§ 1584, 1589, and United States Constitution Amendment XIII. A person is compelled to work under threat of incarceration to pay whatever fine for civil infractions. Because 100% of the revenue collected by threatening persons Liberty, and depriving them of it until they pay, is used directly to pay the salaries of police officers, sheriff's deputies, court clerks and other government officials, and none of it goes to infrastructure, nor any other expenditures that are mutually shared and enjoyed by all the Public, all persons labor from which they pay fines is involuntary and is to financially serve a small number of particular individuals.

160)  A person is returned to a system of peonage by suspension of their driving privilege, in violation of 18 USC § 1581. Ultimately all persons who are not thieves or government officials, or possibly familially wealthy, or on welfare, must labor to generate revenue. The debt imposed imposed upon persons by the state for committing civil infractions, including

1 ones not related to driving in any way is nonconsensual. Because all persons must labor to pay such a debt, compelling persons by deprivation of Liberty to pay such a debt returns people to a system of peonage to subsidize the existence of those creating that debt.

161) Suspending a person's Privilege or License to Drive is a Violation of Consensus of The Governed. As stated supra, literally 100% of the adult population of the state of Florida chooses to drive motor vehicles. When the entire population of a State engages in a particular conduct, that constitutes both Prima Facie, and Unanimous Consent of The Governed to that conduct, and a unanimous affirmation that the conduct engaged in is considered legal by the people of that State. The Organic Laws Of The United States, United States Code, Volume 1, Declaration of Independence, states in relevant part: "We hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the Pursuit of Happiness.--That to secure these Rights, Governments are instituted among Men, deriving their just Powers from the Consent of the Governed...". Further, Article I, Section 1, of the Florida State Constitution states in relevant part: "All political power is inherent in the people." By the entire population of the State of Florida unanimously choosing to drive their vehicles upon the highways of the state, they are exercising their political power to declare that conduct legal, by engaging in that conduct unanimously.

162) FRS § 322.34 is further unconstitutional as-applied for the reasons stated in Paragraphs 163 – 169 infra.

163) As FRS § 322.34 is enforced in the State of Florida, it Violates persons' Rights To Due Process because:

     i) When a person is charged with DWLS in Florida the charging officer will seize or otherwise rob a person of their vehicle and Driver's License. There is no provision in Florida

28 Law for taking a person's Driver's License card for driving while their license is suspended

for failure to pay a judgment for a civil infraction. The excuse police use for taking the vehicle is that at such time a person is charged with DWLS (either with or without knowledge), that allowing a person to continue to use their vehicle is a crime. Per The United States Constitution Amendments V, and XIV, and Article I, section 9, of the Florida Constitution, no person shall be deprived of Life, Liberty, or Property without Due Process of Law. The minimum requirements of Due Process are Notice and Opportunity to Defend, and as a matter of Due Process all persons are entitled to a presumption of innocence. Seizure of a person's vehicle and their driver's license card when charged with DWLS is a violation of Constitutional Due Process requirements of Law and law enforcement.

ii) The law requires that a person **receive** notice that their license **has been suspended**, yet law enforcement officers in the State of Florida charge a person with criminal violations of FRS § 322.34 regardless of whether a person has received notice that their license is suspended or not. The records available to traffic enforcement officers at the time of a traffic stop contain no information whatsoever as to whether a person has actually **received** notice that their driver's license is suspended, but nonetheless officers charge persons with DWLS with knowledge based on those records.

iii) Other than actually being cited for DWLS, Florida Uniform Traffic Citations contain no provisions notifying a person that their driver's license has been suspended, canceled nor revoked as is required by FRS § 322.34(4).

iv) Florida Law enforcement officers claim that failure by a person to pay a traffic citation constitutes knowledge on their part that their driver's license is suspended. Failure to pay a civil judgment in a civil small-claims case does not constitute knowledge of anything related to a person's driver's license.

164) As FRS § 322.34 is enforced in the State of Florida, it Violates persons' Rights To Property for the same reasons as stated above, that a person's vehicle and driver's license card are seized at the time they are charged, even if that charge is a non-criminal civil-infraction charge. A law that is enforced by violating a person's Right to possess and use

1

their own property or cannot be enforced without doing so, is unconstitutional as applied.

165) FRS § 322.34 is Not Compatible with the Mailbox Rule. If a person's License (or Privilege) to Drive is suspended for failure to pay a judgment in a civil action, at such time as they deposit the payment in the mail, they have satisfied that judgment. Yet their license will remain suspended until such time as the payment is applied by the Court, and that they themselves take addition steps to have suspension removed by either paying a reinstatement fee to the Court, or by paying that reinstatement fee directly to the DHSMV. If a person continues to drive their automobile after a judgment against them was satisfied by mail, but before it is recorded, they are under threat of arrest, incarceration, seizure of property and criminal charges for engaging in a lawful behavior, and for failure to satisfy a civil judgment that they did satisfy.

166) In all cases where Plaintiff's license or privilege to drive in the state of Florida was suspended, ultimately that "suspension" was a product of errant record keeping, by the State of Florida. The State has a Due Process obligation to maintain correct records if those records are used as probable cause to charge a person with a crime, or as evidence to prosecute them with a crime, and arrest, criminal charge and prosecution based on incorrect records violates Amendments IV, V, VI, VIII, IX, X and XIV Of the United States Constitution.

167) In addition to "suspending" Plaintiff's privilege to drive in Florida, a Florida Clerk of Court complained to the Arizona State Department of Motor Vehicles because Plaintiff had allegedly not payed a default judgment for a civil traffic infraction case, in which Plaintiff was charged with an infraction for driving his motor vehicle on Private Property, and requested that the Arizona DMV suspend Plaintiff's Arizona Driver's License. The State of Florida, and its court clerks are in complete absence of jurisdiction to cause a person to be

28

arrested, nor have their property and person seized, nor to place them under threat of such,

for exercising any type of Right or Privilege in any other state, for any reason, and particularly when that Privilege or Right is licensed by some other state.

168)  Plaintiff was further notified by a Clerk of Court in the Hillsborough County Court, Traffic Department, that his Privilege to Drive in Florida, (which exists because of Plaintiff's Licensure to do so by the State of Arizona), would be "suspended", (that is Plaintiff would be placed under threat of incarceration, seizure of property and person, violence and death from state officers, arrest and criminal prosecution, for continuing to drive upon the highways of the State of Florida), if he did not pay a fee to appeal a previous charge of DWLS, which was ultimately the product of errant record keeping or other misconduct by the state. The circumstances thereof are described in Plaintiff's separate affidavit.

169)  Because all of the grounds listed in Paragraphs 163 – 168 supra, any enforcement of FRS § 322.34 is a violation of 42 USC § 1983, 1985, 1986 and 18 USC §§ 241, 242, 1581, 1584, and 1589. State Laws whose enforcement violates Federal Law whether the enforcement thereof is either criminal or tortious, are unconstitutional.

170)  Plaintiff submits as a separate affidavit, a statement of his experience with and circumstances of the enforcement of FRS § 322.34 upon him, in support of the Constitutional challenges to FRS 322.43 raised in Paragraphs 143 – 169 supra.

171)  Plaintiff additionally submits a Memorandum of Points and Authorities in support of his claims against FRS § 322.34, and Judicial Notice to those Authorities is hereby given.

28

I

**F) Unconstitutionality of FRS §§ 893.02(3), 893.03(1), 893.13 (Possesion of Cannabis):**

172) FRS §§ 893.02(3), 893.03(1), and 893.13 are unconstitutional with regard to Cannabis. They specifically control the entire genus "Cannabis" as a Controlled Substance. Cannabis is a plant that grows wild without the intention of, and despite Man. As with any wildly occurring plant it will grow and propagate itself without any action by any person, therefore there is no rational relation to the presence of Cannabis and the probability that a crime has been committed by any person. The Cannabis plant is capable of growing without producing any drug scheduled under FRS § 893.03. An example of that circumstance is "Industrial Hemp", (As defined in HR-1831, "Industrial Hemp Farming Act of 2011", and H.R.1009 -- Industrial Hemp Farming Act of 2007), which is indistinguishable from drug-containing Cannabis. FRS § 893.03 schedules numerous specific chemical compounds as controlled substances, including the accepted "drug" components of Cannabis, (TetraHydroCannabinols, FRS § 893.03(1)(c)(37) ), but also schedules the entire Cannabis genus as a controlled substance. (FRS § 893.02(3), FRS § 893.03(1)(c)(7)). Cannabis contains certain drug components, which are specifically identified as controlled substances under FRS § 893.03 as well as 21 U.S.C. §§ 802, 812. Minus these compounds Cannabis is not substantially different in any way from any other plant. It is more than 90% water, the remainder is mostly cellulose. (Cotton, Wood Fiber, Paper. Nothing illegal). In the case of Cannabis, certain drug-compounds are produced by the plant. Minus the drug compounds, Cannabis is not substantially different from any other plant. It is only the drug-components of Cannabis that potentially meet the criteria for scheduling as a controlled substance. (The notion of things like herbs, spices, fruits, vegetables, woods, shrubbery, lawn grass or other flora having a "high potential for abuse" is ridiculous in se, and is no compelling objective). FRS § 893.03(1), (Schedule I), proscribes that a substance must have no medical use AND a high probability for abuse. Both these criteria must be met because simply the fact that something has no medical use cannot by itself be a criteria for control under or by law, and likewise a substance that has "high potential for abuse" may be legal if it has medical value.

28

In FRS § 893.03 the term "abuse" is vague and over broad. Neither "Drug", nor "Abuse" are defined anywhere in FRS Chapter 893, The so-called Florida Comprehensive "Drug Abuse" Prevention and Control Act. By its colloquial meaning "abuse" means "wrongful use". This statute deprives an individual who would use these controlled substances rightfully of the Liberty Interest of using them, because of a presumption of "high probability" of "abuse" by some other party. This presumption constitutes prior restraint. The "clear and present danger" standard is not met. "High Probability" is not synonymous with "clear and present", and "abuse" does not sufficiently define the conduct sought to be proscribed. The provision in FRS § 893.03(1) that Cannabis has "no currently accepted medical use in treatment in the United States" is simply in error because twenty-three of the United States, and the District of Columbia, have passed Medical Marijuana legislation. In addition, four states, Washington, Colorado, Alaska, and Oregon, and the District of Columbia have fully repealed criminal statutes proscribing the personal possession of Cannabis. Citizens in Florida are Guaranteed by The United States Constitution the Full Faith and Credit of those Public Acts, because those acts are not acts particularly enacting legislation, but rather the repealing of laws proscribing conduct as illegal. While The State of Florida is certainly competent to legislate within its own sovereign boundaries, those states repealing laws prohibiting possession of Cannabis are securing that Blessing of Liberty to their Citizens, and it is the Interstate Comity of our Federal Union that extends that Blessing of Liberty, and the Privileges and Immunities concomitant therewith, to the Union as a Whole, pursuant to the Preamble of The United States Constitution. Because the Florida Laws challenged law make illegal a wildly growing plant that may not have any component at all that is schedulable as a controlled substance, and because the law is vague and over broad, and because enforcement of those laws impugns Plaintiff's Fundamental Rights to Life, Liberty, Property, To Be Let Alone, To Free Expression, To Privacy of Ones Own Body, to Freedom of Conscience, and to Freedom of Thought, and likewise, because Washington, Colorado, Alaska, Oregon and the District of Columbia have legalized Cannabis, the Florida Laws laws prohibiting the posession of Cannabis are unconstitutional.

28

173) FRS § 893.13 impugns Plaintiffs' Fundamental Rights because:

i) FRS § 893.13 violates Plaintiffs' Right to Property. Cannabis itself is Property: "Property" is "anything of value". "Value" is "the object of any Human Desire" Cannabis costs money, and Cannabis has value *in se* to its possessors. As such Cannabis is Property. Property Rights are Fundamental Rights. As such, FRS § 893.13 criminalizes possession of this property, namely Cannabis itself. The Effects of Cannabis are Property as well. The cerebral and corporeal effects of Cannabis have value to its users. Use requires at least temporary possession. Prohibition thereof impedes or impugns the obtaining and enjoyment of these benefits, namely the effects of Cannabis, desired by it users, and as such FRS § 893.13 criminalizes the enjoyment of this property as well.

ii) FRS § 893.13 violates Plaintiffs' Right to Privacy. Per *Lawrence v. Texas*, *Roe v. Wade*, and *Griswold v. Connecticut*, Amendments IV, IX, and XIV of the US Constitution, and Article I, Section 23 of the Florida Constitution, the penumbral protections of The Constitution, namely to the Right of Privacy within one's own body, apply. A person may put Cannabis, and its chemical compounds into their blood, brain, and lungs, or otherwise, and but for both a *clear* and *present* danger to others, created thereby, the state may not prohibit them doing so. Because FRS § 893.13 does prohibit doing so, under imminent threat of arrest, criminal prosecution, and incarceration, Plaintiffs and all similarly situated persons' Fundamental Rights to Privacy are violated by this law.

iii) FRS § 893.13 violates Plaintiff's Rights to Free Expression. Cannabis is a facilitator thereof. The use of Cannabis enhances one's ability to perceive and create Music, Art, Literature, Science and Technology, because of its effects on the Mind. Prohibition of the use of Cannabis by the statute challenged denies Plaintiff and all persons similarly situated the enjoyment of this Right, by the use of Cannabis, under imminent threat of arrest, prosecution, and incarceration.

iv) FRS § 893.13 violates Plaintiffs' Right to Freedom of Thought. The use of Cannabis facilitates thinking that is not available without it, and Cannabis users enjoy the thinking created by the stimulation of the imagination created by cannabis use, and in many

1

cases convert that thinking into practical reality for their monetary gain. Prohibition of the use of Cannabis denies Plaintiff and all persons similarly situated of this enjoyment by imminent threat of arrest, criminal prosecution, seizure of property, and incarceration.

174) Because The state MUST show BOTH its Compelling Objective for restricting or impugning the Fundamental Rights stated Supra, AND, The Absence of Less Restrictive Alternatives thereto, upon their failure to do so this Court must find that the statutes under FRS Chapter 893 that are challenged herein are unconstitutional, and grant the relief as requested in Paragraph 415 § vii, infra.

175) FRS § 893.13 is vague because:

    i) The word "Drug" is not defined anywhere in FRS Chapter 893.

    ii) The word abuse is "Abuse" not defined anywhere in FRS Chapter 893.

    iii) "High Probability" not defined. Probability neither evaluated nor stated mathematically is bogus on its face, and is merely an arbitrary claim.

    iv) The Law in question is called the "Florida Comprehensive Drug Abuse Prevention and Control Act", yet the very cause for the Act is not defined in any kind of meaningful way.

176) FRS § 893.13 is overbroad. Industrial hemp, (a plant with no drug components), is included in prohibition of genus Cannabis. This is a natural product that grows despite Man, and a very useful and commercially valuable commodity. The law prohibits individuals, industry, and communities from enjoying these benefits, and constitutes an arbitrary enforcement because the commercial use and enjoyment of otherwise harmless and beneficial products is prohibited by its inclusion in the proscription of a separate, distinct and unrelated material as contraband.

28

1

177) FRS § 893.13 fails to meet is burden of Substantive due process because:

i) The law incorporates FRS § 893.03(1) by reference, which codifies Cannabis and its natural drug components as a Schedule I Controlled Substance. The law is therefor factually in error with its claim of "No Accepted Medical Use" of Cannabis, because as stated supra, Twenty-Three of the Several States, and the District of Columbia have statutorily recognized the medical use of Cannabis and its natural drug components. (Additionally FRS § 893.03(3) recognizes "Synthetic THC", "Dronabinol" as a Schedule III, medically useful controlled substance). Laws must be factually correct, and not self-contradicting in order to be reasonably obeyable, much less legitimately enforceable.

ii) False factual claims within a law, amount to at minimum arbitrary and capricious conditions upon which the law is based, and as such places arbitrary and capricious restrictions upon Plaintiff and all individuals, and ultmately allows for the enforcement of arbitrary proscriptions of People's conduct.

iii) Because the false factual claims stated supra, are in the law's "Compelling Objective" that objective is non-existent, and because the law impugns the Fundamental Rights stated herein, minus a "Compelling Objective" the law fails to meet its Constitutional mandate. The sections of law under FRS Chapter 893 that are now factually erroneous, are ultimately a legal nullity and therefore create a void in whatver law that incorporates them, thereby rendering it unconstitutional because since any law that is unconstitutional is null and void, (*Marbury v. Madison*, 1 Cranch, 137 (1803)), it follows then that any law (or portion thereof) that is null and void, is unconstitutional. (If unconstitutional equals null and void, then null and void equals unconstitutional).

178) FRS § 893.13 fails to meet is burden to Interstate Comity, as required by The United States Constitution, Article IV, Sections 1 and 2. A Recent Intervening Change In Law, namely the "legalization" (or repeal of statutes proscribing use, or prohibiting possession), of Cannabis, in Colorado, Washington, Oregon, Alaska, and the District of Columbia, immediately emburdens the State of Florida and its officers to honor that Blessing of

28

1

Liberty, and its concomitant Privileges and Immunities that were secured by the Public Acts of those states repealing the prohibition to the possession of Cannabis, and to do so by enjoining enforcement of the Florida Laws prohibiting the possession of Cannabis, pursuant to Article IV, §§ 1 and 2 of The Constitution of The United States of America, and its Preamble, until such time as the Florida State Legislature amends Florida state law to be in compliance with the United States Constitution.

179) Because per the Hillsborough County Court's own records show that no less than 16,000 people have already been prosecuted for Pssession of Cannabis, and that it is the County's most prevalent misdemeanor crime, and because the Language of the Florida Statutes challenged herein mirrors almost verbatim, the Federal Drug Laws proscribing possession of Cannabis, and because the recent legalization of possession of Cannabis among several states creates a disuniformity of law between the Several States, and between the Several States and the Union, resolving these conflicts of law is an Urgent Matter of Public Importance requiring the attention of This Court.

## VI. Claims Of Liability:

### A). Claims of Liability upon Tampa police defendants, Municipal Corporation of Tampa, Bob Buckhorn and Karina Rios:

Because of all the aforementioned, Plaintiff holds defendants danny rhodes, dusty rhodes, gudes, neal, norris, carithers, filippone, castor, ward, Buckhorn, The Municipal Corporation of Tampa and Karina Rios liable as follows:

180) Because carithers, gudes, norris, neal, dusty rhodes, danny rhodes and filippone did, and do by their conduct, and words to mccall did explicitly tell or lead mccall to believe that she was free to enter and take the property at 106 West Osborne, they are liable as

28 accomplices for her taking of that property, and the damages caused to Plaintiff thereby.

1

181) Because carithers, gudes, neal and norris did willfully and deliberately attempt to destroy and bespoil the preponderance of evidence supporting criminal charges against mccall and rose, as described in Paragraphs 58 – 62 supra, by refusing to retrieve that evidence when rose attempted to steal it, they did act in their official capacity act as accomplices to mccall and rose in the commission of unlawful imprisonment, and extortion as described supra.

182) Because carithers, gudes, neal, norris, dusty rhodes, danny rhodes and filippone did by their refusal to "trespass" mccall from the real property located at 106 West Osborne, per established department policy and custom, that is, witness that mccall was told not to enter upon that property, and subsequently notify her of the consequent charges therefor, they are liable as accomplices for her unlawful taking of that property, for failure to intervene, and for the damages caused to Plaintiff thereby.

183) Because mccall did commit trespass, burglary, theft, false imprisonment, extortion, harassment, false claims to law enforcement, threats, vexation and annoyance, and carithers, gudes, neal, norris, dusty rhodes, danny rhodes, filippone and Rios were all notified of this, and have all refused pursuant to their Oath to act in their official capacity, to prevent this conduct, and charge crimes therefor, they are liable for aiding and abetting mccall and rose in their crimes against Plaintiff, by their refusal to intervene, and for separate Civil Rights violations by their conduct in their official capacity, for their refusal to intervene, and for the damages caused to Plaintiff thereby.

184) Because castor is liable as the respondeat superior party liable for creating the policy by which Tampa PD officers deliberately impose a "single victim / single perpetrator" false narrative upon the Totality of Circumstances, by arresting and charging only the party being reported, and not the party reporting a crime, thereby misrepresenting the Totality of Circumstances, and thereby not appropriately protecting the Plaintiff's Rights, and the Rights

28

|

of all Citizens equally, and castor is liable for promoting or allowing the individual officers custom of doing so.

185) castor is liable as the respondeat superior party liable for the policy of Tampa PD officers deliberately using the false claim that a mccall's conduct was a exclusively "civil matter", in violation of FRS § 83.54, as an excuse for their indifference, and not charging mccall with trespass, unlawful imprisonment and theft, and is yet another of their habitual, false, (or delusional), justifications for deliberately pitting Citizens against each other, for their sadistic enjoyment, to keep themselves employed, and to keep Citizens preoccupied with inter-Citizen squabbles for the purpose of diverting their attention from noticing the menace, social parasitia, thievery, usurpation and corruption that the Tampa police present. Because this divide-and-conquer strategy is a long known and deliberate military strategy, this policy constitutes an act of war and is therefor treason.

186) Because they are married to, or otherwise domestic partners with defendants castor, carithers, filippone, danny rhodes, dusty rhodes, and ward, their wives, homosexual or lesbian domestic partners are liable in a community-property capacity as recipients of whatever ill-gotten gains are received by defendants including criminal proceeds and salaries paid to defendants while or for violating the Law or the Constitution as claimed in this matter.

187) Because they are police officers, carithers, gudes, norris, neal, dusty rhodes, danny rhodes, filippone and castor ALL know and have cause to know that felony charges cause a person to be denied employment. This fact is well known by all working people, and they themselves are denied employment for felony charges, according to Tampa PD Policy.

188) Because they are police officers, carithers, gudes, norris, neal, dusty rhodes, danny
28  rhodes, filippone and castor ALL know and have cause to know that a person's employment

depends entirely on the free and full use of a motor vehicle. This is prima-facie because of the obvious size and dimensions of the Tampa area, because of the lack of any equivalent alternative, and because they themselves are required to have a valid driver's license to be police officers.

189) Because they are police officers, carithers, gudes, neal, norris, dusty rhodes, danny rhodes filippone and castor ALL know that for the charges that were filed against Plaintiff, that bond would be set at the amount it was, and they all know based on their own salaries, and the national mean and mode salaries being less than $45,000 and $34,000 annually, (Ex. 9), that Plaintiff, nor any normally employed person could ever be able to make the excessive bail that was placed upon him that represents two to three months *gross* salary of the working public.

190) Because they know all the above, and did deliberately sadistically, deliberately indifferently, passive-aggresively, and covert-aggresively refuse to lend aid to Plaintiff by arresting and charging mccall, carithers, gudes, neal, norris, dusty rhodes, danny rhodes, and filippone thereby denied Plaintiff Equal Protection of Law, and caused him to be a victim of, and did commit the crimes of trespass, robbery, threat, assault, and battery, false imprisonment and extortion themselves, or by and through the aiding and abetting of donna mccall, and sandra rose, they are liable for the same civil damages and criminal prosecution as mccall and rose.

191) Because carithers, neal, gudes, norris, filippone, dusty rhodes, danny rhodes, and castor all swore an Oath per Article II, Section 5(b) of The Florida Constitution, and pursuant to Florida Revised Statutes, Chapter 876, they are liable for breach of duty, and failure to act pursuant to that Oath. (Ex. 14).

28

1

192) Because carithers, neal, gudes, norris, filippone, dusty rhodes, danny rhodes, and castor are police officers in the State of Florida, the Standard of Care for their official conduct is mandated by The Constitution of The United States of America, and The Constitution of The State of Florida, in addition to the Ordinary Standard of Care obliged to all persons by Statutory and Common Law.

193) Because carithers, neal, gudes, norris, filippone, dusty rhodes, danny rhodes, and castor are police officers in the State of Florida, the Standard of Care for their professional conduct is additionally mandated by the Florida Department of Law Enforcement Law Enforcement Officer Ethical Standards of Conduct, (Ex. 15), and they did individually, collectively, by custom, in conspiracy, and per policy set by castor violate at minimum Rules 1.1, 1.2, 1.3, 1.4, 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 3.1, 3.2, 3.3, 5.1, 5.2, 5.3, 6.1, and 8.1 thereof by their conduct alleged herein.

194) carithers, neal, gudes, norris, filippone, dusty rhodes, and danny rhodes violated Principle 1, Rules 1.1 – 1.4 of the FDLE Standards of Conduct because:

i) They violated the Constitution of the United States, and the Florida Constitution, by depriving Plaintiff of, or causing Plaintiff to to be deprived of his Constitutionally protected Rights as charged in Counts I – XXXI, and Section X, infra.

ii) They violated applicable laws, with regard to self defense, (FRS § 776.032), and as to real-estate transactions between landlord and tenant, and grantors and grantees of Real Property per Florida Statutes, and Florida Common law as alleged herein, and charged in Counts III, IV, XX, XXI, and Section X infra.

iii) They exceeded their authority by unlawfully arresting Plaintiff, and did unlawfully restrict Plaintiff's Freedom by arresting Plaintiff the moment they arrived on the scene, without making any determination of probable cause, nor establishing any facts, and keeping Plaintiff unlawfully imprisoned in a police car for close to two hours before taking Plaintiff to the County Jail, to be brought before a Judge, as alleged herein, and charged in

28

Counts VII, VIII, XI, XII, XIII, XIV, and Section X infra.

iv) They wrongfully charged Plaintiff with serious crimes as alleged herein, and as charged in Counts XX, XXI, and Section X infra, for defending himself against robbery, home-invasion, theft, and unlawful imprisonment perpetrated by mccall and rose.

v) They did commit criminal offenses as alleged herein and as charged in Counts VII, VIII, IX, X, and Section X infra, by unlawfully imprisoning Plaintiff, and aiding and abetting mccall and rose, in their theft of Plaintiff's Personal Property, and the robbery of Real Property from Plaintiff's Corporation.

vi) They did disobey FRS § 776.032, and Florida Rules of Criminal Procedure Rule 3.190 by arresting and charging Plaintiff for allegedly battering mccall and rose, when at all times mccall and rose did trespass on the Real Property lawfully possessed by Plaintiff's Corporation and was lawfully leased and occupied by Plaintiff, and did so for the purpose of robbing Plaintiff and his corporation of that property, and were at all times the primary and only aggressors.

195)  carithers, neal, gudes, norris, filippone, dusty rhodes, and danny rhodes violated Principle 2, Rules 2.1 – 2.6 of the FDLE Standards of Conduct because:

i) They conducted themselves in a manner that detracts the Public's faith in the criminal justice system by unfairly charging only Plaintiff, and neither mccall nor rose with any offense,

ii) They falsely accused Plaintiff of "running [mccall] over", and battering her,

iii) They lied on their police report, and

iv) They refused to provide copies of, or disclose exculpatory evidence in their possession, and attempted to destroy exculpatory evidence at the time of arrest.

v) They knowingly violated Plaintiff's Constitutional Rights, as alleged herein, and as charged in Counts I – XXXI, infra, all of which are Clearly Established Rights.

vi) They refused to obey Plaintiff's lawful orders to them, when they were told that they were not to trespass on the property lawfully leased and possessed by Plaintiff's

1    Corporation, and occupied by him, nor enter the structure on that property, nor to allow

mccall nor rose to do so, and repeatedly refused Plaintiff's orders to them to retrieve the

ownership documents that mccall was trying to steal from him.

vii) They refused to report the unlawful conduct committed by the officers.

viii) They refused to consider, much less listen to ANYTHING Plaintiff said

regarding mccall and rose's allegations, refused to acknowledge Plaintiff's lawful ownership

and possession of the real property that mccall was attempting to steal, wrongfully claimed

that Plaintiff's Corporation was not the lawful owner of that property, and that Plaintiff was

not the lawful possessor and resident, and that he had "no right" to defend himself on his

own property against violence, unlawful imprisonment, robbery and violence by others, in

contradiction to clearly established common law, and Florida Statutory Law, and ordinary

Common Sense.

ix) carithers made a complete false pretense of taking a statement from Plaintiff

regarding mccall and rose's criminal conduct against him, terminated the interview

immediately upon Plaintiff beginning to speak, and did so deliberately for the purpose of

harassment, insult, violence and abusiveness against Plaintiff, and for the purpose of

refusing to consider, or for the purpose of destroying or suppressing exculpatory evidence.

x) Their conduct served no legitimate governmental, nor social purpose whatsoever,

nor was it any kind of legitimate governmental conduct whatsoever, and only constituted

crime against Plaintiff, and rose to the level of outrage, harassment, abusiveness, and

adequate provocation.

196)  carithers, neal, gudes, norris, filippone, dusty rhodes, and danny rhodes violated

Principle 3, Rules 3.1 – 3.3 of the FDLE Standards of Conduct because:

i) They refused to provide impartial, and effective law enforcement services, by

arresting Plaintiff immediately upon arrival at the scene, based solely on mccall's call to

them, and without making any determination of probable cause nor facts prior to arrest.

28    ii) They expressed gender and race prejudice and by allowing their conduct to be

1   influenced by race and gender. mccall and rose are both females, and carithers is a female. mccall, rose, carithers, norris, and gudes are all of a "race" that carithers refers to in her police report as "black". Plaintiff is of a "race" that carithers refers to as "White". Because females are never more credible than Males, and because a "black" woman on welfare, with a history of violence, drunkenness, drug-abuse and dependent-support actions against males with criminal histories who do not pay to support the children they had with her, and who abandoned her because she is such an abusive worthless person, is never more credible than a "White" Male with a Job, who runs his own business, pays his bills, and is able to give mccall $5,000 cash to purchase her interest in a real-property, carithers clearly chose to give credibility to mccall and rose solely on basis of her "race" and gender in common with them.

iii) carithers refused to charge mccall with Driving While License Suspended (DWLS), pursuant to FRS § 322.34 after carithers checked mccall's driver's license, and knew it was revoked for prior DUI convictions, and after carithers did witness mccall depart the scene by driving her motor vehicle.

iv) Further, carithers has an established pattern of gender bias in her official capacity, because based on the traffic citation data files published by the Hillsborough County Court at: ftp://www.hillsclerk.com/traffic, as of 3 May 2015, carithers cites White Males in a ratio of 2:1 over that of White Females, and Hispanic Males in a ratio 3.4:1 over that of Hispanic Females, for criminal traffic citations, and White Males in a ratio of 2.9:1 over that of White Females, and Hispanic Males in a ratio of 3.8:1 over that of Hispanic Females for non-criminal traffic citations, yet for Black Males, the ratios are only 1.8:1 and1.5:1 over that of Black Females for criminal and non criminal citations respectively. Clearly there is gender bias by her against Males, and preference to her own race in issuing traffic citations.

197)  carithers, neal, gudes, norris, filippone, dusty rhodes, and danny rhodes violated Principle 5, Rules 5.1 and 5.3 of the FDLE Standards of Conduct because of carithers being derelict in her duty, and the other officers refusing to act on Plaintiff's criminal complaints against carithers.

28

1

198) carithers, neal, gudes, norris, filippone, dusty rhodes, and danny rhodes violated Principle 6, Rule 6.1 of the FDLE Standards of Conduct by using their official position to aid and abet mccall and rose in stealing Plaintiff's property, and to avoid prosecution therefor.

199) carithers, neal, gudes, norris, filippone, dusty rhodes, and danny rhodes violated Principle 8, Rule 8.1 of the FDLE Standards of Conduct by causing Plaintiff's photograph and personal information, including name and address to be released to the "mugshot websites" and subsequently published by Google Incorporated, Yahoo! Incorporated, and Microsoft Corporation.

200) Because they are law enforcement officers, and choose to deal with others in a professional capacity, much less any capacity whatsoever, carithers, neal, gudes, norris, dusty rhodes, danny rhodes and filippone are liable for their conduct outside the Ordinary Standard of Care, because at all times they refused to listen to anything Plaintiff had to say, nor to take any action to assist Plaintiff in their professional capacity when demanded, and deliberately chose to refuse to act so as to cause Plaintiff harm by doing so, and they all claimed that they do not need to consider anything that anyone else has to say, nor the consequences of their actions upon others and that it is their place to act unilaterally in all situations regardless of the consequences upon others, and that they do not need to consider the Rights nor Property of others, nor the loss of employment, business, and deprivation of Liberty Interests of the Public they cause, because they are police officers. Because such conduct is outside the Ordinary Standard of Care, obliged to all persons, by all persons, and constitutes both deliberate indifference, and gross negligence, they are liable for the damages caused by that conduct.

201) Because they are police officers, carithers, neal, gudes, norris, dusty rhodes, danny

28 rhodes and filippone are liable for their deliberate indifference to the Totality of

1 Circumstances in their determination of probable cause to charge Plaintiff with the crimes alleged against him, by mccall and rose.

202) Because FRS 776.032 statutorily grants immunity from arrest, detention, charge and prosecution of Plaintiff in the circumstances in which carithers, neal, norris, gudes, dusty rhodes, danny rhodes, and filippone acted in their official capacity, their conduct was in violation of Florida Law and Constitutional requirements of probable cause, and as mandated by FRS 776.032 (2).

203) Because Probable Cause must be evaluated by the Totality Of Circumstances, per *Illinois v. Gates*, (462 U.S. 213, (1983)), and both "probable" and "likely" mean "more likely than not", (i.e. greater than 50 percent chance, more evidence for than against, more likely than not, synonymous with "probable", *Bain v. State*, 74 Ala. 38, at p. 39, Citing Webster; *Bailey v. City of Centerville*, 108 Iowa 20; *O'Brien v. New York, N.H. & H.R. Co.*, 59 Hun 623; *People v. Wilson*, 138 Cal.App4th 1197; *Willard Oil Co. v. Riley*, 29 Okla. 19; *Crenshaw v. Pendleton Mfg. Co.*, 215 S.C. 66), based on the totality of circumstances present, and presented to carithers, gudes, neal, norris, and dusty rhodes at the time of incident on 24 April 2014, and to danny rhodes, and filippone thereafter, there is and was no probable cause to arrest, detain, charge nor prosecute Plaintiff for his alleged criminal conduct against mccall and rose.

204) The Totality of Circumstances is and was at the time of arrest as follows:

  i) Plaintiff has sworn notarized and witnessed documents indicating payment for the property, contract to purchase, and payment of six months rent in advance from 19 February 2014, paid two months prior to the incident. As such he was the lawful lessee.

  ii) mccall claimed that Plaintiff "was behind on his rent for six months". There was no evidence to support this, and notarized evidence to the contrary.

28   iii) mccall had fraudulently prepared documents claiming that a debt was owed to her

1

by Plaintiff. (Plaintiff's agreement was to pay the mortgage company any remaining payments. Not mccall).

iv) mccall admitted that she came to the property to "kick [Plaintiff] out". To "kick" or "kick out" means to use force to deprive a person of the property, and to do so against their will.

v) mccall admitted that she told Plaintiff to "stop." (Ex. 6, p. 21). mccall has no lawful authority to tell a person to stop. To "stop" means to "not go". To deprive a person of their freedom to go for any length of time, however short is an arrest. An arrest is an imprisonment. mccall has no, nor had any lawful authority to arrest or imprison a person who is free to go and is doing so, nor to deprive them of their freedom to go to collect payment, nor take property of any kind.

vi) rose admitted that she told Plaintiff to "stop." (Ex. 6, p. 22). rose has no, nor had any lawful authority to tell a person to stop. To "stop" means to "not go". To deprive a person of their Liberty or Freedom To Go for any length of time, however short is arrest and imprisonment. rose has no, nor had any lawful authority to arrest or imprison a person who is free to go and is doing so, nor to deprive them of their freedom to go to assist mccall to collect payment, nor take property of any kind.

vii) mccall has five prior violence charges against her, including a Second Degree Felony charge for Aggravated Battery With A deadly Weapon. (Ex. 17). This was known to carithers at the time of arrest as Plaintiff saw the word "BATTERY" come up on the police computer while unlawfully imprisoned in the back of the police car while carithers was checking mccall's record.

viii) mccall has has a history of drug abuse. This was apparent to carithers at the time of arrest as Plaintiff saw the statement: "WARNING DRUG ABUSE" come up on the police computer while detained in the back of the police car, while carithers was checking mccall's record. This is also stated on the General Offense report prepared by carithers. (Ex. 6, p. 13).

28

ix) mccall and rose were the primary aggressors in the situation.

x) mccall and rose were trespassing on the Property that Plaintiff had lawfully leased pursuant to a purchase of that property.

xi) mccall had released all legal claim and title to the property she was claiming to repossess, and had done so by Sworn Notarized Agreement. (Ex. 3).

xii) All persons have the Right to Self Defense.

xiii) All persons have the same Right to protect their individual safety as police officers do.

xiv) carithers, gudes, neal, norris, and dusty rhodes were all aware of the cost of bail that Plaintiff would have to pay for the charges they brought.

xv) Opportunity existed for carithers, gudes, neal, and norris to investigate further before arresting Plaintiff, and police frequently do extended investigations before arresting.

xvi) carithers noted on her police report that mccall was trespassing because carithers herself informed mccall that "Hillsborough County Sheriff's Office (HCSO) would respond out on the third day to proceed with the eviction process against the tenant". (Ex. 6, p. 19), and that Plaintiff himself "continued to say that he owned the residence and that Mrs. mccall was trespassing on his property." (Ex. 6, p. 20).

xvii) The "three day notice certified eviction notice" that mccall provided to carithers as documentation (Ex. 6, p. 19), that carithers claimed was "certified" "from the clerk of court", did not contain the word "Court" anywhere upon it, nor a case number, nor the words "Clerk of Court" nor any signature of any Court Clerk, nor any Seal from any Court. Per Florida Law, under FRS Title VI, Chapter 83, and specifically FRS § 83.59 (2), and (3)(a), all Landlord-Tenant disputes are to be resolved through Court:

FRS § 83.59 (2) states in relevant part:

*"(2) A landlord, the landlord's attorney, or the landlord's agent, applying for the removal of a tenant, shall file in the county court of the county where the premises are situated a complaint describing the dwelling unit and stating the facts that authorize its recovery."*

FRS § 83.59 (3)(a) further states in relevant part:

28

1

*(3) The landlord shall not recover possession of a dwelling unit except:*

*(a) In an action for possession under subsection (2) or other civil action in which the issue of right of possession is determined;*

The "Manual For Drafting Legislation" published by the Florida Senate Office of Bill Drafting Services, states in relevant part:

*'The word "shall" imposes the rule of law and leaves the subject no discretion as to whether to perform the act.'* (id. at p.17).

xviii) The witness statements were conflicting with each other. mccall and rose claimed they were standing beside the driveway, near the porch of the house. The witness Bottega claimed mccall and rose were standing on the grass in front of the house, and that Plaintiff attempted to drive his car into them there. There is an extremely large tree-stump in that location that is approximately eight feet across, at its base, and two feet above ground level, with a large cavity in its middle. There is simply no way the car Plaintiff was driving could have crossed it, nor reason to believe Plaintiff would have attempted to do so.

xix) In the 911 call placed by mccall that caused carithers, neal, gudes, and norris to be dispatched to the scene, alleged victim mccall clearly stated that Plaintiff had not used any force against her, nor did she accuse Plaintiff of that in any way, and stated that her grounds for the call were a supposed "eviction", and that Plaintiff had actually left the scene.

205)  At all times, carithers, neal, gudes, norris, dusty rhodes, danny rhodes and filippone were and are currently aware of these circumstances, and with deliberate indifference to them chose to charge only Plaintiff with crimes, and not to charge either mccall nor rose, nor to redact the charges against Plaintiff after the fact. Because Probable Cause must be determined by the totality of circumstances, and must consist of more evidence for than against, (more likely than not), it is clear that  carithers, neal, gudes, norris, dusty rhodes, danny rhodes and filippone chose to deliberately and maliciously charge Plaintiff with crimes he did not commit, and to not charge mccall and rose with serious (Class 1 Felonies), that they did commit against Plaintiff, and as such are liable for the damages caused by that

28

conduct, and to be punished therefor.

206)  Because they are police officers, carithers, neal, gudes, norris, dusty rhodes, danny rhodes and filippone all have a duty to act in their official capacity as such, and did have a duty, and do have a duty to charge mccall and rose with crimes, and to have ceased the unlawful trespass by mccall and rose upon the real property that Plaintiff and his corporation had lawfully leased. Because at all times they did refuse to act as such and do continue to act as such they are liable for the damages caused by that refusal to act and for punitive damages therefor.

207)  Because carithers, neal, gudes, norris, dusty rhodes, danny rhodes and filippone all acted consistently and uniformly in their conduct to violate Plaintiff's Civil Rights, as described herein, particularly in their claims that the questions of property ownership were "civil matters" not for them to enforce, and their decision to unilaterally charge one party in a criminal dispute, and their refusal to enforce the provisions of FRS Chapter 776, their conduct is clearly a custom of the Tampa police department.

208)  Because castor was chief of the Tampa police department during the incidents giving rise to this complaint, the custom of conduct by the Tampa police department was or should have been known to her, and that conduct was therefore a policy set by her, or it is her policy to allow that conduct.

209)  Because the conduct of carithers, neal, gudes, norris, dusty rhodes, danny rhodes and filippone was by policy and custom as stated supra, the Municipal Corporation of Tampa is liable for monetary damages sought by Plaintiff, as requested infra.

210)  Ultimately, per the police report of the incident on 24 April 2014, the officers were dispatched at 1220, and carithers arrived on-scene, and arrested Plaintiff immediately

28

1

thereupon at 1230, without making any determination of probable cause, nor facts thereto, and falsely claiming that Plaintiff was "being detained for a criminal investigation". Because Plaintiff was no longer Free as of that time, by all clearly established law, Plaintiff was arrested and imprisoned as of that time. carithers did not give lawful notice to Plaintiff that he was arrested, nor notify him of his Rights per *Miranda v. Arizona,* until approximately 1400, when carithers began the process of bringing Plaintiff before a Judge. Per the HCSO arrest record, arrest time is shown as 1230, booking time is shown as 1420, and release date and time is shown as 25 April 2014 at 2030. Since the purpose of arrest is to bring a person before a Judge, the process of bringing Plaintiff before a Judge did not begin until 1400, no less than 1.5 hours after Plaintiff was unlawfully imprisoned by carithers. Since per FRS § 772.036, Plaintiff was at all times and is at all times immune from arrest, detention, charge and prosecution for the charges against him, and additionally was later found so by the trial court of the criminal case charged by carithers, and prosecuted by Rios, at all times that Plaintiff was unlawfully imprisoned and arrested by carithers, or detained in jail because of the unlawful charges brought by her, Plaintiff was unlawfully imprisoned, and was so for a total of 1,920 minutes. Per *Trezevant v. Tampa* (741 F.2d 336, 1984), an award of $1,086.96 Dollars per minute is not considered excessive. Therefore Plaintiff is entitled to an an award of $2,086,963.20, per *Trezevant v. Tampa*, which adjusted for inflation, (http://www.bls.gov/data/inflation_calculator.htm), is an amount of $4,714,688.90.

211) Because castor was not an elected official, but previously an employee, to the Municipal Corporation of Tampa, granted both employment and contract by its Mayor Bob Buckhorn, Buckhorn is liable as the respondeat party for the injunctive or equitable relief as requested in Paragraph 414, §§ xiii – xv, that Plaintiff seeks to remedy the policies and customs that caused the damages claimed herein.

28

I   212)  The Municipal Corporation of Tampa is liable because they have been "put on notice"

no less than 136 times for Civil Rights violations, through the following cases, and Judicial

Notice thereof is hereby given:

| | |
|---|---|
| 8:15-cv-01280-EAK-JSS | Bright v. Zeigler et al |
| 8:15-cv-01219-SDM-EAJ | Homeless Helping Homeless. Inc. v. City of Tampa, Florida |
| 8:15-cv-00951-SDM-TBM | Stockwell v. Nelson et al |
| 8:15-cv-00705-VMC-AEP | Randazzo v. Seaworld Parks & Entertainment, LLC. et al |
| 8:14-cv-02201-SDM-AEP | Coleman v. Tampa Police Department |
| 8:14-cv-01775-VMC-EAJ | Bright v. Graham et al |
| 8:14-cv-01774-EAK-TBM | Bright v. City of Tampa et al |
| 8:14-cv-01370-MSS-MAP | Jones v. City of Tampa Police Department |
| 8:14-cv-01074-MSS-EAJ | Bright v. City of Tampa et al |
| 8:14-cv-00446-SDM-TBM | Darien v. City of Tampa Police Department et al |
| 8:13-cv-03250-EAK-MAP | Thomas v. Fernandez et al |
| 8:13-cv-02455-EAK-AEP | Schofield v. Castor et al |
| 8:13-cv-00119-JDW-AEP | Laster v. City of Tampa Police Department et al |
| 8:12-cv-02222-VMC-TBM | Renaldo-Bey v. Rosa et al |
| 8:12-cv-01642-JDW-TBM | Allen v. City of Tampa et al |
| 8:12-cv-01566-EAK-TBM | Renaldo-Bey v. Circuit Court In and For Escambia County, FL et al |
| 8:12-cv-01163-MSS-MAP | Bright v. Frix et al |
| 8:11-cv-02302-MSS-AEP | Foster v. Courtney et al |
| 8:11-cv-00322-EAK-TBM | McGinley et al v. Jetton et al |
| 8:10-cv-01830-TBM | Arroyo v. Federal Bureau of Investigations et al |
| 8:10-cv-00772-JSM-AEP | Woodbury et al v. City of Tampa Police Department et al |
| 8:10-cv-00538-JDW-AEP | Penn v. State Attorney's Office et al |
| 8:10-cv-00487-VMC-EAJ | Miller v. Tampa Police Department |
| 8:09-cv-01440-SDM-EAJ | Griffin v. Hillsborough County Sheriff et al |
| 8:08-cv-02252-EAK-MAP | Martin et al v. City of Tampa, FL |
| 8:08-cv-02076-JDW-MAP | Ronet v. City of Tampa Police Department, et al |
| 8:08-cv-01552-JSM-MAP | Goodrich v. City of Tampa et al |
| 8:08-cv-01008-JDW-EAJ | Torres v. Tampa Police Department et al |
| 8:08-cv-00209-SDM-EAJ | Pete's Towing Co. v. City of Tampa, Florida et al |
| 6:08-cv-01747-JA-KRS | Ronet v. City of Tampa Police Department, et al |
| 3:08-cv-00754-VMC-HTS | Bright v. Derringer et al |
| 3:08-cv-00652-TJC-MCR | Bright v Derringer et al |
| 8:07-cv-00993-JDW-MAP | Anderson v. City of Tampa et al |
| 8:07-cv-00984-SDM-MAP | Bright v. Strickland et al |
| 8:07-cv-00136-SCB-MAP | Martin v. City of Tampa, Florida et al |
| 8:07-cv-00135-JSM-EAJ | Washington v. City of Tampa, Florida et al |
| 8:06-cv-00216-JSM-MSS | Mayes v. City of Tampa Police Department et al |

28

| | |
|---|---|
| 8:05-cv-01489-JSM-TGW | Hervy v. Davenport et al |
| 8:03-cv-02622-TBM | Nelson v. City of Tampa, et al |
| 8:03-cv-02580-RAL | Bartsch v. Archer, et al |
| 8:03-cv-02573-SCB | Clayton v. Belden, et al |
| 8:03-cv-01938-SCB-MAP | Abusaid, et al v. City of Tampa, et al |
| 8:03-cv-01794-RAL-TBM | Mercer v. Behanna, et al |
| 8:03-cv-01581-SDM | Griffin v. Hillsborough County, et al |
| 8:03-cv-00966-JDW | Powell v. City of Tampa |
| 8:03-cv-00656-SDM-EAJ | Clark v. City of Tampa Police, et al |
| 8:03-cv-00489-RAL-MAP | Thurman v. City of Tampa, FL |
| 8:03-cv-00451-EAK-EAJ | Carpenter v. City of Tampa |
| 8:03-cv-00236-EAK | Vicente v. City of Tampa Police |
| 8:02-cv-02206-SCB | P.M. Realty v. City of Tampa |
| 8:02-cv-01957-SDM | Abusaid v. City of Tampa |
| 8:02-cv-01729-SDM | Jackson v. Moore, et al |
| 8:02-cv-01677-RAL | Cohoon v. State of Florida, et al |
| 8:02-cv-00922-JSM | Bland v. City of Tampa, FL |
| 8:01-cv-02313-SCB | Malone, et al v. City of Tampa |
| 8:01-cv-02176-EAJ | Collier v. Schantz, et al |
| 8:01-cv-01951-SDM | Reyes v. McFarlane, et al |
| 8:01-cv-01550-JSM | Cruz v. City of Tampa, et al |
| 8:01-cv-01538-JDW | Muller v. City of Tampa, FL, et al |
| 8:01-cv-01001-SDM | Jackson v. WFTS Channel 28, et al |
| 8:01-cv-00866-RAL | Lewis v. Tampa Police Dept. |
| 8:01-cv-00728-SCB | Timmons, et al v. City of Tampa, FL, et al |
| 8:01-cv-00016-SDM | Jackson v. WFTS Channel 28, et al |
| 8:00-cv-02598-RAL | Hall v. City of Tampa, et al |
| 8:00-cv-02597-JDW | Hall v. City of Tampa PD, et al |
| 8:00-cv-02596-JSM | Hall v. City of Tampa, et al |
| 8:00-cv-01079-JDW | Tsirambidis v. Griffin, et al |
| 8:00-cv-00949-RAL | Solomon v. Tampa, Florida, et al |
| 8:00-cv-00694-SCB | Jackson v. City of Tampa, et al |
| 8:00-cv-00548-SCB | Maverick Media Group v. City of Tampa, FL |
| 8:00-cv-00149-SCB | Watkins v. City of Tampa |
| 8:00-cv-00012-RAL | Arrington, et al v. City of Tampa, FL |
| 6:00-cv-00654-ACC | Tsirambidis v. Griffin, et al |
| 3:00-cv-00044-RWN | Watkins v. Consol City of Jax, et al |
| 8:99-cv-02835-EAK | Justus, et al v. City of Tampa, FL, et al |
| 8:99-cv-02623-EAK | Blum v. City of Tampa |
| 8:99-cv-02273-SCB | Free Course, Inc. v. City of Tampa, FL |
| 8:99-cv-02180-SCB | Voyeur Dorm, L.C., et al v. City of Tampa, FL |
| 8:99-cv-01671-JDW | Oby v. Tampa Police Dept., et al |
| 8:99-cv-01412-EAJ | Ricci, et al v. City of Tampa, et al |
| 8:99-cv-01011-JDW | Arrington v. Bowers, et al |

28

| | | |
|---|---|---|
| 1 | 8:99-cv-00725-SDM | Jackson v. State of Florida, et al |
| | 8:99-cv-00688-RAL | Duncan v. City of Tampa, et al |
| | 8:98-cv-02001-MSS | Al-Hakim v. City of Tampa, et al |
| | 8:98-cv-00821-SCB | Production Equipment, et al v. City of Tampa, et al |
| | 8:98-cv-00493-MAP | 4616 MLK, Inc., et al v. City of Tampa |
| | 8:97-cv-01111-EAK | Robinson, et al v. City of Tampa, et al |
| | 8:97-cv-00766-EAK | Luke v. City of Tampa, et al |
| | 8:97-cv-00294-HLA | Meyers v. City of Tampa |
| | 8:96-cv-02021-SDM | Stephens v. City of Tampa, et al |
| | 8:96-cv-01777-HLA | Whitley v. City of Tampa, et al |
| | 8:96-cv-01583-SCB | Redden v. City of Tampa, et al |
| | 8:96-cv-01542-HLA | Perkins v. Copeland, et al |
| | 8:96-cv-01314-SCB | Mitchell, et al v. City of Tampa |
| | 8:96-cv-01008-SCB | Ellis v. City of Tampa, et al |
| | 8:95-cv-01863-SDM | Chamblee v. City of Tampa, et al |
| | 8:95-cv-01628-SCB | Harris v. Iorio, et al |
| | 8:95-cv-00596-SCB | Al-Hakim v. Tampa Police Dept., et al |
| | 8:95-cv-00341-RWN | Clewis, et al v. City of Tampa, et al |
| | 8:94-cv-01766-EAK | Klein v. City of Tampa, et al |
| | 8:94-cv-01765-EAK | Lewis, et al v. City of Tampa, et al |
| | 8:94-cv-01454-SDM | Whitley v. City of Tampa, et al |
| | 8:94-cv-01406-SCB | Specialty Malls, et al v. City of Tampa, et al |
| | 8:94-cv-01369-SCB | Huff v. Electric Machinery, et al |
| | 8:94-cv-01154-EAK | Doty v. City of Tampa, et al |
| | 8:94-cv-00999-SCB | Atlantic Show v. City of Tampa, et al |
| | 8:94-cv-00947-EAK | Griffin v. Kars by Keith Towing, et al |
| | 8:94-cv-00445-EAJ | Farina, et al v. City of Tampa, et al |
| | 8:93-cv-01840-EAK | Hendry v. Jordan, et al |
| | 8:93-cv-01836-RWN | Manter v. City of Tampa |
| | 8:93-cv-01793-SDM | Lackos v. Jordan, et al |
| | 8:93-cv-00699-RWN | Boedicker v. Smith, et al |
| | 8:93-cv-00410-EAK | Venero v. City of Tampa, et al |
| | 8:93-cv-00264-SCB | Lykes Bros. Inc. v. Architectural Review, et al |
| | 8:93-cv-00186-EAJ | Daniel, et al v. City of Tampa |
| | 8:93-cv-00140-SCB | Green v. City of Tampa, et al |
| | 8:92-cv-02041-HLA | Peterman-Jackson v. City of Tampa, et al |
| | 8:92-cv-01884-UA | Carrow v. Sessions, et al |
| | 8:92-cv-01700-HLA | Carey, et al v. City of Tampa, et al |
| | 8:92-cv-01360-EAK | Henry v. City of Tampa, et al |
| | 8:91-cv-01171-WJC | Ippolito v. City of Tampa, et al |
| | 8:91-cv-00179-ACC | Pauley v. City of Tampa |
| | 8:90-cv-01269-UA | J.B.M. Management, et al v. City of Tampa |
| | 8:90-cv-01262-WJC | Machin v. City of Tampa, et al |
| 28 | 8:90-cv-01108-WJC | Creach, et al v. City of Tampa, et al |

1

| | |
|---|---|
| 8:90-cv-00985-RWN | Redner v. City of Tampa |
| 8:90-cv-00888-UA | Specialty Malls v. City of Tampa |
| 8:90-cv-00851-WTH | Sibley v. Foster, et al |
| 8:90-cv-00532-RWN | Sankner v. Goethe, et al |
| 8:89-cv-01089-UA | Brown, et al v. Tampa, FL, et al |
| 8:89-cv-00744-WJC | Johnston v. City Of Tampa |
| 8:89-cv-00383-ACC | Community Blood v. Duncan, et al |
| 8:88-cv-00447-EAK | Bailey v. Tampa, FL, et al |
| 8:87-cv-01256-WTH | Stewart v. Tampa, FL, et al |
| 8:87-cv-01067-WJC | Arroyo, et al v. Tampa, FL, et al |
| 8:87-cv-00431-WJC | Pelley, et al v. Tampa, FL |

213)  Because of the above cases it can clearly be seen that there is a custom of non-compliance with Constitutional Law by officers of the Municipal Corporation of Tampa. Whether that custom is a product of a deliberate policy, can only be discerned by Discovery in this matter. Whether that custom is a product of failure to properly train officers, or deliberate indifference to Constitutional Law, likewise can only be discerned by Discovery. But, based on the cases cites supra, it can be seen that there is a "custom" of non-compliance to Constitutional Law, and regardless of the reason for that custom, what can be discerned is that there is a clear failure to enforce, or maintain Constitutional Compliance. Because this failure to enforce or maintain Constitutional Compliance is a custom of the Municipal Corporation of Tampa, The Municipal Corporation of Tampa is liable for the conduct of all of its officers named as defendants herein, and Plaintiff is entitled per *Ex Parte Young,* to the relief he seeks in Paragraph 414 § xi – xv, which is for the purpose of enforcing Constitutional Compliance upon, and maintaining Constitutional Compliance by the officers of the Municipal Corporation of Tampa.

214)  Further, because the Municipal Corporation of Tampa has been "put on notice" regarding the conduct of its officers and their custom of violating Civil Rights and has failed to take corrective action to enforce and maintain Constitutional Compliance by its officers, The Municipal Corporation of Tampa is liable for its negligent failure to cease and desist

28  that custom of its officers violating Citizens' Civil Rights.

1

215) Rios is liable because she is an attorney, an officer of The State of Florida, because she swore an Oath to uphold the Constitution and Laws of the United States and The State of Florida, because all persons have a Right to enforce Constitutional Compliance upon Public officers, because her prosecution of Plaintiff is wrongful in both fact and by law, and because prosecutorial immunity is a treasonous defense that serves the public in no way, and by which an individual acting in government claims to be beyond the law, and beyond the People, and because whatever claims of immunity a prosecutor may make, they do not apply to injunctive relief, nor to a prosecutor being compelled to comply with Constitutional Law.

216) Because Time flows in solely in one direction, is subject to continual expiry, and can never be recouped, all consumption of Plaintiff's Time in unlawful imprisonment, to defend criminal charges, to plead this case, and to compensate for the economic and personal losses caused by the actions of Tampa Municipal and police defendants and Karina Rios, constitutes irreparable harm.

217) Because but for the actions of carithers, gudes, neal, and norris, Plaintiff's rental vehicle would not have been returned to the rental company, the items that were in that vehicle would not have been irretrievably taken from him, and therefore carithers, gudes, neal and norris are liable for the loss of that property.

**B) Claims of Liability upon defendants Google Incorporated, Yahoo! Incorporated, Microsoft Corporation and "mugshot websites" :**

218) The business practices of Google Incorporated, as described infra, do facilitate, accessorize, aid and abet the "mugshot websites" in publishing their misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information about Plaintiff and thereby causing the damages to Plaintiff described herein, and as such they are liable for the relief Plaintiff requests for those damages as described

28   infra.

1

219) The business practices of Yahoo! Incorporated, as described infra, do facilitate, accessorize, aid and abet the "mugshot websites" in publishing their misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information about Plaintiff and thereby causing the damages to Plaintiff described herein, and as such they are liable for the relief Plaintiff requests for those damages as described infra.

220) The business practices of Microsoft Corporation as described infra, do facilitate, accessorize, aid and abet the "mugshot websites" in publishing their misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information about Plaintiff and thereby causing the damages to Plaintiff described herein, and as such they are liable for the relief Plaintiff requests for those damages as described infra.

221) Because defendants Yahoo! Incorporated, Google Incorporated and Microsoft Corporation aggregate, republish, and provide centralized access to the misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing content published by "mugshot websites", they are liable as described infra as they act as accessories to the publication of that content. But for their conduct in combination with defendants "mugshot websites" other parties could not use that information to deny persons employment nor would the misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information have widespread publication. Yahoo Incorporated, Google Incorporated and Microsoft Corporation aggregate that information via automated processes generally referred to as "search engines", and then publish that information via what is generally referred to as a "portal" to the aggregated information via their "Google.com", "Yahoo.com", and "Bing.com" "websites", respectively.

28

1

222) Plaintiff knows for a fact that people are searching his name via the "Google", "Yahoo!", and "Bing" portals, (search pages), because Plaintiff himself publishes at least two websites: "Bugoni.net", and "FireACop.com". Plaintiff publishes these websites himself using all the technical practices of art described herein. When a person, or automated process "clicks through" to one of Plaintiff's websites, after searching for his name on "Google.com", "Yahoo.com" or "Bing.com", (i.e. directs the "browser" program on their computer to access a link to Plaintiff's website that was displayed as search results by Google, Yahoo!, or Microsoft), an "HTTP Referrer" is logged in Plaintiff's websites' "server logs". This "Referrer" indicates which other website linked, or referred a searcher to Plaintiffs website, and in the case of the "Google", "Yahoo!" and "Bing" websites, what the original search query was. It is clear from these "HTTP Referrers" that are logged, that people are entering the name "Piero Bugoni" as the search text in Google's, Microsoft's, and Yahoo!'s search pages, and that links to Plaintiff's websites are being returned as results among other results of those queries, and that people or automated programs are then "clicking through" to Plaintiff's websites, where the connection is then logged.

223) Defendants Google Incorporated, Yahoo! Incorporated, Microsoft Corporation, and the "mugshot websites" are specifically liable as follows:

i) "mugshot websites" aggregate "booking photographs", arrest records, and other supposedly "public" records by various methods including automated electronic retrieval from electronically published sources. (Other "Websites", typically published by Government agencies).

ii) "mugshot websites" then republish these data on their own "websites", and these data can be viewed by using Google Incorporated's, Yahoo!'s, and Microsoft Corporation's "search engines" to search the name of a particular person, and the photographs and other information about an Individual will be viewed without their consent.

iii) The information that is published in this manner may be erroneous, and libelous, and the information itself is misrepresentive and falsely implicative, and is harassing,

28

vexatious, annoying, outrageous, offensive and embarrassing to the subject of that publication, and does cause a person to lose standing in the community, subject them to obloquy, pillory, public humiliation and community suspicion, and does cause loss of business, employment, and personal relationships, and is published without any consent by the parties about whom information is published.

iv) In Plaintiff's case, exactly that did happen.

v) Google Incorporated, Yahoo! Incorporated, Microsoft Corporation, and the "mugshot websites" make no effort to guarantee that the information presented is legitimate. Rather, they only rely on automated processes to aggregate and republish the misrepresentive, falsely implicative, harassing, vexatious, annoying, outrageous, offensive and embarrassing information in response to a search for a particular person's name, but make no effort to verify the information presented, nor obtain the consent of the party whose name, photograph, and other personal and private information they publish. Because of the nature of the information presented, and because they make no effort to verify the legality, and correctness of the information they publish, and do so without the prior consent of the party whose information is published, this is contrary to a normal standard of care, and is tortious in se.

vi) Upon publishing the information that they obtain from public record sources, "mugshot websites" will then charge a fee to the person whose information is published, to remove from publication, that person's photograph, personal, and private information. Because of this, "mugshot websites" are not merely publishing matters concerning Public Records solely for their informative value to the Public, but rather instead are charging individuals a fee to cease and desist the publications concerning Public Records about them, and compelling that person to pay such a fee by appropriating that person's name and likeness and publishing that name and likeness in a way that may be outright libelous and false, but in all cases is misrepresentive, and falsely implicative, and would be harassing, vexatious, annoying, outrageous, offensive and embarrassing to any reasonable person. Because "mugshot websites" ultimately will *cease and desist* such publications for the

1

payment of a fee, they cannot claim that their business practice is one of solely publishing matters concerning Public Records.

vii) Nothing in the Constitutional Protections of The Free Press are for the purpose of protecting publication for the purpose of extortion, libel, slander, pillory, public humiliation, misrepresenting a person, making false and injurious implications about them, harassing, vexing, or annoying a person, causing them outrage, nor offending or embarrassing them, nor to cause one to be denied Employment, Business, Relationships, Privacy, Peace and Dignity, or any other Right.

viii) The publications of Google Incorporated and the "mugshot websites" are commercial speech, and as such are not subject to the same protections as the Free Press, nor Individual Free Speech.

ix) Whatever rights a state office may have to publish records, those rights do not inure upon any private corporation nor individual to re-publish those same records. Those records are Public records, not Google's records, nor Yahoo!'s records, nor Microsoft's records, nor the "mugshot websites'" records, nor are Google Incorportaed, Yahoo! Incorporated, Microsoft Corporation nor the "mugshot websites" public offices, state agencies nor any other kind of governmental body, and as such they are liable for whatever damage is caused by their republication of public records. Very simply, public records are for *access* by the Public from their *original* sources, for *Public* purposes, NOT for republication by third parties for commercial gain. Whatever rights the state may have to publish those records, or immunity from suit state agencies or officers may have for publishing records, those rights or immunities belong to the state, its agencies and officers alone. Not private corporations or individuals. Further, since state officers, and agencies can be held liable pursuant to 42 USC §§ 1983, 1985, 1986, and 18 USC §§ 241, and 242 for official acts, private parties can be held liable in tort, on similar grounds.

x) Under Florida Law, (Florida Constitution Article I, Section 4, and FRS Chapter 836), individuals are liable for their publication of damaging information, and the damage caused to Plaintiff by their publications ultimately did take place in the State of Florida.

28

1

xi) The Value in the financial remuneration of a recorded image of an individual is the Property of the individual themselves, as it is their image. That Value is not the Property of any recorder of such an image merely by recording it, nor is that Value the Property of any publisher thereof merely by publishing it.

xii) All persons have a Right to be Free from the disruption of their existence by others and to be free from vexation, annoyance, harassment, outrage, community suspicion, and embarrassment, and to be Free from disruption caused by others of their Life, Liberty, Property, Economic Mobility, Prosperity, Business, Commerce, Labor, Liberty to Contract, and To Pursue Economic Sustenance, Profit and Wealth, and whatever Rights Google Incorporated, and the "mugshot websites" may have to act as artificial persons, the exercise of their Rights is limited by the potential for damage to the Rights of others, and by ordinary standards of care. The conduct of Google Incorporated, Yahoo! Incorporated, Microsoft Corporation, and the "mugshot websites" did and does disrupt Plaintiff's existence, Life, Liberty Property, Economic Mobility, and Sustenance, Labor, and Contracting as described supra, and does cause Plaintiff vexation annoyance, outrage, harassment, and embarrassment, loss of employment, loss of wealth, loss of profits, and loss of economic sustenance as described supra, and for those disruptions and losses caused by their conduct, Google Incorporated, Yahoo! Incorporated, Microsoft Corporation, and the "mugshot websites" are liable.

xiii) Because the information in question disseminated by Google Incorporated, Yahoo! Incorporated, Microsoft Corporation, and "mugshots websites" are public records, nothing prevents any person interested in that information from seeking it from its original source. Google Incorporated  Yahoo! Incorporated, Microsoft Corporation, and "mugshot websites" re-disseminate that information purely for commercial gain. It is published by Google, Yahoo! and Microsoft as a vehicle to support advertising for which they are paid, and the "mugshot websites" will typically charge a a person a fee to remove the publication of a person's image and arrest or detention records, and this ultimately amounts to extortion.

28

Because these parties republish this information exclusively for their own gain, and because

1  prohibiting them from continuing to do so does not in any way deprive the public of that same information from its original sources, and because none of these parties are governmental nor public agencies in any way, they are liable to be enjoined from continuing to disseminate the information in question, and to compensate Plaintiff, and for punitive damages for the harm they have caused thereby.

xiv) Because the defamatory content published by "mugshot websites" that is republished and disseminated by Google Incorporated, Yahoo! Incorporated, and Microsoft Corporation serves NO LEGITIMATE PURPOSE WHATSOEVER, and only serves to vex, annoy, harass, embarrass, and emotionally harm persons, and does cause them to suffer loss of personal standing in the community, and loss of employment, economic sustenance and opportunity, and did cause that kind of harm to Plaintiff, their publications amount to harassment, and they are liable for the damages therefor sought by Plaintiff.

xv) Because this Complaint constitutes Notice of Non-Consent by Plaintiff to publication of ANY KIND OF INFORMATION WHATSOEVER by defendants Google Incorporated, Yahoo! Incorporated and Microsoft Corporation, upon their having received such notice by service of this Complaint, their continued publication thereafter of information regarding Plaintiff as described in this Complaint constitutes gross negligence and willful, intentional and deliberate defamation, libel, and harassment of Plaintiff, for which they are liable for Punitive Damages as requested in Paragraph 414 § xx infra.

**C). Claims of Liability Upon Board Of Trustees Of City Pension Fund For Firefighters and Police Officers In City Of Tampa:**

224)  Because FRS §§ 185.01, 185.03, 185.05 and 185.25 are not laws of general application, and are specifically for the benefit of a particular class of persons, and because these statutes impugn, or emburden the Public's Fundamental Right to Property, by taxation, and because these statutes invidiously discriminate against non-police and non-firefighter employees of The Municipal Corporation of Tampa, and those not employed by The

28  Municipal Corporation of Tampa, and because the Board of Trustees of City Pension Fund

1   For Firefighters and Police Officers In City of Tampa are charged in an official capacity
with managing the taxes collected pursuant to these statutes, the Board of Trustees of City
Pension Fund For Firefighters and Police Officers In City of Tampa are liable as the
respondeat party to show cause as to the compelling objective for, and the lack of less
restrictive alternatives to these statutes, or otherwise why these statutes are Constitutional,
and upon failure thereto, to release that pension fund to this Court for re-disbursement back
to the Citizens.

**D) <u>Claims of Liability on ICANN, Verisign, Public Interest Registry, and
"Registrars" of Internet "Domain Names"</u>:**

225) The "Registrars" of internet "Domain Names" secure ownership of the domain names
to the individual parties publishing the offensive and defamatory information as "mugshot
websites" and provide certain "top level" technical and practical services that but for these
services no persons can publish any information under any "Domain Name", and do so by
maintaining a "Registry" of "Domain Names", the individual parties responsible for
publishing under those "Domain Names", and communications-protocol information
necessary to do so. The "Registrars" are the parties liable to be enjoined to transfer
ownership of "Domain Names" to Plaintiff as punitive damages upon the publishers of the
defamatory content, and to be enjoined from securing ownership of domain names to future
publishers of such defamatory content, and likewise liable to be preliminarily enjoined to
cease-and-desist provision of the technical services necessary for "mugshot websites" to
continue publication of defamatory content.

226) ICANN is liable because but for their "Root Zone" Domain Name Service, "Domain
Names" like "Mugshots.com" and "Arrests.org" could not be published as such, nor
accessed as such by any party, and ICANN is liable as the party to be enjoined from
providing "Domain Name Service" to the publishers of defamatory content, necessary for
28   them to publish such content.

227) Verisign is liable because they accredit "Registrars" of the ".com" ("Dot-Com") "Top Level Domain" (TLD), and but for their conduct, "Registrars" like GoDaddy.com LLC, Key-Systems GmbH, Fabulous.com PTY Ltd., and Network Solutions LLC could not register any "Domain Names" and thereby facilitate, aid, abet, and act as accessories to the publication of defamatory information by "mugshot websites". Verisign is also liable to be enjoined from accrediting any further "Registrars" who facilitate, aid, abet, and act as accessories to the publication of defamatory information for extortionate purposes, and to remove the accreditation from those who currently do.

228) Public Interest Registry is liable because they accredit registrars of the ".org" ("Dot-Org) "Top Level Domain" and but for their conduct, "Registrars" like GoDaddy.com LLC, Key-Systems GmbH, Fabulous.com PTY Ltd., and Network Solutions LLC could not register any "Domain Names" and thereby facilitate, aid, abet, and act as accessories to the publication of defamatory information by "mugshot websites". Verisign is also liable to be enjoined from accrediting any further "Registrars" who facilitate, aid, abet, and act as accessories to the publication of defamatory information for extortionate purposes, and to remove the accreditation from those who currently do.

**E) Claims of Liability upon Internet "Domain Name" "Registrants":**

229) The "Registrants" of "Domain Names" are the actual parties responsible for registering the "Domain Names" with a "Registrar". A "Registrant" may be the actual party publishing the defamatory information via a "mugshot website" "Domain", or may be acting as an agent for those who do. These individuals are aiding and abetting the publishers themselves and have knowledge of the actual identity of the publishers of defamatory content for extortionate purposes, and can be subpoenaed to provide that information and enjoined to prevent future such activity. They aid and abet the publishing parties by obscuring their actual identity and protecting the publishers' privacy while acting as accessories before and after the fact to aid and abet the publishers who publish defamatory

1

information for extortionate purposes by removing an individual's privacy from them, and charging them to restore it.

**F) Claims of Liability upon Amazon.com Incorporated, Cloudflare Incorporated, Hurricane Electric Incorporated, APH Incorporated, d.b.a. Codero, and Srikanth Rao:**

230) Srikanth Rao is indicated by information stored in and retrieved via the "WHOIS" system as the "Administrative Contact" for defendant "Cloudflare Incorporated", who provides "Domain Name Service", and server "hosting" to "mugshotsearch.org" and "openpasts.com" who do and did publish wrongful and defamatory information regarding Plaintiff. As such Rao is the individual party responsible for populating and maintaining "DNS Zone Files" and providing "Domain Name Service" so that those "domains" can publish such information, and but for Rao's conduct the publishing parties could not electronically publish any information much less the defamatory information published. Because of this, Rao is liable for damages caused by that defamatory information, and liable to be enjoined to prevent further such damages, and subject to punishment for the damages that were caused.

231) Amazon.com Incorporated Provides server hosting and Domain Name Service (DNS) for the Internet Domains "TampaBayProfiles.com", "arrests.org", and "mugshots.com". "Server" hosting and "DNS" are essential technical products and services necessary for a person to publish any information via the "Internet". But for the business practices of Amazon.com Incorporated, a party publishing defamatory information would be unable to do so. Amazon.com Incorporated has cause to know, or should know of the content being published by those who take advantage of their products and services, and is the party liable to be enjoined for the purposes of ceasing and desisting the publication of defamatory information by TampaBayProfiles.com", "arrests.org", and "mugshots.com".

28

232) Cloudflare Incorporated provides server hosting and DNS for "openpasts.com", and "mugshotsearch.com" Server" hosting and "DNS" are essential technical products and services necessary for a person to publish any information via the "Internet". But for the business practices of Cloudflare Incorporated, a party publishing defamatory information would be unable to do so. Cloudflare Incorporated has cause to know, or should know of the content being published by those who take advantage of their products and services, and is the party liable to be enjoined for the purposes of ceasing and desisting the publication of defamatory information by "openpasts.com", and "mugshotsearch.com".

233) Hurricane Electric Incorporated provides "server" "hosting" for "mugshots.org". "Server" hosting and "DNS" are essential technical products and services necessary for a party to publish any information via the "Internet". But for the business practices of Hurricane Electric Incorporated, a party publishing defamatory information would be unable to do so. Hurricane Electric Incorporated has cause to know, or should know of the content being published by those who take advantage of their products and services, and is the party liable to be enjoined for the purposes of ceasing and desisting the publication of defamatory information by "mugshots.org".

234) APH Incorporated d.b.a. Codero provides "server" "hosting" for hidden-past.com". "Server" hosting is an essential technical product and service necessary for a party to publish any information via the "Internet". But for the business practices of APH Incorporated, d.b.a. Codero, a party publishing defamatory information would be unable to do so. APH Incorporated, d.b.a. Codero, has cause to know, or should know of the content being published by those who take advantage of their products and services, and is the party liable to be enjoined for the purposes of ceasing and desisting the publication of defamatory information by "hidden-past.com".

28

1

### VII. <u>Claims Of Malice</u>:

235) carithers, neal's, gudes', and norris' conduct constitutes malice because:

    i) Their conduct is in violation of the Florida State and United States Constitution and Laws as claimed herein.

    ii) They were shown clear and unequivocal exculpatory evidence that Plaintiff was the lawful lessee of the property that mccall and rose were attempting to take from Plaintiff.

    iii) They were shown clear and unequivocal exculpatory evidence that mccall had relinquished by notarized instrument all ownership and title to the property that mccall and rose were attempting to take from Plaintiff.

    iv) They claimed that the ownership of the house and real property located at 106 West Osborne, Tampa, was a "civil matter", presumably to be decided by a Court, when Plaintiff had lawfully leased and secured a purchase contract for the property, and payed fully in advance for the lease and usage of that house and property, and was payed in full, until 19 August 2014. (Four months ahead of the date of the incident).

    v) They claimed that ownership of the house was a "civil matter" presumably to be decided by a Court, when mccall had signed a notarized deed releasing all claim of ownership to the property, and as such had no legal claim to the property whatsoever.

    vi) They claimed by the aforementioned, that individuals cannot decide matters of business by themselves, nor take individual ownership of anything, and that all such matters must somehow be decided by government.

    vii) They did so because like all such persons they are ineffectual losers and cannot conduct themselves in society with any kind of socio-economic success nor acumen, and therefore, have to turn to government to be told what to think, and how to conduct themselves, and likewise have their existence spoon-fed to them by government at the expense of the public.

    viii) Their conduct is because that is the kind of people they are, and as such they cannot cope with the complexities of society, and commerce, and they assume that no one else can, and project their inadequacy and incompetency upon the existence of others

28

1     through their official misconduct. (Literally, tyranny by stupidity, or tyranny by worthlessness).

ix) They were told repeatedly that mccall had no lawful claim to the property, that mccall and rose were trespassing, and that mccall and rose both attempted to unlawfully imprison Plaintiff and unlawfully take money and property from Plaintiff, and at all times they refused to take any action therefor.

x) At all times they monomaniacally, sadistically, and narcissistically refused to consider anything Plaintiff said, and instead chose to unilaterally impose their conduct upon the Public, under color of official right.

xi) Matters of real estate ownership and possession, trespassing, theft, and unlawful imprisonment are matters of law, and enforceable by police. They chose to selectively enforce the law upon Plaintiff based on mccall's and roses' complaints, but not enforce the law upon mccall nor rose upon any of Plaintiff's complaints.

xii) They claimed out of one side of their face that ownership of the property was supposedly a "civil matter", which they do not enforce, yet in complete contradiction to their own statements decided that mccall was the lawful owner of the property because otherwise she was a complete stranger appearing on Plaintiff's property attempting to rob him, and commit larceny from him, and their decision to charge only Plaintiff constitutes an implicit decision by them that mccall had legal claim to the property.

xiii) Their continued claim that that they do not enforce "civil matters" or otherwise deal with "civil matters" is wholly false, because as Tampa police officers the majority of their work is enforcing traffic and other civil infractions. (Seatbelt, vehicle registration, bicycle light-reflector, jaywalking, noise, garbage, and pet violations).

xiv) carithers admitted in her report (GO# 2014-264588, Exhibit 6, p. 19) that Plaintiff was not under arrest but still chose to unlawfully and without probable cause imprison Plaintiff in handcuffs and the back of her patrol vehicle, and not take him to a Judge.

28     xv) carithers lied in her report (GO# 2014-264588, Exhibit 6, p. 19), claiming

I   mccall had provided her with a "three day notice certified eviction notice from the clerk of court" (Exhibit 4). That document is notarized but does not contain any Seal from The Clerk of Court, nor the word "Court" anywhere upon it, nor any case number upon it, nor was there any landlord-tenant action, nor or any other civil matter extant in any Court brought by mccall against Plaintiff at that time.

xvi) carithers believed, or claimed that the "three day notice" in Exhibit 4 was certified from the Clerk of Court, that supposed certification, and likewise the actual Notarization of it by a Notary Officer constitutes sufficient Notice, and Recording of the Transfer of the Real Property to Plaintiff's Corporation per FRS Title XL, but carithers refused to acknowledge that Transfer, and therefore lawful ownership of the Property located at 106 West Osborne by Plaintiff's Corporation, or mccall's creditors.

xvii) carithers, neal, gudes, and norris all had the records described in Paragraphs 58 – 62 supra, in their possession at the time of mccall's complaint, as well as access to all Hillsborough County Court dockets regarding landlord-tenant actions, and based on the records in their possession at that time, they had sufficient knowledge that mccall and rose had no lawful business with Plaintiff whatsoever, no lawful reason to enter upon the Real Property located at 106 West Osborne, nor into the structure therein, and no lawful reason to demand, nor attempt to collect by any means any Money or Property of any kind from Plaintiff, yet with deliberate indifference to all this, they chose to aid and abet mccall and rose with robbing and extorting Plaintiff, committing larceny from him by false pretenses, and did wrongfully charge Plaintiff with serious felony crimes for defending himself and his property, against crimes by mccall and rose, and for attempting to free himself from unlawful imprisonment, and those crimes.

xviii) mccall and rose, by their own admissions, notified carithers, neal, gudes, and norris that they had unlawfully imprisoned and were attempting to rob Plaintiff, but carithers, neal, gudes, and norris all refused to take any action whatsoever in their official capacity to prevent it, nor charge mccall and rose therefor.

28   xix) Plaintiff's Right to Self-Defense, and the use of force therefor, is clearly

1   established, and is protected by Florida Law under Article I, Section 8 of the Florida
Constitution, and FRS Chapter 776, and specifically FRS §§ 776.012(2), 776.013, 776.031,
and 776.032 therein. Because carithers, gudes, norris, neal, dusty rhodes, danny rhodes, and
filippone are law enforcement officers, they are all aware of, or should be aware of, these
statutes, and Common Law, and have a duty to be aware of these statutes and Common Law,
and are in breach of that duty by not informing mccall and rose that Plaintiff was justified in
the circumstances in using force as alleged, and they are in breach of duty and violation of
law for charging Plaintiff for allegedly using force in the circumstances because Plaintiff is
immune in those circumstances from any criminal prosecution therefor per FRS § 776.032,
because per the Laws of Florida, Chapter 2005-27, the intent of the State Legislature in
enacting the provisions of FRS § 776.013 et seq. is clear:

*"the Legislature finds that it is proper for law-abiding people to protect themselves,
their families, and others from intruders and attackers without fear of prosecution or civil
action for acting in defense of themselves and others, and"*

*"the castle doctrine is a common-law doctrine of ancient origins which declares that
a person's home is his or her castle, and"*

*"Section 8 of Article I of the State Constitution guarantees the right of the people to
bear arms in defense of themselves, and"*

*"the persons residing in or visiting this state have a right to expect to remain
unmolested within their homes or vehicles, and"*

*"no person or victim of crime should be required to surrender his or her personal
safety to a criminal, nor should a person or victim be required to needlessly retreat in the
face of intrusion or attack"*

xx) carithers' conduct toward Plaintiff appears to be part of a pattern of such conduct.
Plaintiff is in possession of a "dash-cam" video taken from a traffic stop where carithers
harasses a Citizen. In that video, the Citizen asks her if she has a warrant, and carithers
states "I don't need a warrant... that's my job!"

28   xxi) Neither carithers, neal, norris, nor gudes had any probable cause nor arguable

1

cause to arrest nor "detain" Plaintiff. Plaintiff was not free to go from the moment they arrived at 106 West Osborne, and was told explicitly that he was not free to terminate the encounter, nor leave, and Plaintiff was physically restrained from the beginning of the encounter, and prohibited thereby from terminating the encounter nor leaving in any case, nor at his own will. Plaintiff was not taken to the County jail to be brought before a magistrate for almost two hours. Plaintiff was told that he was being "detained" for criminal investigation, which meant that at the time Plaintiff was so "detained", neither carithers, nor neal, nor gudes, nor norris, had any probable cause whatsoever to arrest Plaintiff, but in fact did, because Plaintiff was physically restrained, and prevented from terminating the encounter and leaving, while gudes, neal, norris, and carithers sough to obtain, or otherwise fabricate probable cause to bring Plaintiff before a magistrate, and because carithers, neal, norris, and gudes deliberately physically restrained Plaintiff and prohibited him from leaving from the onset of the encounter, and at all times that conduct was a ploy or pretext for the purpose of obtaining probable cause to bring Plaintiff before a magistrate, without having any probable cause to do so at the time it was done.

xxii) Counts 1 and 2, (the Aggravated Battery charges reported by mccall and rose), were dismissed at an evidentiary hearing based on the evidence contained in the video recording made by Plaintiff, and more substantially the evidence contained in the 911 call made by mccall, during which mccall never claimed that Plaintiff used any force against her, and in which she clearly stated that Plaintiff had not struck her, and as such, neither carithers, neal, norris, nor gudes had any arguable cause to detain, arrest, nor charge Plaintiff, nor to appear at 106 West Osborne for any reason.

xxiii) Plaintiff was unlawfully imprisoned by carithers, gudes, neal, and norris because by their conduct he was physically restrained and prohibited from terminating the encounter with them, and they had neither probable cause nor arguable cause to do so.

xxiv) At all times, Plaintiff was inside his own residence and place of business, of which he was the lawful possessor, minding his own business, when mccall and rose came

28

to that property, by their own admissions, to unlawfully take that property from Plaintiff,

1

and did attempt to enter that dwelling in order to forcefully evict Plaintiff from that dwelling, and for Plaintiff retreating from that situation to protect his safety, carithers chose to charge Plaintiff with two counts of serious felony charges, and because gudes, norris and neal refused to intervene in that wrongful conduct by carithers.

xxv) Additional claims of malice as stated in Counts I – XXXI, and Section X, infra.

236) dusty rhodes conduct constitutes malice because:

i) he was notified as to the wrongful conduct of the other officers and per his own statement that at the point he was spoken to, (during booking in the Hillsborough County jail), "anything [was] a possibility", including carithers redacting the charges, or some other officer like rhodes himself, intervening and doing so. dusty rhodes was notified of all attendant circumstances, including and especially Plaintiff's self-defense, and refused to aid Plaintiff in any way in his official capacity, much less notifying carithers of the wrongfulness of her conduct and her charging Plaintiff.

ii) He was shown the notarized agreement in Exhibit 3, and acknowledged it, but still refused to charge mccall and rose, with any crime, nor intervene in the wrongful incarceration and criminal charges caused by carithers.

iii) He deliberately lied to Plaintiff claiming that exculpatory evidence had been reviewed, and that it was not exculpatory, when it was that same evidence that would later play a crucial role in dismissing felony charges against Plaintiff. While it may be held legal for police to engage in "strategic deception" (a.k.a. being a "lying piece of shit"), as part of a criminal investigation, it was malice for rhodes to lie regarding the existence, or nature of exculpatory evidence, and because his actions were not part of any legitimate police conduct but only for sadistic purposes as described supra.

iv) He deliberately refused to issue a trespass warning to mccall per established TPD SOPs 402.5, 403.5, and 541.1, nor inform Plaintiff as to the disposition of that question so that Plaintiff could pursue a trespassing action directly against mccall, via Civil Proceedings.

28

v) He was notified expressly and deliberately by Plaintiff that the charges brought

against him in this matter would result in loss of employment for seven years due to "background checks" by potential employers. He refused to take that into account, nor take any action to mitigate those damages, when by his own admission he had the ability to do so.

vi) He claimed that Plaintiff had no Right to defend himself, nor use his motor vehicle to leave the scene of mccall and rose's criminal conduct against him, and that in response to that criminal conduct by mccall and rose, that "a reasonable person would call the police".

237) danny rhodes conduct constitutes malice because:

he is the lead detective in the matter and therefore is fully cognizant of all the facts and law in this matter, as enumerated herein, and has from the outset refused to aid Plaintiff in any way, nor take any official action to charge mccall, rose, nor any other of the officers for their criminal conduct.

238) filippone's conduct constitutes malice because:

he was contacted as an officer in the District 3 department of the Tampa police, regarding the crimes by mccall and rose, and he refused to take any official action as such, and continues to refuse to take action to intervene in the wrongful conduct of the other officers, or for the crimes by mccall and rose, but instead, made up false grounds and excuses for his deliberate indifference and refusal to act.

239) carithers', gudes', neal's, norris', dusty rhodes', danny rhodes' and filippone's conduct constitutes malice because they all claimed that because Plaintiff did not call the police to report mccall and rose trespassing that mccall and rose did not trespass, and that because Plaintiff committed crimes against mccall and rose or was accused by them therefor, that therefor mccall and rose's conduct was not criminal and that mccall was now free to enter and take The property located at 106 West Osborne from Plaintiff, and that because of

1   Plaintiffs alleged conduct, that mccall's taking of of that property was no longer criminal, and that Plaintiffs conduct, and his failure or refusal to call the police negated the criminality of mccall and roses conduct, thereby making it legal for them to do what they did.

240)   The policies or customs of The Municipal Corporation of Tampa, and the Tampa police department as they were carried out against Plaintiff by its officers were malice because:

i) the Tampa police, a department of the Municipal Corporation of Tampa, refused to release evidence to the State, (the originating 911 call that was placed by mccall), that was exculpatory and was ultimately cause for the charges of Aggravated Battery against Plaintiff to be dismissed. The Tampa police had a duty to produce that evidence as requirements of both probable cause, and due process, and were in breach of that duty by not providing that evidence to the State attorney prosecuting the charges against Plaintiff filed by an officer of The Municipal Corporation of Tampa. Because of that breach of duty, and because that evidence was exculpatory, Plaintiff was wrongfully charged and prosecuted, and suffered all the damages therefrom, as described herein.

ii) carithers, gudes, neal, norris, and dusty rhodes all uniformly made the excuse that mccall and rose's unlawful trespass and unlawful taking of Plaintiff's property was a "civil matter" to which they do not take any action, yet in the 911 call that mccall made it was clearly stated by her that the reason she was calling the Tampa police was to evict Plaintiff, and they responded to that call on those grounds.

iii) carithers, gudes, neal, norris, and dusty rhodes all refused to consider anything Plaintiff said in his defense, nor any evidence in his defense that was presented to them, and chose to be entirely partial to mccall and rose because it was mccall who called them.

iv) carithers, gudes, neal and norris immediately arrested Plaintiff without probable cause and claimed he was being detained for a criminal investigation.

28      v) all Tampa police officers charged as defendants uniformly chose to impose a

1

single-victim / single-perpetrator, or victim / perpetrator mutual-exclusion false narrative upon the Totality of Circumstances.

vi) carithers, gudes, neal, norris, and dusty rhodes all claimed that Plaintiff had no Right to self-defense, and charged Plaintiff for exercising that Right, or assisted with the charging and prosecution of Plaintiff for exercising that Right.

vii) all Tampa police officers charged as defendants violated or assisted with the violation of Plaintiff's Civil Rights as charged herein.

241) Rios' conduct constitutes malice because:

i) she deliberately refused to consider the totality of circumstances, and exculpatory evidence in making and her decision to prosecute, and in pursuing that prosecution, and;

ii) she chose to prosecute Plaintiff for exercising his Fundamental Right to Self-Defense, and;

iii) she is part of a common plan or conspiracy by state government to deprive people of their Right to self-defense, and punish them for exercising their Right to Self-Defense, and;

iv) she chose to prosecute because she is offended by Citizens exercising Individual Freedom and Empowerment and therefor chose to impose her own, personal, political and social agenda against Plaintiff, by the use of her official office, and;

v) she was in possession of exculpatory evidence from the outset of the case and continued to prosecute Plaintiff despite that exculpatory evidence, and;

vi) she continued to prosecute Plaintiff in violation of State Law when Plaintiff was immune therefrom pursuant to FRS 776.032, and immune therefrom pursuant to Amendment II, of The United States Constitution, and;

vii) upon termination in favor of Plaintiff of the charges brought by her she refused to admit the wrongfulness of her conduct, and provide Plaintiff with such remedy as necessary for him to return to his prior socioeconomic position, and;

28

viii) her prosecuting Plaintiff is in violation of established Constitutional Law, and in

1

violation of established State Law, and;

ix) her prosecuting Plaintiff served no legitimate governmental purpose, and in the contrary serves only to increase crime by enabling perpetrators of crimes to commit those crimes undeterred by persons they intend to victimize, and serves to "chill" Citizens by threat of wrongful prosecution, from protecting their Personal Safety and Property, and from preventing crimes against them, as stated in Paragraph 102 supra, and;

x) at all times, Plaintiff was inside his own residence and place of business, of which he was the lawful possessor, minding his own business, when mccall and rose came to that property, by their own admissions, to unlawfully take that property from Plaintiff, and did attempt to enter that dwelling in order to forcefully and unlawfully evict Plaintiff from that dwelling, and for Plaintiff retreating from that situation to protect his safety, Rios chose to prosecute, and persist in prosecuting Plaintiff with two counts of serious felony charges for protecting himself from crime, and engaging in completely lawful behavior, and;

xi) Rios' prosecuted Plaintiff for violating FRS § 322.34 is for the purpose of collecting revenue, for the purpose of collecting revenue that was not due, and for the purpose of re-collecting revenue that was already paid, and is therefor without lawful grounds, and;

xii) Rios prosecuted Plaintiff for violating FRS § 893.13(6)(b) which is blatantly unconstitutional as alleged in Paragraphs 172 – 179 supra, Rios had been given notice of this, and has duty to know, and continued to prosecute Plaintiff for allegedly violating that statute, in breach of her duty, and violation of her oath.

242) Google Incorporated, Yahoo! Incorporated, Microsoft Corporation and the "mugshot websites'" conduct is malice because in all cases their conduct is a violation of ordinary standards of care, and because Plaintiff gave no consent in any way to Google Incorporated, Yahoo! Incorporated, Microsoft Corporation, nor the "mugshot websites" to publish any information about him ever, nor does Plaintiff consent to any publication of any information about him of any kind whatsoever by them, and because none of these parties are state

28

1  agencies, and in no way did these parties ever seek Plaintiff's consent nor release to publish
any information about him.

243) Further, the conduct of Google Incorporated, Yahoo! Incorporated, and Microsoft
Corporation constitutes malice because by the application of comparatively simple acts of
the same practices that are their core business, (computer programming), they could create
and publish a facility whereby individuals could enter their given names, and the Uniform
Resource Locators (URLs) where they observed any defamatory content published about
themselves, and Google, Yahoo!, and Microsoft could then delete such information from
that which they have aggregated, and at that persons request, no longer publish any
information about a particular person or from a particular source. In short it is far simpler in
technological terms and in terms of actual labor to program a computer to NOT publish
information about a given person or from a particular URL, than the tens of thousands of
programmer-hours needed to create and deploy a highly complex information aggregation
and publishing system that denies persons of their privacy, and publishes information about
them without their consent. Because Google, Yahoo!, and Microsoft refuse to provide such a
de-publication mechanism, and could have done so at negligible cost via their established
business practices, their deliberate refusal to do so constitutes malice.

244) The conduct of Amazon.com Incorporated, Hurricane Electric Incorporated,
Cloudflare Incorporated, and APH Incorporated d.b.a Codero, constitutes malice because
they provide essential practical and technical services necessary for parties to publish
defamatory information about thousands of persons, and provide the specific technical and
practical services necessary for these parties to charge a fee to un-publish that defamatory
information, thereby aiding and abetting the publishing parties in committing extortion, and
because Amazon.com Incorporated, Hurricane Electric Incorporated, Cloudflare
Incorporated, and APH Incorporated d.b.a Codero do not sufficiently monitor the content

28  their clients publish to prevent such abuse, and deny services to those who do publish

1    abusive and defamatory content such as "mugshot websites".

245) The conduct of defendants herein named as "registrants" constitutes malice because they deliberately and willfully obscure the identity of the actual parties responsible for publishing defamatory material in order to protect them from liability and litigation therefrom. They protect the privacy of those publishing defamatory content while the parties publishing that content deprive thousands of other persons of their *privacy* deliberately for the purpose of bilking them of money to restore it,

246) The conduct of defendants herein named as "registrars" constitutes malice because they fail to put in place safeguards that either prevent the publication of defamatory or illegal content by publishers like "mugshot websites", or in the alternative facilities or methods for individuals to prevent it for themselves. Because of the inherent nature of the technology involved in publishing anything via the internet, the "registrars" play a critical role in that publication. Literally they are the "gate keepers". They possess the ability to make any "website" inaccessible in seconds. Literally, by deleting an entry from a "database", or possibly changing a setting from "active" to "inactive", and possibly stopping and restarting a Name Server Program, or "daemon", they can in just a few moments make any "website" inaccessible. By not providing a facility to the public to provide this service upon request of any private party, until such time as a "website" registered by them removes any defamatory content, they are denying the Public the ability to maintain their Privacy, Peace and Dignity against the abuse thereof by "mugshot websites", which they thereby aid and abet.

247) Srikanth Rao's conduct constitutes malice because he is individually responsible for performing the technical tasks necessary for Cloudflare incorporated to publish information via "server" hosting of "websites," and thereby does individually aid and abet

28    "openpasts.com" and "mugshotsearch.org" with publishing the defamatory content against

1

Plaintiff described herein.

## VIII. Claims Of Retaliation

248) All Tampa police defendants' conduct constitutes retaliation as follows:

i) Plaintiff is a professional Technology Developer with more than fifteen years experience developing electronics technology and computer programming.

ii) Plaintiff leased and contracted to purchase the real property located at 106 West Osborne in Tampa, through a corporation, to use as a combination residential, office, and light-manufacturing facility to develop electronic technology products for commercial gain. One of these products is called the "KopCam". (http://KopCam.com). (See Exhibit 16, Basic KopCam Technical Dossier).

iii) The Internet Domain "KopCam.com" was first published in by Plaintiff in October 2009. A USPTO Trademark Application #85323366 for the Mark "KopCam" was filed in may 2011.

iv) As stated in Paragraph 53, supra, the Tampa police are aware of Plaintiff's usage of this device.

v) Plaintiff uses this device because he knows from his experience *with* police officers that they habitually violate Citizens' Civil Rights, and that they habitually lie. Plaintiff began developing this device in order to obtain evidence against police officers for use in Civil Rights cases against them.

vi) The design of the KopCam is such that police officers have no control over the recording, and that recording begins immediately when the device is removed from its battery charging console, and when returned to that console the video is "downloaded" to storage, the internal memory cleared, and the battery recharged. The device is further designed so that it has a ten-hour battery life, and is of a form factor around one-inch wide by one-inch deep by about six-inches tall, with a target cost per unit expected to be less than $150.00 per.

28

vii) The goal of this invention is to create a device that is inexpensive enough that no

1    police department can make any excuse for not using it, while at the same time removing from police officers all control over the acquiring and keeping of this evidence, nor its content, and thereby removing from them all ability to manipulate, con people, and lie about their behavior, and likewise get away with police corruption.

viii) This is distinct from other police camera systems because: a) the cost is significantly lower than other units that cost $500 - $1,500 per camera, and; b) because other systems allow the police officers to control the recording process thereby allowing them to "cover up" corrupt conduct by deliberately failing to record it, and; c) it enables free access to the information by the Public, as well as lawyers looking for work, by automatically copying the information to off-site storage for chain-of-custody validation, and to make it available for reviewing via Internet Website. (See Exhibit 16, Basic KopCam Technical Dossier).

ix) Plaintiff has used this device successfully to secretly record Civil Rights violations by police officers, and knows from experience that when questioned about their conduct police officers will lie and say "I don't recall", or in a Civil Rights case, they will lie on their affidavit in response to the claims against them. (See *Bugoni v. Coffman*, USDC AZ CV-04-01345).

x) Because of these facts, and ultimately because in Civil Rights cases the burden of proof is upon the Plaintiff, and evidence is critical to that proof, Plaintiff uses the KopCam secretly to obtain evidence for use in Civil Rights cases against police officers, and for perjury charges when they lie on their affidavits.

xi) Additionally, Plaintiff publishes an Internet Website as: http://FireACop.com. This Website is for the purposes of assisting Citizens with Civil Rights complaints, and other misconduct complaints against police officers and for the purpose of helping Citizens get police officers fired. Plaintiff does this to protect his own individual and personal safety, as well as to help others protect their individual and personal safety, and to protect Public Safety.

28   xii) Because carithers, neal, norris, gudes, dusty rhodes, danny rhodes, filippone and

1

castor all know these facts, their conduct is deliberate retaliation against Plaintiff for his personal, commercial, and technological efforts to expose and cease their corrupt, tortious, violent, unconstitutional and criminal conduct against the Public.

249) Because the sum total of conduct of carithers, neal, norris, gudes, dusty rhodes, danny rhodes, filippone, and castor, Plaintiff was deprived of his business, his economic mobility, his prosperity, and commercial endeavor, as described herein, therefor Plaintiff has the Right to regain that, and re-create that for himself as requested in Paragraph 413 § iii, and Paragraph 414 §§ xi – xv, infra.

250) Because all of the aforementioned defendants at all times with malice, and deliberate indifference, did commit the acts described, and cause the harm described, they are liable for compensatory damages, criminal prosecution, injunctive and equitable relief, and must for the absolute callousness, indifference, and complete refusal to obey the law, The Constitution, and respect the Rights and Property of Others, be subjected to punitive damages, as requested infra.

### IX. <u>Damages Suffered</u>:

251) As a result of carithers', gudes', norris', neal's, danny rhodes, dusty rhodes, filippone's, castors', Rios', Google's, and Mugshot Websites' conduct, Plaintiff did suffer the following damages:

i) Wrongful and very serious charges that resulted in unlawful incarceration in the Hillsborough County jail, and the requirement of paying bail in the amount of $9,200 that Plaintiff did not have, in order to secure his business assets and personal property that were inside the building at 106 West Osborne, and prevent burglary thereof by mccall. It is clear that mccall intended to rob Plaintiff of this property and that George Betancourt, Ralph Bottega, and possibly Betancourt's family may be conspiring, and did conspire with mccall

28

to steal the Real Property located at 106 West Osborne, as well as Plaintiff's business and

1      personal assets therein.

         ii) Plaintiff's elderly Mother, a person of seventy-five years, who has had no part whatsoever in this or any matter with mccall, for whom Plaintiff is the sole provider, and who committed no crime whatsoever, has had to have a burden placed on her in order to help free Plaintiff from jail in order to prevent him from losing all his personal property, and business property that is the accumulation of tens of thousands of man-hours of Plaintiff's Labor, and now must face the possibility of losing her house, and her sustenance, and being out on the street because of carithers', norris', gudes', neal's, danny rhodes', dusty rhodes', and filippone's complete refusal to listen to anything Plaintiff had to say, their complete refusal to consider that information, nor act on it, their complete refusal to accept nor act on exculpatory evidence, and their complete refusal to enforce the law to protect Plaintiff from mccall and rose, and their continued insistence on deliberately and indifferently imposing their psychopathic and treasonous conduct against Plaintiff and the Citizens of this County.

         iii) Plaintiff has lost all business to the corporation that entered into the contract with mccall, and faces having to administratively dissolve that corporation to protect himself from further abusive litigation by mccall or rose.

         iv) Plaintiff leased, and contracted to purchase through a Corporation, the property at 106 West Osborne to continue to develop, and bring to market a novel digital video acquisition and processing technology product that is realistically valued at at least Fifteen Million Dollars for a market-ready prototype. The particulars of that product are being withheld to protect Plaintiff's intellectual property, however Plaintiff can produce sufficient work-product, documentation, and prototype, to prove that the product is valid, and that development was sufficiently underway. Plaintiff has had to cease development of that product, and seek other employment due to the actions of Tampa police defendants, and Plaintiff has likewise had to face administratively dissolving the Corporation he formed to produce this product, because of their conduct, in order to prevent abusive litigation by mccall and rose to further steal from Plaintiff.

28          v) Ultimately it was the wealth from that invention that was to be Plaintiff's

1   retirement benefits. Those are all lost now due to the actions of mccall, rose, carithers, gudes, neal, norris, dusty rhodes, danny rhodes, filippone, castor and Rios.

vi) Plaintiff likewise as an individual inventor used the property at 106 West Osborne to develop the "KopCam" system, and as such has likewise lost all use of the property therefor, and has had to cease development of that product as a result of the actions of carithers, gudes, neal, norris, dusty rhodes, danny rhodes, filippone, castor and Rios.

vii) Plaintiff did after the incident on 24 April 2014, and after being released from custody, meet with a potential client to negotiate a contract worth $110,000 for a year's work. After the first meeting the client agreed to a second meeting, for the purposes of closing the deal. Just after beginning the negotiation it was halted abruptly, and Plaintiff was escorted from the building. This happened because the client searched Plaintiff's name using the "search engine" published by defendant, Google Inc. That negotiation was terminated, because they saw the "mug shot" of Plaintiff's arrest record, which was published because of the criminal charges filed by carithers, and because of the arrest by her and gudes, norris, neal, and dusty rhodes. Plaintiff was notified that as a result of those charges and that publication, that the negotiation for that contract was terminated.

viii) Because of this, when during the week 22 June 2014 Plaintiff did receive a call from another potential client for a similar contract he disclosed the events described above, and was told that because of the possibility of losing his Freedom due to the acts of carithers, gudes, neal, norris, and rhodes, that they could not offer any kind of contract to him.

ix) A client with whom Plaintiff had had a successful business relationship in the Tampa area for more than one year, and with whom Plaintiff was in negotiations to do further business, now no longer returns Plaintiff's phone calls, or will do any further business with him.

x) Because of the wrongful charges brought against Plaintiff by carithers, aided and abetted by gudes, neal, norris, and rhodes, Plaintiff has had an unconstitutional ultra-vires, 28   "Do Not Drive" order placed on him by Judge walter heinrich, and that because of that

I   Plaintiff's Economic Mobility and Business has been taken from him under threat of incarceration for pursuing it.

xi) The disruption of Plaintiff's existing course of life and business has caused him to have to seek employment elsewhere, and in doing so has had to accrue debt, which at the time of filing this complaint is no less than $46,000, (including the $9,200 bond payed for his release), at Eighteen Percent interest, which requires a minimum monthly payment of at least $1,100, of which no less than $670, is interest alone, and will take thirty-seven years to pay off via the minimum monthly payments, with a total amount of $113,859 payed on that debt, if not payed sooner.

xii) Plaintiff suffered physical injury to his wrists, the dermal tissues, and sub-dermal connective tissues thereof, pain, numbness, and the loss of use of his hands for at least a week because of the physical injury caused by carithers.

xiii) In order to prevent further harassment by mccall, and abuse of the no-contact order by her for the purposes of getting Plaintiff arrested and incarcerated so as to further rob him of his property, Plaintiff had to move from 106 West Osborne, and seal the property, on or about May 31 2014. As such Plaintiff lost the remainder of the $5,000 rent that was payed to mccall. (At Least $2,337.50).

xiv) Because of mccall's extensive history with the criminal justice system, particularly as a perpetrator of domestic violence, mccall knew how the Tampa PD behave, and will behave when called by a victim, (or supposed victim), particularly of domestic violence, and did use that experience and knowledge to cause Plaintiff to be unlawfully detained, arrested, charged and prosecuted so that she could steal the Property at 106 West Osborne from him, steal personal property within that Property from him, and did steal that Property from Plaintiff.

xv) Because of her numerous dependent support actions, mccall knew to have witnesses, who would lie for her, and her witnesses sandra rose did lie. Because of these facts, Plaintiff faced, and may still face the threat of wrongful conviction and incarceration, and did suffer theft of property as described supra.

28

1

xvi) Because Plaintiff opened and operated a retail store during the years of 2008 –
2010, but ultimately closed that store due to the economic "recession" at that time,
(http://www.bls.gov/spotlight/2012/recession/pdf/recession_bls_spotlight.pdf), all business
debt incurred to do that business is now assessed to him personally. By the beginning of
2014, Plaintiff was beginning to overcome the remainder of that debt, and to a large extent,
the lease and purchase of the property at 106 West Osborne was a cost-saving measure to
assist with that. Plaintiff has had to stop servicing those debts, and is currently unable to
overcome them, as a result of defendants' conduct. Because servicing debt is necessary to
continue to do business, and to financially prosper individually, and is critical thereto via
"credit ratings" and "credit scores" maintained by third parties, Plaintiff's Economic
Mobility, has been hindered and ultimately shunted by the combined conduct of defendants
carithers, gudes, neal, norris, danny rhodes, dusty rhodes, filippone, and Rios, and by policy
of defendant castor, and the custom of the Tampa police officer defendants acting thereupon,
and by the business practices Google Incorporated, Yahoo! Incorporated, Microsoft
Corporation, "mugshot websites", "registrars", "registrants", "Server" and "Domain Name
Service" providers.

xvii) Plaintiff conducts his business by responding to contract and employment leads
that are sent to him by persons and corporations soliciting his services. These leads are
typically sent via automated systems, or electronic mailing lists. Plaintiff then responds to
the leads to which he has the qualifications to pursue. From those responses, contact with
actual persons and contract negotiations begin. Since the initial contact to Plaintiff is usually
automated, there has been no decrease in those solicitations. However, since the publication
by Google Incorporated, Yahoo! Incorporated, Microsoft Corporation and "mugshot
websites" of Plaintiff's booking image, and arrest information resulting from the wrongful
charges brought by carithers, and prosecuted by Rios, replies by actual persons to Plaintiff's
responses to the automated solicitations of him has ceased almost entirely. Plaintiff has
pursued his businesses this way for more than fifteen years, and this is completely
uncharacteristic. Typically all leads to which Plaintiff personally responded would be

28

1   followed by a reply from an actual person. This change in circumstances took place

immediately after Plaintiff's arrest by carithers, and the booking image therefrom was

published, and is because typically after receiving a response from Plaintiff a person will

search Plaintiff's name using Google Incorporated's "search engine" and upon seeing the

information now published, chose not to pursue business with Plaintiff. This has caused

Plaintiff grievous and irreparable loss of business and economic opportunity.

xviii) carithers, gudes' neal, norris' danny rhodes, dusty rhodes, filippone's, castors

and Rios' conduct has caused Plaintiff outrage, anger, harassment, complete shock to the

conscience, and is an outright insult to, and violence against Plaintiff, and insult, outrage,

and violence to the sensibility, Peace and Dignity of Plaintiff and all Peaceful Citizens, to

The Constitution of This Nation, and all Standard Reasonable Men.

xix) During the pendency of the criminal charges brought by carithers, and

prosecuted by Rios in Case Number 14-CF-005912, Florida 13th Circuit Court, Plaintiff has

had no less than four offers of employment or contract business worth more than $100,000

each, rescinded due to the appearance of the charges in that case on "background checks"

that were performed as the last step of granting that employment or business. The

employment and business lost were confirmed offers, and were rescinded solely because of

the wrongful charges filed by carithers and prosecuted by Rios. But for the existence of the

wrongful charges filed by carithers, and prosecuted by Rios, Plaintiff would have obtained

that employment or business, and earned the revenue therefrom, and for the existence of

those wrongful charges filed by carithers and prosecuted by Rios being on Court Records,

Plaintiff will continue to have Rightfully Earned and Rightfully Obtained offers of

employment and contract business rescinded.

xx) On 13 July 2015, Plaintiff was notified by a contract agent that a client with

whom he had interviewed twice for a contract that a third interview scheduled for 16 July

2015 with that client was in jeopardy because that client had done a "Google Search" for

Plaintiff's name, and seen the booking photographs published by defendant Google, that

28   were collected from defendant "mugshot websites" publications, and when "clicked",

1

redirected a viewer's "browser" program to those publications. That ultimately caused Plaintiff further stress and aggravation at the jeopardy of losing business for which he had invested many hours of his Time, and no less than $200.00 in costs, to obtain.

xxi) Plaintiff has suffered loss of personal property as a result of carithers', gudes', neals' and norris' conduct including property stolen from 106 West Osborne as described supra, or taken from the vehicle he was renting and is now lost as described supra. That property must be replaced at Plaintiff's expense, and the cost of Plaintiff's time.

xxii) Because the debit card used by Plaintiff to do corporate business was taken from him, he was unable to continue to do business in the name of that corporation until a replacement could be obtained, which required Plaintiff to appear at a branch of the issuing bank, or have access to account information that was not stored in Tampa. Because of the disruption of Plaintiff's Life, and his mobility caused by carithers, gudes, neal and norris, Plaintiff was not able to obtain a replacement for more than a year while Plaintiff was working in an area with no branches of the bank issuing the card, and no access to his account information, ultimately causing disruption of business to the corporation Plaintiff presides, which is a wholly separate person and entity and was not charged with any crime whatsoever.

xxiii) Plaintiff's has had hundreds of hours to date of his Time consumed, and continues to have his Time consumed by the conduct of carithers, gudes, neal, norris, filippone, dusty rhodes, danny rhodes, the policy of castor, and custom of the Municipal Corporation of Tampa, the prosecution by Rios, and in compensating for the harm caused thereby described herein, and that time is irretrievably lost, and would have been spent by Plaintiff enjoying his Life, Liberty, Property, Prosperity, and Economic Mobility, and pursuing Employment and Business, and because that time cannot be recouped, all loss of Life, Liberty, Property, Prosperity, Economic Mobility, Employment, and Business concomitant with the loss of that Time is irreparable harm caused by the conduct of carithers, gudes, neal, norris, filippone, dusty rhodes, danny rhodes, and Rios, and by the policy of castor, and the custom of the Municipal Corporation of Tampa, as charged herein.

28

1

xxiv) Plaintiff was unlawfully imprisoned for a total of 1,920 minutes in the back of a police car and in the Hillsborough County Jail.

xxv) Additional damage as stated in Counts I – XXXIV, and section X, infra.

xxvi) Continuing injury in the loss of Time, Life, Freedom, Tranquility, Peace and Dignity as described herein, and continued Emotional Distress caused by the actions of Defendants, and the consequences on Plaintiff's Life caused by those actions.

## X. Cause Of Action:

252) Civil Rights violations, individually, and in conspiracy, by carithers, dusty rhodes, danny rhodes, neal, norris, gudes and filippone, and respondeat liability upon castor, Buckhorn and Municipal Corporation of Tampa, therefor, as claimed in Counts I – XXXIV infra.

253) Common Law Invasion of Privacy Torts by Google Incorporated, Yahoo! Incorporated, Microsoft Corporation, "mugshot websites", Internet Registrars and Registrants, Internet Authority Defendants, Server Hosting Providers, and Srikanth Rao, as claimed in Count XXXII Infra.

254) Malicious Prosecution by Karina Rios. As claimed in Count XXXIII Infra.

255) Unconstitutionality of Florida SB 2015-248, (Amendments to FRS § 119.071), FRS § 322.34, FRS §§ 893.02(3), 893.03(1), and 893.13, and FRS §§ 185.01, 185.03, 185.05, and 185.25, as claimed in Counts XXXIV – XXXVII infra.

256) For all Counts charged infra, this Court has Jurisdiction, and Venue is proper herein as stated in Paragraphs 1 – 7 supra.

28

1

257)  For all Counts Charged infra, Plaintiff is entitled to relief as stated in Paragraph 8, supra.

258)  For all Counts charged infra, the Factual Allegations made in Paragraphs 20 – 179 are adopted by reference in each Count, per FRCP Rule 10(c), as though those allegations were fully alleged in each Count infra.

**Count I**

Violation of Plaintiff's Right to Privacy by carithers, gudes, neal, norris, dusty rhodes, castor, and The Municipal Corporation of Tampa, in violation of United States Constitution Amendments IV, IX, X, and XIV, 42 USC 1983, and 18 USC 242:

259)  carithers violated Plaintiff's Right to Privacy by touching Plaintiff and sexually assaulting him. All persons have the Right to Privacy of their own body. carithers violated this Right by attempting to impose her own perverse violent sexual agenda upon Plaintiff.

260)  carithers further violated Plaintiff's Right to Privacy by entering into the structure upon, and the curtilage of, the property at 106 West Osborne, without any warrant or lawful authority, and after being told explicitly not to do so, and allowing and assisting mccall and rose to do the same, and photographing the contents inside that structure.

261)  Because, gudes, neal, norris and dusty rhodes acted as accessories and accomplices to carithers, aiding and abetting, or otherwise directing her violations charged in this Count, or failing to charge her therefor, they are therefor liable as principals in this Count for those violations.

262)  Because carithers, neal, norris, gudes and dusty rhodes all acted per policy set by castor, and by custom allowed by her, castor and The Municipal Corporation of Tampa are

28

liable as respondeat superior for the violations by carithers, gudes, neal, norris and dusty rhodes charged in this Count.

263) The defendants charged in this Count are additionally liable for their conduct as claimed in Paragraphs 180 – 234, supra. Their conduct constituted malice as claimed in Paragraphs 235 – 247, supra, and they acted out of retaliation against Plaintiff, as claimed in Paragraphs 248 – 250, supra.

**Count II**
Conspiracy for Count I, and neglect to prevent the violations charged in Count I, in violation of United States Constitution Amendments IV, IX, X, and XIV, 42 USC 1983, 1985, 1986 and 18 USC 241:

264) All Cause of Action charged in Count I is adopted by reference in this Count, Per FRCP Rule 10(c), as Cause of Action for Conspiracy committed by defendants charged in this Count.

265) Because gudes, neal, and norris and carithers, acted in concert and by mutual decision to commit the violations charged in Count I, and thereby deprive Plaintiff of his Right To Privacy as stated in that Count, their conduct constitutes a conspiracy to deprive Plaintiff of that Right, in violation of 42 USC 1985 (3), and they are liable for damages therefor.

266) Because gudes, neal, and norris did know of the wrongs conspired to be done charged in this Count, and neglected to prevent them, they are liable for damages for that neglect pursuant to 42 USC 1986.

267) Because all defendants charged in this Count did act by policy set by castor, and custom allowed by her, castor and The Municipal Corporation of Tampa are liable as

1  respondeat superior for the damages caused by the conduct of carithers, gudes, neal and norris, charged in this Count.

## Count III

Violation of Plaintiff's Right to Property by in violation of United States Constitution Amendments IV, V, IX, X, and XIV, and 42 USC 1983, 18 USC 242:

268)  carithers violated Plaintiff's Right to Property by trespassing upon the curtilage of the real property located at 106 West Osborne, and trespassing into the structure thereupon, in violation of FRS Chapter 810. carithers had no permission whatsoever to do so, and was told explicitly not to do so. She further aided and abetted mccall in doing the same. She had no warrant, and no crime was accused nor committed inside the structure, nor any where upon the property. A Man's Home is his Castle, and she had no legitimate nor lawful purpose to enter thereupon. Further, all losses to Plaintiff and his business, whether of Time, Money, Economic Opportunity, or Employment constitute loss of property, and carithers' conduct caused Plaintiff to be deprived of such property irretrievably and irreparably, as claimed supra. Plaintiff is further being deprived of his personal property that was in the motor vehicle that was taken from him, and was deprived of the use of that motor vehicle itself. Plaintiff ultimately had to remove himself from the Real Property located at 106 West Osborne to prevent further harassment by mccall, and abuse of a no-contact order by mccall that was a product of carithers' conduct. mccall ultimately illegally took the real property located at 106 West Osborne from Plaintiff because of carithers' conduct, and stole personal property therefrom because of carithers conduct, as claimed herein, and but for carithers conduct, mccall would not have been able to do so.

269)  Because gudes, neal, norris, dusty rhodes, danny rhodes and filippone acted as accessories and accomplices aiding and abetted carithers with the violations of Plaintiff's

28  Right to Property charged in this Count, or by failing to intervene to prevent them, they are

1

therefor liable as principals for those violations.

270) Because all defendants charged in this Count did act by policy set by castor, and custom allowed by her, and because the Tampa police latent crime unit took no action upon report of mccall's subsequent trespass upon and theft of Plaintiff's property, castor and the Municipal Corporation of Tampa are liable as respondeat superior for damages caused by defendants charged in this Count.

271) The defendants charged in this Count are additionally liable for their conduct as claimed in Paragraphs 180 – 234, supra. Their conduct constituted malice as claimed in Paragraphs 235 – 247, supra, and they acted out of retaliation against Plaintiff, as claimed in Paragraphs 248 – 250, supra.

**Count IV**

Conspiracy for Count III, and neglect to prevent the violations charged in Count III, in violation of United States Constitution Amendments IV, IX, X, XIV, 42 USC 1983, 1985, 1986 and 18 USC 241:

272) All Cause of Action charged in Count III is adopted by reference in this Count, Per FRCP Rule 10(c), as Cause of Action against Conspiracy committed by defendants charged in this Count.

273) Because carithers, gudes, neal and norris did act in concert and by mutual decision to violate Plaintiff's Rights as charged in Count III, their conduct constitutes a conspiracy to deprive Plaintiff of his Right to Property as claimed in Count III, and in violation of 42 USC 1985 (3), and they are liable for damages therefor.

28

274) Because gudes, neal, and norris did know of the wrongs conspired to be done, charged

1 in this Count, and did neglect to prevent those wrongs, they are liable for the damages suffered by Plaintiff because of that conspiracy, pursuant to 42 USC 1986.

275) Because all defendants charged in this Count did act by policy set by castor, and custom allowed by her, and because castor did direct them to act as such, castor and the Municipal Corporation of Tampa are liable as respondeat superior for the damages caused by defendants charged in this Count.

**Count V**

Violation of Plaintiff's Right To Be Free From Unlawful Search in violation of United States Constitution Amendments IV, IX, X, and XIV, 42 USC 1983, and 18 USC 242:

276) carithers violated Plaintiff's Right to be free from unlawful search by entering into the structure upon 106 West Osborne, with mccall and photographing the interior, as stated supra. She had no warrant, and no crime was alleged nor committed inside the structure. Further she also searched the rental vehicle that Plaintiff was driving. That vehicle was parked lawfully across the street from 106 West Osborne, was sealed and closed, and could be, and was ultimately retrieved by the car rental company and was their property, and Plaintiff was the lawful lessee and possessor thereof. But for carithers' unlawful search of that vehicle, in violation of Amendment IV of the United States Constitution, and TPD SOP 821.IV(B)(1), 821.VII(A)(4) and VII(B), and 821.VIII(A)(4) et. seq., Plaintiff could not have been charged with violating FRS § 893.13(6)(b), (Possession of Cannabis), and would not be prosecuted therefor. Because of that charge appearing in "background checks", Plaintiff has been denied employment multiple times. That charge is or will be dismissed in State Court during the pendency of this action, because the evidence therefor was obtained from carithers violating Plaintiff's Right to be free from unlawful search and seizure, as charged in this Count.

28

1

277) Because gudes, neal, and norris acted as accessories and accomplices to carithers violating Plaintiff's Rights as charged in this Count, aiding and abetting those violations and refusing to intervene, they are therefor liable for damages as principals for those violations.

278) Because carithers, neal, norris, and gudes all acted per policy set by castor, and by custom allowed by her, castor and The Municipal Corporation of Tampa are liable as respondeat superior for the violations by carithers, gudes, neal, and norris.

279) The defendants charged in this Count are additionally liable for their conduct as claimed in Paragraphs 180 – 234, supra. Their conduct constituted malice as claimed in Paragraphs 235 – 247, supra, and they acted out of retaliation against Plaintiff, as claimed in Paragraphs 248 – 250 supra.

**Count VI**

Conspiracy for Count V, and neglect to prevent the violations charged in Count V, in violation of United States Constitution Amendments IV, IX, X, XIV, 42 USC 1983, 1985, 1986 and 18 USC 241:

280) All Cause of Action charged in Count V is adopted by reference in this Count, Per FRCP Rule 10(c), as Cause of Action against Conspiracy committed by defendants charged in this Count.

281) Because carithers, gudes, neal and norris did act in concert and by mutual decision to violate Plaintiff's Rights as charged in Count V, their conduct constitutes a conspiracy to deprive Plaintiff of his Right to Be Free from unlawful search as claimed in Count V, and in violation of 42 USC 1985 (3), and they are liable for damages therefor.

28

282) Because gudes, neal, and norris did know of the wrongs conspired to be done, charged

1

in this Count, and did neglect to prevent those wrongs, they are liable for the damages suffered by Plaintiff because of that conspiracy, pursuant to 42 USC 1986.

283) Because all defendants charged in this Count did act by policy set by castor, and custom allowed by her, and because castor did direct them to act as such, castor and the Municipal Corporation of Tampa are liable as respondeat superior for the damages caused by defendants charged in this Count.

**Count VII**

Violation of Plaintiff's Right to be Free From Unlawful Seizure by carithers, in violation of United States Constitution Amendments IV, IX, X, and XIV, 42 USC 1983, and 18 USC 242:

284) carithers violated Plaintiff's Right to be free from unlawful seizure by 1) unlawfully imprisoning Plaintiff and keeping him imprisoned in the back of a police car for close to two hours for the purposes of and as a ploy or pretext for obtaining probable cause to charge Plaintiff when there was none, and for the purpose of her and the other officers deliberately attempting to make a sadistic display of their hallucinations of "dominance", self-importance, and "showing authority", (that they do not have), for the purpose of a continued pattern of trying to convince the Public that they are "in charge" in this Country, (when they are not in actually charge of *anything*), and to attempt to convince the Public that they can conduct themselves in Public Service, and to the Public as such, and; 2) by unlawfully seizing, and continuing to maintain possession of Plaintiff's property as described in Paragraphs 47 and 108, supra, and; 3) causing Plaintiff to be imprisoned in the Hillsborough County Jail on criminal charges for crimes he did not commit, was falsely accused of, and for which there was no probable cause whatsoever to charge Plaintiff with.

28

285) carithers' conduct constitutes unlawful seizure and unlawful imprisonment because

I    carithers had no warrant to take Plaintiff's personal property, and upon arresting Plaintiff refused to bring Plaintiff before a Judge immediately, but instead kept him unlawfully imprisoned in violation of FRS § 787.02, during which time Plaintiff suffered physical injury as described supra, and because Plaintiff was unlawfully imprisoned in the back of a police car from the beginning of the encounter with carithers, and for close to two hours thereafter when there was no probable cause at or during that time to do so, and because Plaintiff was unlawfully imprisoned as such for the purposes of obtaining probable cause to arrest Plaintiff, or while carithers and the other officers present sought to obtain probable cause to arrest Plaintiff, as described supra, and because based on the Totality of Circumstances, there was no probable cause nor arguable cause whatsoever to detain, arrest nor charge Plaintiff with any of the charges that were reported by mccall nor rose, nor did result from the encounter carithers and the other officers.

286)  Because gudes, neal, and norris acted as accessories and accomplices to carithers violating Plaintiff's Rights as charged in this Count, aiding and abetting those violations and refusing to intervene, they are therefor liable for damages as principals for those violations.

287)  Because carithers, neal, norris, and gudes all acted per policy set by castor, and by custom allowed by her, castor and The Municipal Corporation of Tampa are liable as respondeat superior for the violations by carithers, gudes, neal, and norris.

288)  The defendants charged in this Count are additionally liable for their conduct as claimed in Paragraphs 180 – 234, supra. Their conduct constituted malice as claimed in Paragraphs 235 – 247, supra, and they acted out of retaliation against Plaintiff, as claimed in Paragraphs 248 – 250 supra.

28